1
2
3
4
5
6
7          UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF WASHINGTON
8                  SEATTLE DIVISION

9    REPLY S.P.A.,                    )
                                      )
10                      Plaintiff,    )
                                      )     Civil Action No. _____
11         v.                         )
                                      )     **VERIFIED COMPLAINT**
12   SENSORIA INC.; AND SENSORIA      )
     HOLDINGS LTD., DR. DAVIDE VIGANÒ,)     **JURY TRIAL DEMANDED**
13   AND MAURIZIO MACAGNO,            )
                                      )
14                      Defendants.   )
                                      )
15   _____)

16                        <u>**VERIFIED COMPLAINT**</u>

17         Plaintiff Reply S.p.A. ("Reply" or "Plaintiff"), by and through its attorneys, Bryan Cave

18   Leighton Paisner LLP, as and for its Complaint against Defendants Sensoria Inc. ("Sensoria"),

19   Sensoria Holdings Ltd ("Sensoria Holdings"), Dr. Davide Viganò ("Viganò") and Maurizio

20   Macagno ("Macagno," and together with Viganò, the "Director Defendants"), hereby alleges as

21   follows:

22                          <u>**THE PARTIES**</u>

23         1.      Plaintiff Reply is an Italian corporation with its principal place of business at

24   Corso Francia, 110, Turin, TO 10143, Italy.  Plaintiff Reply provides consulting, system

25   integration, application management, and business process outsourcing services in Italy and

26   internationally.

27

VERIFIED COMPLAINT - 1
Civil Action No.

132392.0001/7617886.1

2.      Defendant Sensoria is a corporation with citizenship in the State of Delaware and a principal place of business at 16225 Northeast 87th Street, Suite A-10, Redmond, Washington 98052.  Defendant Sensoria designs, develops, and produces body-sensing wearable devices.

3.      Defendant Sensoria Holdings is a limited liability company with citizenship in Delaware and principal place of business at 1468 James Road, Gardnerville, Nevada 89460. Upon information and belief, Defendant Sensoria Holdings has four partners: Viganò; Macagno; Andrea Silvestrini, an individual residing, upon information and belief, at 12902 NE 87th Street, Kirkland, Washington 98033, with citizenship in the State of Washington; and Davide Mauri, an individual residing, upon information and belief, at 15829 NE 113th Court, Redmond, Washington 98052, with citizenship in the State of Washington.

4.      Defendant Viganò is an individual residing at 16203 NE 43rd Court, Redmond, Washington 98052, with citizenship in the State of Washington.

5.      Defendant Macagno is an individual residing at 13521 173rd Place NE, Redmond, Washington 98052, with citizenship in the State of Washington.

**JURISDICTION AND VENUE**

6.      This Court has jurisdiction over this matter and these parties pursuant to 28 U.S.C. § 1332(a) as the amount in controversy exceeds $75,000.00, and there is diversity among the parties, because Plaintiff is a citizen of Italy, Defendant Sensoria is a citizen of Delaware and Washington, Defendant Sensoria Holdings is a citizen of Delaware, Washington and Nevada, and the Director Defendants are citizens of Washington.

7.      Venue is proper pursuant to 28 U.S.C. § 1391, because (i) Defendant Sensoria and the Director Defendants reside within this judicial district, and (ii) a substantial part of the transactions giving rise to Plaintiff's claims occurred in this division of this judicial district.

**GENERAL ALLEGATIONS**

8.      Defendant Sensoria was incorporated on or around June 17, 2014.

9.      On or around July 18, 2014, Plaintiff Reply purchased 6,843,100 Series A Shares of Defendant Sensoria, pursuant to that certain Sensoria Inc. Series Preferred Stock Purchase

VERIFIED COMPLAINT - 2
Civil Action No.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

132392.0001/7617886.1

Agreement (the "Purchase Agreement"). A true and correct copy of the Purchase Agreement is attached hereto as **Exhibit A**.

10. At all relevant times, Plaintiff Reply is and was the majority shareholder of Defendant Sensoria.

**Plaintiff Reply Loans Money to Defendant Sensoria**

11. On or around March 2, 2016, Plaintiff Reply and Defendant Sensoria entered into that certain Infragroup Financing Contract (the "March Loan Agreement"). A true and correct copy of the March Loan Agreement is incorporated herein by reference and attached hereto as **Exhibit B**.

12. Upon information and belief, Defendant Viganò, on behalf of Defendant Sensoria, executed the March Loan Agreement in the State of Washington.

13. Pursuant to the March Loan Agreement, Plaintiff Reply made a short-term loan to Defendant Sensoria in the sum of 230.000,00€ (EUR). See Exhibit B at ¶2.1.

14. On or around October 18, 2016, Plaintiff Reply and Defendant Sensoria entered into that certain Infragroup Financing Contract (the "October Loan Agreement"). A true and correct copy of the October Loan Agreement is incorporated herein by reference and attached hereto as **Exhibit C**.

15. Upon information and belief, Defendant Viganò, on behalf of Defendant Sensoria, executed the October Loan Agreement in the State of Washington.

16. Under the October Loan Agreement, Plaintiff Reply made a short-term loan to Defendant Sensoria in the amount of 1.000.000,00€ (EUR). See Exhibit B at ¶2.1.

17. On May 26, 2017, the October Loan Agreement was amended by letter (the "May Letter") to alter the short-term loan amount from 1.000.000,00€ (EUR) to $1,075,000.00 (USD). A true and correct copy of the May Letter is incorporated herein by reference and attached hereto as **Exhibit D**.

18. Pursuant to the March Loan Agreement and the October Loan Agreement as amended by the May Letter (the "Loan Agreements"), interest on the loan accrued "on a daily

VERIFIED COMPLAINT - 3
Civil Action No.

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

132392.0001/7617886.1

1  basis at a rate of annual return equivalent to the three-months EURIBOR rate in force on the date

2  of calculation of interest raised by 3% spread." See Exhibits B and C at ¶4.1.

3      19.    Pursuant to the Loan Agreements, Defendant Sensoria agreed that, upon Plaintiff

4  REPLY's demand, the loan was to be "repaid in its entirety (including interest accrued and unpaid

5  . . . with prior written notice to be sent to [Defendant Sensoria] . . . ." See Exhibits B and C, ¶5.1.

6      20.    On August 14, 2017, Plaintiff Reply sent Defendant Sensoria a notice of default

7  and demand for payment (the "First Demand Letter") of the outstanding loan within 30 days of

8  receipt of the First Demand Letter.  A true and correct copy of the First Demand Letter is

9  incorporated herein by reference and attached hereto as **Exhibit E**.

10      21.    On August 10, 2018, Plaintiff Reply sent Defendant Sensoria a second notice of

11  default and demand for payment (the "Second Demand Letter") demanding full payment of the

12  loan plus interest.  A true and correct copy of the Second Demand Letter is incorporated herein

13  by reference and attached hereto as **Exhibit F**.

14      22.    Defendant Sensoria owes Plaintiff Reply a total of 230.000,00€ (EUR) and

15  $1,075,000.00 (USD) (collectively, the "Loan Amount"), exclusive of interest, costs and fees,

16  pursuant to the Loan Agreements.

17      23.    Defendant Sensoria failed or refused to repay Plaintiff Reply the outstanding Loan

18  Amount pursuant to the Loan Agreements.

19      24.    Plaintiff Reply performed all of its obligations by providing the Loan Amount

20  pursuant to the Loan Agreements.

21      25.    As of the date of the filing of this Complaint, Plaintiff Reply has not received

22  payment from Defendant Sensoria for the Loan Amount.

23      **Transfer of Defendant Sensoria's Assets**

24      26.    On or around July 31, 2017, Defendant Macagno, on behalf of Defendant

25  Sensoria, entered into that certain Sensoria IP Licensing Agreement (the "Licensing Agreement")

26  with Viganò, on behalf of Sensoria Holdings.  A true and correct copy of the Licensing

27  Agreement is incorporated herein by reference and attached hereto as **Exhibit G**.

VERIFIED COMPLAINT - 4
Civil Action No.

**LANE POWELL** pc
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

132392.0001/7617886.1

27.  Defendant Viganò is an officer and board member of Defendant Sensoria.

28.  Defendant Viganò is the managing partner of Defendant Sensoria Holdings.

29.  Defendant Macagno is an officer and board member of Defendant Sensoria.

30.  Defendant Macagno is a partner of Defendant Sensoria Holdings.

31.  Defendant Sensoria's sole real asset was its "Authored Work and intellectual property" (the "Asset").

32.  Upon information and belief, the value of the Asset in 2014 was approximately $20,000,000.00 (USD).

33.  Under the Licensing Agreement, Defendant Sensoria granted Defendant Sensoria Holdings an exclusive, irrevocable, worldwide, perpetual, transferable license to all of Defendant Sensoria's "Authored Work and intellectual property" (the "Asset Transfer").  See Exhibit G.

34.  Defendant Sensoria Holdings paid Defendant Sensoria $247,000.00 (USD) for licensing rights in connection with the Asset Transfer.

35.  Defendant Sensoria Holdings in turn transferred the "Authored Work and intellectual property" to Sensoria Health, Inc., who is using it for commercial purposes.

36.  According to Defendant Sensoria's Amended and Restated Certification of Incorporation, an asset transfer "shall be deemed to be a liquidation of the [Defendant Sensoria], unless the holders of at least a majority of the outstanding Series Preferred . . . elect otherwise by written notice given to [Defendant Sensoria] at least five (5) days prior to the effective date of any such . . . Asset Transfer."  See Amended and Restated Certificate of Incorporation of Sensoria Inc. ("Certificate of Incorporation"), Art. IV, §4(a), a true and correct copy of which is incorporated herein and attached hereto as **Exhibit H**.

37.  An asset transfer shall mean "a sale, lease, transfer or other disposition of all or substantially all of the assets of Defendant Sensoria or the sale, exclusive license, conveyance, exchange or other transfer of all or substantially all of the intellectual property of [Defendant Sensoria]." See Exhibit H, Art. IV, §4(b).

VERIFIED COMPLAINT - 5
Civil Action No.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

132392.0001/7617886.1

38.     Pursuant to the Purchase Agreement, Defendant Sensoria "will not, without Board approval, which approval must include the affirmative vote of the Series A Designee" engage in ". . . selling, assigning, licensing, pledging or encumbering material technology or intellectual property." See Exhibit A at p. 16, ¶3.7(b)(9).

39.     The Series A Designee did not affirmatively vote to execute the Licensing Agreement.

40.     Upon information and belief, the Director Defendants knew that the Series A Designee would not agree to the Asset Transfer if presented with the opportunity to vote as contemplated by Certificate of Incorporation and the Purchase Agreement.

41.     At the time of the Asset Transfer, Plaintiff Reply did not have any representation on Defendant Sensoria's board of directors.

### Demand Futility

42.     At all relevant times herein, the Director Defendants comprised two thirds of Defendant Sensoria's board of directors.

43.     The Director Defendants breached their contractual obligations and the fiduciary duties that they owed to Defendant Sensoria and its shareholders by improperly authorizing and facilitating the fraudulent transfer of assets consisting of Defendant Sensoria's "Authored Work and intellectual property" to Defendant Sensoria Holdings in exchange for $247,000.00 (USD).

44.     A majority of Defendant Sensoria's board of directors could not exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because the members of the board of directors are personally interested in the outcome.

45.     The Asset Transfer constitutes a liquidation event under Defendant Sensoria's Certificate of Incorporation and is not a valid exercise of business judgment.

46.     Demand was not made in this case because demand is excused by virtue of the Director Defendants conflict of interest in effectuating the Asset Transfer.

VERIFIED COMPLAINT - 6
Civil Action No.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

132392.0001/7617886.1

47. The action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

48. Plaintiff Reply will adequately and fairly represent the interests of Defendant Sensoria in enforcing and prosecuting its rights.

## COUNT I
## BREACH OF CONTRACT – DEFENDANT SENSORIA

49. Plaintiff Reply incorporates and re-alleges each and every one of the allegations set forth in paragraphs 1 through 48 above as though fully set forth herein.

50. In 2016, Defendant Sensoria entered into the Loan Agreements with Plaintiff Reply, wherein Plaintiff Reply agreed to loan Defendant Sensoria the Loan Amount and Defendant Sensoria agreed to repay the Loan Amount plus applicable interest.

51. Plaintiff Reply loaned Defendant Sensoria the Loan Amount.

52. On or around August 14, 2017, Plaintiff Reply sent the First Demand Letter to Defendant Sensoria. See Exhibit E.

53. On or around August 6, 2018, Plaintiff Reply sent the Second Demand Letter to Defendant Sensoria. See Exhibit F.

54. Defendant Sensoria failed or refused to repay the outstanding Loan Amount plus interest.

55. By refusing to pay the Loan Amount, Defendant Sensoria materially breached the Loan Agreements.

56. Plaintiff Reply fully performed its obligations by providing the Loan Amount to Defendant Sensoria pursuant to the Loan Agreements.

57. As a result of Defendant Sensoria's breach of its obligations under the Loan Agreements, Plaintiff Reply suffered damages in that it loaned the Loan Amount to Defendant Sensoria, which has not been repaid.

VERIFIED COMPLAINT - 7
Civil Action No.

132392.0001/7617886.1

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

58.     Defendant Sensoria's conduct described above constitutes a breach of the Loan Agreements for which Defendant Sensoria is liable to Plaintiff Reply in the amount no less than 230.000,00€ (EUR) and $1,075,000.00 (USD), plus accrued interest.

**COUNT II**
**BREACH OF CONTRACT – DEFENDANT SENSORIA**

59.     Plaintiff Reply incorporates and re-alleges each and every one of the allegations set forth in paragraphs 1 through 48 above as though fully set forth herein.

60.     Defendant Sensoria entered into the Purchase Agreement with Plaintiff Reply, wherein Plaintiff Reply agreed to purchase Series A Shares from Defendant Sensoria.

61.     Through the Licensing Agreement, Defendant Sensoria transferred all of its intellectual property to Defendant Sensoria Holdings.

62.     The Series A Designee did not affirmatively vote to approve or deny the Licensing Agreement.

63.     By failing to obtain the affirmative vote of the Series A Designee, Defendant Sensoria materially breached the Purchase Agreement.

64.     Plaintiff Reply fully performed its obligations under the Purchase Agreement by purchasing the Series A shares of Defendant Sensoria.

65.     As a result of Defendant Sensoria's breach of its obligations under the Purchase Agreements, Plaintiff Reply suffered damages in that Defendant Sensoria's license of all of its intellectual property to Defendant Sensoria Holdings decreased the value of Defendant Sensoria's shares.

66.     At the time of the transfer, Defendant Sensoria's intellectual property was its main source of income.

**COUNT III**
**UNJUST ENRICHMENT – Defendant Sensoria**
**(In the alternative to Counts I and II)**

67.     Plaintiff Reply incorporates and re-alleges each and every one of the allegations set forth in paragraphs 1 through 48 above as though fully set forth herein.

VERIFIED COMPLAINT - 8
Civil Action No.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

132392.0001/7617886.1

1    68.    Plaintiff Reply loaned Defendant Sensoria the Loan Amount.

2    69.    Defendant Sensoria accepted the Loan Amount from Plaintiff Reply.

3    70.    Defendant Sensoria unjustifiably failed to repay the Loan Amount to Plaintiff

4    Reply upon demand.

5    71.    Plaintiff Reply sent the First Demand Letter and the Second Demand Letter to

6    Defendant Sensoria.  See Exhibits E and F.

7    72.    The total amount currently due and owing from Defendant Sensoria for the unpaid

8    Loan Amount is 230.000,00€ (EUR) and $1,075,000.00 (USD), exclusive of interest.

9    73.    It is unjust for Defendant Sensoria to retain the benefits it obtained from Plaintiff

10   Reply.

11   74.    As a result of Defendant Sensoria's unjust enrichment, Plaintiff Reply has been

12   damaged, at a minimum, in the amount of 230.000,00€ (EUR) and $1,075,000.00 (USD),

13   exclusive of interest, fees and costs.

14   **COUNT IV**
**FRAUDULENT TRANSFER UNDER THE UNIFORM VOIDABLE TRANSACTIONS**
15   **ACT, RCW 19.40 – DEFENDANTS SENSORIA & SENSORIA HOLDINGS**

16   75.    Plaintiff Reply incorporates and re-alleges each and every one of the allegations

17   set forth in paragraphs 1 through 48 above as though fully set forth herein.

18   76.    On July 31, 2017, Defendant Sensoria transferred all of its intellectual property to

19   its holding company, Defendant Sensoria Holdings, in exchange for $247,000.00 (USD).

20   77.    The Asset Transfer occurred less than three months after the May Letter.

21   78.    Defendant Sensoria retained control of the intellectual property after the Asset

22   Transfer.

23   79.    Pursuant to the Loan Amount, Plaintiff Reply had an interest in Defendant

24   Sensoria's intellectual property.

25   80.    At the time of the Asset Transfer, Defendant Sensoria's intellectual property was

26   its main source of income.

27

VERIFIED COMPLAINT - 9
Civil Action No.

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA  98111-9402
206.223.7000  FAX: 206.223.7107

132392.0001/7617886.1

81. The parties underestimated the value of Defendant Sensoria's intellectual property.

82. Defendant Sensoria did not receive reasonably equivalent value for its intellectual property in connection with the Asset Transfer.

83. Before the Asset Transfer on July 31, 2017, Defendant Sensoria was aware of the Loan Amount due and owing to Plaintiff Reply.

84. The Asset Transfer rendered Defendant Sensoria insolvent.

85. Accordingly, the Asset Transfer is voidable and recoverable.

86. Defendant Sensoria refused to repay the Loan Amount to Plaintiff Reply after the Asset Transfer.

87. As a result of the Asset Transfer, Plaintiff Reply has suffered damages in an amount no less than 230.000,00€ (EUR) and $1,075,000.00 (USD), plus accrued interest.

## COUNT V
## BREACH OF FIDUCIARY DUTY – DIRECTOR DEFENDANTS

88. Plaintiff Reply incorporates and re-alleges each and every one of the allegations set forth in paragraphs 1 through 48 above as though fully set forth herein.

89. The Director Defendants owed and continue to owe Defendant Sensoria fiduciary obligations.

90. By reason of their fiduciary relationships, the Director Defendants owed and owe Defendant Sensoria the highest obligations of good faith, fair dealing, loyalty and due care.

91. The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision to Defendant Sensoria.

92. Each of the Director Defendants had actual knowledge that they improperly authorized and fraudulently approved, allowed and facilitated the Asset Transfer.

93. These actions were not a good faith exercise of prudent business judgment to protect and promote Defendant Sensoria's corporate interests.

VERIFIED COMPLAINT - 10
Civil Action No.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

94.     As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, Defendant Sensoria has sustained significant damages and has engaged in fraud and self-dealing.

95.     As a result of the misconduct alleged herein, the Director Defendants are liable to Defendant Sensoria.

**COUNT VI**
**BREACH OF GROSS MISMANAGEMENT – DIRECTOR DEFENDANTS**

96.     Plaintiff Reply incorporates and re-alleges each and every one of the allegations set forth in paragraphs 1 through 48 above as though fully set forth herein.

97.     By their actions alleged herein, the Director Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Defendant Sensoria in a manner consistent with the operations of the corporation.

98.     As a direct and proximate result of the Director Defendants' gross mismanagement and breaches of duty alleged herein, Defendant Sensoria has sustained significant damages.

99.     As a result of the misconduct and breaches of duty alleged herein, the Director Defendants are liable to Defendant Sensoria.

**COUNT VII**
**CORPORATE WASTE – DIRECTOR DEFENDANTS**

100.    Plaintiff Reply incorporates and re-alleges each and every one of the allegations set forth in paragraphs 1 through 48 above as though fully set forth herein.

101.    Defendant Sensoria did not receive adequate consideration in connection with the Asset Transfer.

102.    The Director Defendants acted irrationally and egregiously by facilitating the Asset Transfer.

103.    The Director Defendants failed to exercise proper business judgment in facilitating the Asset Transfer.

VERIFIED COMPLAINT - 11
Civil Action No.

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

104.    By failing to properly consider the interests of Defendant Sensoria and its shareholders by failing to conduct proper supervision, engaging in fraud and self-dealing, the Director Defendants caused Defendant Sensoria to waste valuable corporate assets by improperly authorizing and fraudulently approving, allowing and facilitating the Asset Transfer.

105.    As a result of the waste of corporate assets, the Director Defendants are liable to Defendant Sensoria.

WHEREFORE, Plaintiff Reply S.p.A. respectfully requests that this Honorable Court enter Judgment as follows:

(a)     Award Judgment in favor of Plaintiff Reply and against Defendant Sensoria in connection with Defendant Sensoria's breach of the Loan Agreements in Count I;

(b)     Award Judgment in favor of Plaintiff Reply and against Defendant Sensoria in connection with Defendant Sensoria's breach of its obligations under the Purchase Agreements in Count II;

(c)     In the alternative, award judgment in favor of Plaintiff Reply and against Defendant Sensoria for unjust enrichment in Count III;

(d)     Award Judgment in favor of Plaintiff Reply and against Defendant Sensoria and Defendant Sensoria Holdings in connection with the fraudulent transfer of assets in Count IV, including transfer of the Asset back to Defendant Sensoria;

(e)     Director Defendants violated and breached their fiduciary duties of care in Count V;

(f)     Director Defendants grossly mismanaged Defendant Sensoria in Count VI;

(g)     Director Defendants caused Defendant Sensoria to waste valuable corporate assets in Count VII;

VERIFIED COMPLAINT - 12
Civil Action No.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

132392.0001/7617886.1

(h)      Award Plaintiff Reply no less than 230.000,00€ (EUR) and $1,075,000.00

(USD),plus pre-judgment and post-judgment interest;

(i)      Award such other and further relief as this Court deems just and equitable.

DATED:  March 27, 2019

Respectfully submitted,

PLAINTIFF REPLY S.p.A, Inc.


By:   /s/ Barbara J. Duffy
Barbara J. Duffy
      /s/ Jessica N. Walder
Jessica N. Walder
LANE POWELL PC
1420 5th Avenue, Suite 4200
Seattle, WA 98111
Telephone: (206) 223-7000
Facsimile: (203) 223-7107


Maria Z. Vathis *(pro hac vice to be filed)*
Demetria L. Hamilton *(pro hac vice to be filed)*
BRYAN CAVE LEIGHTON PAISNER LLP
161 North Clark Street, Suite 4300
Chicago, Illinois 60601
Telephone:  (312) 602-5000
Facsimile:  (312) 602-5050

VERIFIED COMPLAINT - 13
Civil Action No.

132392.0001/7617886.1

<u>**VERIFICATION**</u>

I, Daniele Angelucci, of lawful age, being first duly sworn on oath states:

That I am the Director, legal representative and CFO of Reply S.P.A., that I have read the foregoing Verified Complaint and that the allegations contained therein are true to the best of my knowledge and belief, and that I am authorized and duly empowered to sign this Verification on behalf of Plaintiff Reply S.P.A.

I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: _MARCH, 27, 2019_

Name:   <u>Daniele Angelucci</u>
Title:    <u>Director, legal representative and CFO</u>

14

# EXHIBIT

# A

Execution Copy

**SENSORIA INC.**

**SERIES A PREFERRED STOCK PURCHASE AGREEMENT**

This **Series A Preferred Stock Purchase Agreement** (the *"Agreement,"* or the *"Series A Preferred Stock Purchase Agreement"*) is made and entered into as of July 18, 2014 by and among **Sensoria Inc.**, a Delaware corporation (the *"Company"*), and each of those persons and entities, severally and not jointly, whose names are set forth on the Closing Schedule attached hereto as **EXHIBIT A** (which persons and entities are hereinafter collectively referred to as *"Purchasers"* and each individually as a *"Purchaser"*).

**RECITALS**

**Whereas,** effective June 17, 2014, the Company converted its charter from Haepsylon, LLC, a Nevada limited liability company, into Sensoria Inc., a Delaware corporation.

**Whereas,** the Company has authorized the sale and issuance of up to 9,629,513 shares of Series A Preferred Stock (the *"Shares"*);

**Whereas,** Purchaser desires to purchase the Shares on the terms and conditions set forth herein;

**Whereas,** the Company desires to issue and sell the Shares to Purchaser on the terms and conditions set forth herein; and

**Whereas,** the sale of the Shares will occur in up to two (2) closings (i.e., an Initial Closing (as defined below) and a Second Tranche Closing (as defined below)). To the extent there is a Second Tranche Closing, the Purchaser will purchase at such Second Tranche Closing the number of Shares set forth opposite to Purchaser on **EXHIBIT A** hereto.

**AGREEMENT**

**Now, Therefore,** in consideration of the foregoing recitals and the mutual promises, representations, warranties, and covenants hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.  **AGREEMENT TO SELL AND PURCHASE.**

    1.1     **Authorization of Shares.** The Company has authorized (a) the sale and issuance to Purchasers of the Shares and (b) the issuance of such shares of Common Stock to be issued upon conversion of the Shares (the *"Conversion Shares"*). The Shares and the Conversion Shares have the rights, preferences, privileges and restrictions set forth in the Second Amended and Restated Certificate of Incorporation of the Company, in the form attached hereto as **EXHIBIT B** (the *"Restated Charter"*).

1

### 1.2    Sale and Purchase at Initial Closing.

(a)    Subject to the terms and conditions hereof, at the Initial Closing (as hereinafter defined) the Company hereby agrees to issue and sell to Purchaser, and Purchaser agrees to purchase from the Company, the number of Shares of Series A Preferred set forth opposite to Purchaser's name on **EXHIBIT A**, at a purchase price of $0.730663 per share.

(b)    The closing of the initial sale and purchase Shares under this Agreement (the "*Initial Closing*") shall take place at 10:00 a.m. on the date hereof, at the offices of Squire Patton Boggs (US) LLP, 275 Battery Street, 26th Floor, San Francisco, CA 94111 (or remotely via the exchange of electronic documents and signatures) or at such other time or place as the Company and the Purchasers may mutually agree.  The date of the Initial Closing is hereinafter referred to as the "*Initial Closing Date*."  The Initial Closing and the Second Tranche Closing (as defined below), if any, are each referred to as a "*Closing*."  The Initial Closing Date and the Second Tranche Closing Date (as defined below), if any, are each referred to as a "*Closing Date*".

### 1.3    Sale and Purchase at Second Tranche Closing.

(a)    Subject to the terms and conditions of this Section 1.3, the Company shall issue and sell to Purchaser, and Purchaser shall purchase from the Company, at an additional closing following the Initial Closing (the "*Second Tranche Closing*"), the number of Shares of Series A Preferred set forth opposite to Purchaser's name under **EXHIBIT A**, at a per share purchase price of $0.730663 per share and an aggregate purchase price set forth opposite Purchaser's name on **EXHIBIT A**.  The date of the Second Tranche Closing shall be referred to as the "*Second Tranche Closing Date*."

(b)    The Second Tranche Closing shall occur on or before January 5, 2015.

(c)    The Second Tranche Closing shall take place at the offices of Squire Patton Boggs (US) LLP, 275 Battery Street, 26th Floor, San Francisco, CA 94111 (or remotely via the exchange of electronic documents and signatures) at 10:00 a.m. on the Second Tranche Closing Date, or at such other place as the Company and the Purchasers may mutually agree.  At the Second Tranche Closing, (i) all sales shall be made on the terms and conditions set forth in this Agreement, (ii) the representations and warranties of the Company set forth in Section 3 hereof (and the Schedule of Exceptions (as defined below)) shall speak as of the Second Tranche Closing Date and the Company shall update any such disclosure so as to be as of the date of the Second Tranche Closing Date, and (iii) the representations and warranties of the Purchasers at such Closing in Section 4 hereof shall speak as of such Closing.

### 1.4    Issuance of Additional Shares.  The Company agrees that in the event that either (i) Company's cumulative net income for fiscal year 2014-2015 is more negative than a $1,800,609 loss, or (ii) the net income for fiscal year 2016 is less than $1,741,552, the Company will issue to Purchaser that number of shares required to make Purchaser's

2

shareholding interest in the Company be equal to 24% of the fully diluted outstanding capital stock of the Company.

## 2. DELIVERY AND PAYMENT; USE OF PROCEEDS.

**2.1    Delivery and Payment.**  At or immediately after each Closing, subject to the terms and conditions hereof, the Company will deliver to Purchaser one certificate representing the number of Shares purchased at such Closing by Purchaser, registered in the name of Purchaser, against payment of the purchase price therefor by wire transfer made payable to the order of the Company, in accordance with wire instructions as provided by the Company prior to the Closing.

**2.2    Use of Proceeds.**  The proceeds from the sale of Shares hereunder shall be used by the Company for sales and marketing, technology infrastructure, working capital and general corporate purposes.

## 3. REPRESENTATIONS AND WARRANTIES OF THE COMPANY.

Except as set forth on a Schedule of Exceptions (the *"Schedule of Exceptions"*) delivered by the Company to Purchaser, and subject to the terms and conditions of this Agreement, the Company hereby makes the following representations and warranties to Purchaser as of the applicable Closing:

**3.1    Organization, Good Standing and Qualification.**  The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.  The Company has all requisite corporate power and authority to own and operate its properties and assets, to execute and deliver this Agreement and the Investor Rights Agreement in the form attached hereto as **EXHIBIT C** (the *"Investor Rights Agreement"*), the Right of First Refusal and Co-Sale Agreement in the form attached hereto as **EXHIBIT D** (the *"Co-Sale Agreement"*), and the Voting Agreement in the form attached hereto as **EXHIBIT E** (the *"Voting Agreement"*) (collectively, the *"Related Agreements"*), to issue and sell the Shares and the Conversion Shares, and to carry out the provisions of this Agreement, the Related Agreements and the Restated Charter and to carry on its business as presently conducted.  The Company is duly qualified to do business and is in good standing as a foreign corporation in all jurisdictions in which the nature of its activities and of its properties (both owned and leased) makes such qualification necessary, except for those jurisdictions in which failure to do so would not have a Material Adverse Change. *"Material Adverse Change"* means any change, circumstance, effect, event or fact that has a material and adverse effect on the business, assets, financial condition, results of operations or prospects of the Company.

**3.2    Subsidiaries.**  Except as provided in Section 3.2 of the Schedule of Exceptions (each such subsidiary set forth thereon which shall be referred to herein as a *"Subsidiary"* and collectively, as the *"Subsidiaries"*), the Company (i) does not own or control any equity security or other interest of any other corporation, partnership, limited liability company or other business entity, (ii) is not a participant in any joint venture, partnership, limited liability company or similar arrangement, nor (iii) since its inception, has not consolidated or

3

merged with, acquired all or substantially all of the assets of, or acquired the stock of or any interest in any corporation, partnership, limited liability company or other business entity.

**3.3    Capitalization; Voting Rights.**

(a)    The authorized capital stock of the Company, immediately prior to the Closing, consists of (i) 50,000,000 shares of Common Stock, par value $0.001 per share, of which 20,086,000 shares are issued and outstanding, and 4,500,000 shares are reserved under the Sensoria Inc. 2014 Stock Plan, and (ii) 20,000,000 shares of Preferred Stock, par value $0.001 per share, none of which are issued and outstanding.

(b)    Except as set forth in Section 3.3 of the Schedule of Exceptions, there are no outstanding options, warrants, rights (including conversion or preemptive rights and rights of first refusal), or agreements of any kind for the purchase or acquisition from the Company of any of its securities.  Except as may be set forth in this Agreement or the Related Agreements, there are no proxies, voting agreements or similar agreements regarding the voting of the Company's securities.

(c)    All issued and outstanding shares of the Company's Common Stock (i) have been duly authorized and validly issued and are fully paid and nonassessable, (ii) were issued in compliance with all applicable state and federal laws concerning the issuance of securities; and (iii) with respect to common stock only, are subject to a right of first refusal in favor of the Company upon transfer.

(d)    The rights, preferences, privileges and restrictions of the Shares and the Conversion Shares are as stated in the Restated Charter.  The Shares and the Conversion Shares have been duly and validly reserved for issuance. When issued in compliance with the provisions of this Agreement and the Restated Charter, the Shares and the Conversion Shares will be validly issued, fully paid and nonassessable, and will be free of any liens or encumbrances other than (i) liens and encumbrances created by or imposed upon the Purchaser and (ii) any right of first refusal set forth in the Company's Bylaws or in the Related Agreements; provided, however, that the Shares and the Conversion Shares may be subject to restrictions on transfer under state and/or federal securities laws as set forth herein or as otherwise required by such laws at the time a transfer is proposed. The sale of the Shares and the subsequent conversion of the Shares into Conversion Shares are not and will not be subject to any preemptive rights or rights of first refusal that have not been properly waived or complied with.

(e)    Except as disclosed in Section 3.3 of the Schedule of Exceptions, no stock plan, stock purchase, stock option or other agreement or understanding between the Company and any holder of any equity securities or rights to purchase equity securities provides for acceleration or other changes in the vesting provisions or other terms of such agreement or understanding as the result of (i) termination of employment or consulting services (whether actual or constructive); (ii) any merger, consolidated sale of stock or assets, change in control or any other transaction(s) by the Company; or (iii) the occurrence of any other event or combination of events.

4

**3.4    Authorization; Binding Obligations.**  All corporate action on the part of the Company and its Subsidiaries, and each of their officers, directors and stockholders necessary for the authorization of this Agreement and the Related Agreements, the performance of all obligations of the Company hereunder and thereunder at the Closing and the authorization, sale, issuance and delivery of the Shares pursuant hereto and the Conversion Shares pursuant to the Restated Charter has been taken.  The Agreement and the Related Agreements, when executed and delivered, will be valid and binding obligations of the Company enforceable in accordance with their terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights, (b) general principles of equity that restrict the availability of equitable remedies, and (c) to the extent that the enforceability of the indemnification provisions in the Investor Rights Agreement may be limited by applicable laws.

**3.5    Financial Statements.**  The Company has made available to Purchaser the following financial statements of the Company: (a) unaudited balance sheet for twelve months ended on December 31, 2011, 2012, and 2013, and the quarter ended March 31, 2013, respectively, and (b) unaudited statement of income and cash flows for the twelve months ending December 31, 2011, 2013, and 2013, and the quarter ending March 31, 2014, respectively (the "*Statement Date*") (collectively, the "*Financial Statements*").  The Financial Statements have been compiled and reviewed by a Certified Public Accountant and present fairly the financial condition and position of the Company in all material respects as of each applicable Statement Date; provided, however, that the unaudited financial statements are subject to normal recurring year-end audit adjustments (which are not expected to be material either individually or in the aggregate), and do not contain the footnotes required under United States Generally Accepted Accounting Principles.

**3.6    Liabilities.**  Except as described in Section 3.6 of the Schedule of Exceptions, neither the Company nor any of its Subsidiaries have any material liabilities and, to the best of its knowledge, no material contingent liabilities, not disclosed in the Financial Statements, except current liabilities incurred in the ordinary course of business subsequent to the Statement Date which have not been, either in any individual case or in the aggregate, materially adverse.

**3.7    Agreements; Action.**

(a)    Except for agreements explicitly contemplated hereby and for agreements between the Company or any of its Subsidiaries, and the employees of the Company or any of such Subsidiaries with respect to the purchase and sale of the Company's Common Stock, there are no agreements, understandings or proposed transactions between the Company and any of its officers, directors, employees, affiliates or any affiliate thereof.

(b)    Except as set forth on Section 3.7(b) of the Schedule of Exceptions, there are no agreements, understandings, instruments, contracts, proposed transactions, judgments, orders, writs or decrees to which the Company or any of its Subsidiaries is a party or to their knowledge by which either the Company or any its Subsidiaries is bound which may involve (i) future obligations (contingent or otherwise) of, or payments to, the Company or any of its Subsidiaries in excess of $5,000, or (ii) the transfer or license of any

5

patent, copyright, trade secret or other proprietary right to or from the Company or any of its Subsidiaries (other than licenses by the Company or any of its Subsidiaries of *off the shelf* or other standard products), or (iii) provisions restricting the development, manufacture or distribution of the Company's or any of its Subsidiaries' products or services, or (iv) indemnification by the Company or any of its Subsidiaries with respect to infringements of proprietary rights. The Company is not in material breach of or default under any such agreement and, to the Company's knowledge, there is no current claim or threat that the Company is or has been in material breach of or default under any such agreement.

(c)     Except as set forth on Section 3.7(c) of the Schedule of Exceptions, neither the Company nor any of its Subsidiaries have (i) accrued, declared or paid any dividends, or authorized or made any distribution upon or with respect to any class or series of its capital stock, (ii) incurred or guaranteed any indebtedness for money borrowed or any other liabilities (other than trade payables incurred in the ordinary course of business or as disclosed in the Financial Statements) individually in excess of $5,000 or, in the case of indebtedness and/or liabilities individually less than $5,000, in excess of $15,000 in the aggregate, (iii) made any loans or advances to any person, other than ordinary advances for travel expenses, or (iv) sold, exchanged or otherwise disposed of any of their assets or rights, other than the sale of their inventory in the ordinary course of business.

(d)     For the purposes of subsections (b) and (c) above, all indebtedness, liabilities, agreements, understandings, instruments, contracts and proposed transactions involving the same person or entity (including persons or entities the Company or any of its Subsidiaries have reason to believe are affiliated therewith) shall be aggregated for the purpose of meeting the individual minimum dollar amounts of such subsections.

3.8     **Obligations to Related Parties**.  Except as set forth on Section 3.8 of the Schedule of Exceptions, there are no obligations of the Company or of any of its Subsidiaries to officers, directors, stockholders, or employees of the Company or of any such Subsidiaries other than (a) for payment of salary for services rendered, (b) reimbursement for reasonable expenses incurred on behalf of the Company or of any of the Subsidiaries and (c) for other standard employee benefits made generally available to all employees (including stock option agreements outstanding under any stock option plan approved by the Company's Board of Directors (the "*Board*")). Except as otherwise provided in this Agreement and the Related Agreements, none of the officers, directors or, to the best of the Company's knowledge, key employees or stockholders of the Company or of any of its Subsidiaries or any members of their immediate families, is indebted to the Company or to any of its Subsidiaries or has any direct or indirect ownership interest in any firm or corporation with which the Company or any Subsidiary is affiliated or with which the Company has a business relationship, or any firm or corporation that competes with the Company or any of its Subsidiaries, other than (i) passive investments in publicly traded companies (representing less than 1% of such company) which may compete with the Company or its Subsidiaries and (ii) investments by venture capital funds with which directors of the Company may be affiliated and service as a board member of a company in connection therewith due to a person's affiliation with a venture capital fund or similar institutional investor in such company. Except as disclosed in Schedule 3.8, no officer, director or stockholder, or any member of their immediate families, is, directly or indirectly, interested in

6

any material contract with the Company or any of its Subsidiaries (other than such contracts as relate to any such person's ownership of capital stock or other securities of the Company).

**3.9    Changes**. Except as provided in Section 3.9 of the Schedule of Exceptions, since March 31, 2014, there has not been to the Company's knowledge:

(a)    Any change in the assets, liabilities, financial condition, prospects or operations of the Company or any of its Subsidiaries from that reflected in the Financial Statements, other than changes in the ordinary course of business, none of which individually or in the aggregate has had or is reasonably expected to have a Material Adverse Change;

(b)    Any resignation or termination of any officer, key employee or group of employees of the Company or any of its Subsidiaries;

(c)    Any material change, except in the ordinary course of business, in the contingent obligations of the Company or of any of its Subsidiaries by way of guaranty, endorsement, indemnity, warranty or otherwise;

(d)    Any damage, destruction or loss, whether or not covered by insurance, materially and adversely affecting the properties, business or prospects or financial condition of the Company or of any of its Subsidiaries;

(e)    Any waiver by the Company or any of its Subsidiaries of a valuable right or of a material debt owed to it;

(f)    Any material change in any compensation arrangement or agreement with any employee, officer, director or stockholder of the Company or any of its Subsidiaries;

(g)    Any labor organization activity related to the Company or to any of its Subsidiaries;

(h)    Any sale, assignment, or exclusive license or transfer of any patents, trademarks, copyrights, trade secrets or other intangible assets of the Company or any of its Subsidiaries;

(i)    Any change in any material agreement to which the Company or any of its Subsidiaries is a party or by which it is bound which materially and adversely affects the business, assets, liabilities, financial condition, operations or prospects of the Company or any of its Subsidiaries;

(j)    Any other event or condition of any character that, either individually or cumulatively, has materially and adversely affected the business, assets, liabilities, financial condition or operations of the Company or any of its Subsidiaries; or

(k)    Any arrangement or commitment by the Company or any of its Subsidiaries to do any of the acts described in subsection (a) through (j) above.

7

**3.10    Title to Properties and Assets; Liens, Etc.**  The Company and each of its Subsidiaries has good and marketable title to its properties and assets and good title to its leasehold estates, in each case subject to no mortgage, pledge, lien, lease, encumbrance or charge, other than (a) those resulting from taxes which have not yet become delinquent, (b) minor liens and encumbrances which do not materially detract from the value of the property subject thereto or materially impair the operations of the Company or any of its Subsidiaries, and (c) those that have otherwise arisen in the ordinary course of business.  The Company and each of its Subsidiaries own, or hold a lease in the Company's or such Subsidiary's name, as applicable, for all of the facilities, machinery, equipment, fixtures, vehicles and other properties and assets necessary for the conduct of the Company's and each Subsidiary's business, as the case may be, as now being conducted by it or as proposed to be conducted.  All facilities, machinery, equipment, fixtures, vehicles and other properties owned, leased or used by the Company and by each of its Subsidiaries are in good operating condition and repair and are reasonably fit and usable for the purposes for which they are being used.

**3.11    Intellectual Property.**

(a)    The Company and each of its Subsidiaries own or possess valid rights to use, sell and/or license, free and clear of liens, all Group Intellectual Property as necessary to operate the businesses of the Company and of its Subsidiaries as presently conducted.  The Company and its Subsidiaries own or possess valid rights to use, all software and other Technology used in the conduct of their businesses and operations as presently conducted (the "**Group Technology**").  The Group Owned Intellectual Property is valid, subsisting, and enforceable.  To the Company's knowledge, the Company's and its Subsidiaries' businesses as presently conducted and as presently proposed to be conducted, including but not limited to the products and services marketed or sold (or proposed to be marketed or sold) by them, do not and will not violate, infringe, misappropriate or dilute any rights of any third party.  As of the date hereof, neither the Company nor any of its Subsidiaries is the subject of any pending or, to the their respective knowledge, threatened actions which involve a claim of infringement, unauthorized use, misappropriation, dilution or violation by any Person against any of them or challenging the ownership, use, validity or enforceability of any Group Owned Intellectual Property.  Neither the Company nor any of its Subsidiaries has received any communications or threats alleging that they have violated or, by conducting their businesses, would violate any of the patents, trademarks, service marks, tradenames, copyrights, trade secrets, mask works or other proprietary rights or processes of any other Person.  Neither the Company nor any of its Subsidiaries has brought any actions or asserted any claims against any Person for infringing or misappropriating any Group Technology or any Group Owned Intellectual Property, nor, to the knowledge of the Company or any such Subsidiary, is there any basis for any such action.

(b)    The Company and each of its Subsidiaries, respectively, have taken commercially reasonable measures to protect the confidentiality of all trade secrets and any other non-public proprietary information owned by each of them.  To the Company's knowledge, it will not be necessary to the Company's or its Subsidiaries' businesses as presently conducted or as presently proposed to be conducted to use any inventions owned by any of their respective employees or consultants (or persons it currently intends to hire).  Except as disclosed in Section 3.11(b) of the Schedule of Exceptions, the Company and each of its Subsidiaries have executed

8

valid written agreements with all of their respective past and present employees and consultants who have contributed to the development of Group Owned Intellectual Property, as the case may be, pursuant to which such persons have assigned to the Company or its Subsidiaries, as respectively applicable, all their rights in and to all Group Technology and Intellectual Property they may develop in the course of their employment or engagement, as respectively applicable, and agreed to hold all trade secrets and confidential information of the Company and its Subsidiaries in confidence both during and after their employment or engagement, as respectively applicable.

(c)     Section 3.11(c) of the Schedule of Exceptions is an accurate and complete list of all registered and pending applications for registration of Group Intellectual Property and is a complete and accurate list of (i) all software that is owned by the Company and its Subsidiaries, and (ii) all material Software that is used by the Company or its Subsidiaries that is not exclusively owned by them, excluding Software available on reasonable terms through commercial distributors or in consumer retail stores for a license fee of no more than $15,000. There are no agreements between the Company or any of its Subsidiaries and any third party relating to any Group Intellectual Property, or any Group Technology, under which there is or, to the Company's knowledge, is expected to be, any default or any dispute regarding the scope or performance of such agreement.

(d)     The information technology systems of the Company and of each of its Subsidiaries, including the relevant software and hardware, are adequate for their businesses as presently conducted. The information technology systems of the Company and of each of its Subsidiaries have not suffered any material failure within the past two years. The Company and each of its Subsidiaries have implemented technology and polices designed to ensure that their respective information technology systems are reasonably secure against intrusion. To the knowledge of the Company, neither the Company nor any of its Subsidiaries has suffered any security breaches within the past two years that have resulted in a third party obtaining access to any of their confidential information or that of any third party. The Company and each of its Subsidiaries are in compliance with any posted company privacy policies and any laws or regulations relating to personally identifiable information.

(e)     The Company is not aware that any of its employees or any employees of any of its Subsidiaries are obligated under any contract (including licenses, covenants or commitments of any nature) or other agreement, or subject to any judgment, decree or order of any court or administrative agency, that would interfere with their duties to the Company or to each such Subsidiary, as the case may be, or that would conflict with the businesses of the Company and of each of its Subsidiaries as proposed to be conducted. No former and current employee, officer or consultant of the Company or of any of its Subsidiaries has (i) excluded works or inventions made prior to his or her employment with the Company or with any of its Subsidiaries from his or her assignment of inventions pursuant to such employee, officer or consultant's proprietary information and inventions agreement or confirmatory assignment of intellectual property, as respectively applicable, or (ii) failed to affirmatively indicate in such proprietary information and inventions agreement or confirmatory assignment of intellectual property, as respectively applicable, that no such works or inventions made prior to his or her employment with the Company or with each of its Subsidiaries exist. The Company does not believe it is or will be necessary to utilize any inventions, trade secrets or proprietary

9

information of any of the employees or consultants of any of its Subsidiaries made prior to their employment by the Company or by such Subsidiary or Subsidiaries, except for inventions, trade secrets or proprietary information that have already been assigned to the Company or its Subsidiaries, as the case may be.

(f)   Neither the Company nor any of its Subsidiaries is subject to any *"open source"* or *"copyleft"* obligations or is otherwise required to make any public disclosure or general availability of source code either used or developed by either of them. Neither the Company nor any of its Subsidiaries, their respective products, nor any software or technology developed by or for any of them is subject to any obligation or condition that would require that any of their products or any other software or technology developed by or for them (i) be disclosed or distributed in source code form; (ii) be licensed for the purpose of making derivative works; or (iii) be redistributable at no charge.

For purposes of this Section 3.11:

*"Group Intellectual Property"* means all Intellectual Property necessary to the conduct of the Company's business and of each of the Subsidiaries' businesses, as now conducted and as presently proposed to be conducted.

*"Group Owned Intellectual Property"* means any Intellectual Property owned by the Company or by any of its Subsidiaries.

*"Intellectual Property"* means any and all rights available (including with respect to Group Technology) under patent, copyright, trade secret or trademark law or any other similar statutory provision or common law doctrine in the United States or anywhere else in the world, and also domain names, to the Company or to any of its Subsidiaries.

*"Technology"* means, collectively, designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, results of research and development, software, tools, data, inventions, apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and any other embodiments of the above, in any form whether or not specifically listed herein, and all related technology, that are used, incorporated or embodied in or displayed by any of the foregoing or used in the design, development, reproduction, sale, marketing, maintenance or modification of any of the foregoing.

**3.12   Compliance with Other Instruments**. Neither the Company nor any of its Subsidiaries is in violation or default of any term of its charter documents, each as amended, or of any provision of any mortgage, indenture, contract, lease, agreement, instrument or contract to which it is party or by which it is bound or of any judgment, decree, order or writ.  The execution, delivery, and performance of and compliance with this Agreement, and the Related Agreements, and the issuance and sale of the Shares pursuant hereto and of the Conversion Shares pursuant to the Restated Charter, will not, with or without the passage of time or giving of notice, result in any such material violation, or be in conflict with or constitute a material default under any such term or provision, or result in the creation of any mortgage, pledge, lien, encumbrance or charge upon any of the properties or assets of the Company or any of its

10

Subsidiaries or the suspension, revocation, impairment, forfeiture or nonrenewal of any permit, license, clearance, authorization or approval applicable to the Company or any of its Subsidiaries, their businesses or operations or any of their assets or properties. To its knowledge, the Company and each of its Subsidiaries has avoided every condition, and has not performed any act, the occurrence of which would result in a loss by the Company or any of its Subsidiaries of any material right granted under any license, distribution agreement or other agreement required to be disclosed on the Schedule of Exceptions.

      3.13   **Litigation.**  There is no action, suit, proceeding or investigation pending or, to the Company's knowledge, currently threatened against the Company or any of its Subsidiaries that would reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Change, financially or otherwise, or any change in the current equity ownership of the Company or any of its Subsidiaries or that questions the validity of this Agreement or the Related Agreements or the right of the Company or its Subsidiaries to enter into any of such agreements, or to consummate the transactions contemplated hereby or thereby, nor is the Company or any of its Subsidiaries aware that there is any basis for any of the foregoing. The foregoing includes, without limitation, actions pending or, to the Company's knowledge, threatened in writing or any basis therefor known by the Company involving the prior employment of any of the Company's or any of its Subsidiary's employees, their use in connection with the Company's business of any information or techniques allegedly proprietary to any of their former employers, or their obligations under any agreements with prior employers. Neither the Company nor any of its Subsidiaries is a party or to its knowledge subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality. There is no action, suit, proceeding or investigation by the Company or any of its Subsidiaries currently pending or which the Company or any of its Subsidiaries intends to initiate.

      3.14   **Tax Returns and Payments.**

      (a)   Each of the Company Returns (i) has been or will be filed on or before the applicable due date (including any extensions of such due date), and (ii) has been, or will be when filed, prepared in compliance with all applicable legal requirements. All Taxes due and payable on or before the Closing Date have been or will be paid on or before the Closing Date. The Financial Statements fully accrue all actual and contingent liabilities for Taxes of the Company and its Subsidiaries with respect to all periods through the date thereof, in accordance with generally accepted accounting principles. Except as disclosed in the Financial Statements of the Company and its Subsidiaries, or except as disclosed in Section 3.14(a) of the Schedule of Exceptions, the Company and its Subsidiaries have collected or withheld all amounts required to be collected or withheld by each of them for income, social security, unemployment, excise, or any other similar Taxes, and all such amounts have been paid to the appropriate governmental agencies. No Company Return has ever been examined or audited by any taxing authority. No extension or waiver of the limitation period applicable to any of the Company Returns has been granted (by the Company or any other Person), and no such extension or waiver has been requested from the Company or any Subsidiary.

      (b)   No claim or legal proceeding is pending or, to the knowledge of the Company, has been threatened against or with respect to the Company or any Subsidiary in

respect of any Tax. Except as disclosed in the Financial Statements of the Company and of each of its Subsidiaries, there are no unsatisfied liabilities for Taxes (including liabilities for interest, additions to tax and penalties thereon and related expenses) with respect to any notice of deficiency or similar document received by the Company or by any Subsidiary with respect to any Tax. There are no liens for Taxes upon any of the assets of the Company or of any Subsidiary except liens for current Taxes not yet due and payable. No claim has ever been made by any governmental body in a jurisdiction where the Company or any Subsidiary does not file Tax Returns that the Company or such Subsidiary is or may be subject to Taxes assessed by such jurisdiction.

(c)     Neither the Company nor any Subsidiary will be required to include any adjustment in taxable income for any tax period (or portion thereof) (i) pursuant to Section 481 or 263A of the Code (or any comparable provision of state or foreign Tax laws), (ii) pursuant to any "closing agreement," as described in Section 7121 of the Code (or any corresponding provision of state, local or foreign income Tax law), (iii) as a result of any deferred intercompany gain described in Treasury Regulation Sections 1.1502-13 or any excess loss account described in Treasury Regulation Sections 1.1502-19 or 1.1502-32 (or any corresponding or similar provision or administrative rule of federal, state, local or foreign income tax law), (iv) as a result of any prepaid amount received on or prior to the Closing Date, or (iv) as a result of transactions or events occurring, or accounting methods employed, prior to the Closing.

(d)     Neither the Company nor any Subsidiary has been either a "distributing corporation" or a "controlled corporation" in a distribution of stock intended to qualify for tax-free treatment under Section 355 of the Code (i) in the two years prior to the date of this Agreement or (ii) which could otherwise constitute part of a "plan" or "series of related transactions" (within the meaning of Section 355(e) of the Code) in conjunction with the transactions contemplated by this Agreement.

(e)     There is no agreement, plan, arrangement or other contract covering any employee or independent contractor or former employee or independent contractor of the Company or any Subsidiary that, considered individually or considered collectively with any other such contracts, will, or could reasonably be expected to, give rise directly or indirectly to the payment of any amount that would not be deductible pursuant to Section 280G or Section 162 of the Code (or any comparable provision under state or foreign Tax laws).

(f)     Neither the Company nor any of its Subsidiaries, nor any entity to whose liabilities the Company or any of its Subsidiaries has succeeded, has filed or been included in a consolidated, unitary, or combined Tax Return with another Person, other than a group of which the Company is the common parent. Neither the Company nor any Subsidiary is or has ever been a party to or bound by any tax indemnity agreement, tax sharing agreement, tax allocation agreement or similar contract. Neither the Company nor any Subsidiary has made any election under Section 341(f) of the Code (or any corresponding provision of state, local or foreign income Tax law).

(g)     Except as disclosed in the Financial Statements of the Company, no amount will be required to be deducted or withheld by the Company or any other person

12

pursuant to Section 1445(a) of the Code in connection with the transactions contemplated by this Agreement.

For purposes of this Section 3.14:

"**Company Returns**" means any return, report, information return or other document (including any related or supporting information, any schedule or attachment thereto, and any amendment thereof) filed or required to be filed with any federal, foreign, state or local taxing authority in connection with the determination, assessment, collection, administration or imposition of any Taxes of the Company and of any Subsidiary of the Company.

"**Tax**" or, collectively, "**Taxes**" shall mean any and all national, provincial, municipal, local or foreign taxes of any kind whatsoever, including without limitation, taxes based upon or measured by gross receipts, net income, profits, sales, use and occupation, and value added, ad valorem, transfer, franchise, withholding, payroll, recapture, employment, excise and property taxes, together with all interest, penalties and additions imposed with respect to such amounts.

3.15    **Employees.**  Neither the Company nor any of its Subsidiaries has any collective bargaining agreements with any of its employees. There is no labor union organizing activity pending or, to the Company's knowledge, threatened with respect to the Company or any of its Subsidiaries. Neither the Company nor any of its Subsidiaries is a party to or bound by any currently effective employment contract, deferred compensation arrangement, bonus plan, incentive plan, profit sharing plan, retirement agreement or other employee compensation plan or agreement, except as required under local, state, federal laws and regulations of the United States and of Italy, as applicable to the Company and the subsidiaries, respectively ("*Applicable Law*") or in accordance with customary business practices in their respective jurisdiction. No employee of the Company or any of its Subsidiaries has been granted the right to continued employment by the Company or to any material compensation following termination of employment with the Company or any of its Subsidiaries, except as required under Applicable Law or in accordance with customary business practices in their respective jurisdiction. To the Company's knowledge, no employee of the Company or any of its Subsidiaries, nor any consultant with whom the Company or any Subsidiary has contracted, is in violation of any term of any employment or consulting contract, as applicable, proprietary information agreement or any other agreement relating to the right of any such individual to be employed by, or to contract with, the Company or any of its Subsidiaries; and to the Company's knowledge the continued employment by the Company or its Subsidiaries of its present employees, and the performance of the Company's and its Subsidiaries' contracts with its independent contractors, will not result in any such violation. Neither the Company nor any Subsidiary has received any notice alleging that any such violation has occurred. Neither the Company nor any Subsidiary is aware that any officer, key employee or group of employees intends to terminate his, her or their employment with the Company or any Subsidiary, nor does the Company or any of its Subsidiaries have a present intention to terminate the employment of any officer, key employee or group of employees. Each former employee of the Company whose employment was terminated by the Company has entered into an agreement with the Company providing for the full release of any claims against the Company or any related party arising out of such employment. There are no actions pending, or to the Company's knowledge, threatened, by any former or current employee concerning such person's employment by the Company.

13

**3.16    Obligations of Management.** To the knowledge of the Company, each officer and key employee of the Company and of each Subsidiary is currently devoting substantially all of his or her business time to the conduct of the business of the Company or such Subsidiary, as applicable. The Company is not aware that any officer or key employee of the Company or of any Subsidiary is planning to work less than full time at the Company or at such Subsidiary in the future. To the knowledge of the Company, no officer or key employee of the Company or of any Subsidiary is currently working or, to the Company's knowledge, plans to work for a competitive enterprise.

**3.17    Registration Rights and Voting Rights.** Except as required pursuant to the Investor Rights Agreement, the Company is presently not under any obligation, and has not granted any rights, to register under the Securities Act of 1933, as amended (the "*Securities Act*"), any of the Company's presently outstanding securities or any of its securities that may hereafter be issued. To the Company's knowledge, except as contemplated in the Voting Agreement, no stockholder of the Company has entered into any agreement with respect to the voting of equity securities of the Company.

**3.18    Compliance with Laws; Permits.** (i) The Company and each of the Subsidiaries is (and has been at all times during the past three years) in compliance in all material respects with all Applicable Law; (ii) neither the Company nor any Subsidiary has been charged with and, to the knowledge of the Company, is now under investigation with respect to, a violation of any Applicable Law; (iii) neither the Company nor any Subsidiary is a party to or bound by any order, judgment, decree, injunction, rule or award of any Governmental Entity; and (iv) the Company and each of the Subsidiaries has filed all reports and has all Government Authorizations required to be filed with any Governmental Entity on or before the date hereof.

For purposes of this Section 3.18:

"**Applicable Law**" means any domestic or foreign, federal, state or local statute, law, ordinance, rule, administrative interpretation, regulation, order, writ, injunction, decree or other requirement of any Governmental Entity applicable to the Company or any of its Subsidiaries or any of their properties, assets, officers, directors, employees, consultants or agents (in connection with such officer's, director's, employee's, consultant's or agent's activities on behalf of such entities).

"**Governmental Authorization**" means any approval, consent, license, permit, franchise, certificate, waiver, exemption, classification, registration or other similar document or authorization issued, granted or otherwise made available by or under the authority of any Governmental Entity.

"**Governmental Entity**" means any foreign, domestic, federal, territorial, state or local governmental authority, quasi-governmental authority, instrumentality, court, government or self-regulatory organization, commission, tribunal or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing.

14

**3.19  Environmental and Safety Laws.**  To its knowledge, neither the Company nor any Subsidiary is in violation of any applicable statute, law or regulation relating to the environment or occupational health and safety, and to its knowledge, no material expenditures are or will be required in order to comply with any such existing statute, law or regulation.  No Hazardous Materials (as defined below) are used or have been used, stored, or disposed of by the Company or by any Subsidiary or, to the Company's knowledge, by any other person or entity on any property owned, leased or used by the Company or by any such Subsidiary.  For the purposes of the preceding sentence, "Hazardous Materials" shall mean (a) materials which are listed or otherwise defined as "hazardous" or "toxic" under any applicable local, state, federal and/or foreign laws and regulations that govern the existence and/or remedy of contamination on property, the protection of the environment from contamination, the control of hazardous wastes, or other activities involving hazardous substances, including building materials, or (b) any petroleum products or nuclear materials.

**3.20  Offering Valid.**  Assuming the accuracy of the representations and warranties of Purchaser contained in Section 4.2 hereof, the offer, sale and issuance of the Shares and the Conversion Shares will be exempt from the registration requirements of the Securities Act, and will have been registered or qualified (or are exempt from registration and qualification) under the registration, permit or qualification requirements of all applicable state securities laws. Neither the Company nor any agent on its behalf has solicited or will solicit any offers to sell or has offered to sell or will offer to sell all or any part of the Shares to any person or persons so as to bring the sale of such Shares by the Company within the registration provisions of the Securities Act or any state securities laws.

**3.21  Qualified Small Business.**  As of the Closing, (i) the Company will be a domestic C corporation, (ii) the Company will not have, during the one-year period preceding the Closing, made any purchases of its own stock which would constitute a significant redemption within the meaning of Code Section 1202(c)(3)(B), (iii) the Company's (and any predecessor's) aggregate gross assets, as defined by Section 1202(d)(2) of the Code, at no time between the date of incorporation of the Company and through the Closing have exceeded or will exceed $50,000,000, taking into account the assets of any corporations required to be aggregated with the Company in accordance with Section 1202(d)(3) of the Code, (iv) the Company will be an eligible corporation, as defined by Section 1202(e)(4) of the Code, (v) the Company will have a qualified trade or business within the meaning of Section 1202(e)(3) of the Code, and (vi) the Company will be in compliance with the active business requirement of Section 1202(e) of the Code.

**3.22  Minute Books.**  The minute books of the Company made available to Purchaser contain a materially complete summary of all meetings of directors and stockholders since the time of incorporation.

**3.23  Section 83(b) Elections.**  To the Company's knowledge, all elections and notices permitted by Section 83(b) of the Code and any analogous provisions of applicable state tax laws have been timely filed by all employees who have purchased shares of the Company's common stock under agreements that provide for the vesting of such shares.

15

**3.24   Real Property Holding Corporation.**   The Company is not a real property holding corporation within the meaning of Code Section 897(c)(2) and any regulations promulgated thereunder.

**3.25   Executive Officers.**   To the knowledge of the Company, no executive officer or person nominated to become an executive officer of the Company or of any of its Subsidiaries (i) has been convicted in a criminal proceeding or is a named subject of a pending criminal proceeding (excluding minor traffic violations) or (ii) is or has been subject to any judgment or order of, the subject of any pending civil or administrative action by the Securities and Exchange Commission, any self-regulatory organization.

**3.26   Full Disclosure.**   The Company has provided Purchaser with all information requested by the Purchaser relating to the Company and its Subsidiaries in connection with the Purchaser's decision to purchase the Shares.   Neither this Agreement, the exhibits hereto, the Related Agreements nor any other document delivered by the Company to Purchaser or its attorneys or agents in connection herewith or therewith or with the transactions contemplated hereby or thereby, contain any untrue statement of a material fact nor, to the Company's knowledge, omit to state a material fact necessary in order to make the statements contained herein or therein not misleading.   Notwithstanding the foregoing or any other provision of this Agreement, the Company does not make any representation or warranty regarding any projection or valuation of the Company's business, regardless of whether such projection or valuation was prepared by the Company or its agents.   Other than explicitly set forth in this Section 3, the Company makes no other representation or warranty in connection with the transactions contemplated by this Agreement and disclaims all implied warranties related thereto.

**3.27   No Severance.**   There are currently no agreements between the Company and any employee, officer or director providing for severance payments from the Company to such individuals and the Company agrees that no such agreements will be implemented without Board approval, including the approval of the director appointed by the holders of the Series A Shares.

**3.28   Valid Issuance of Shares.**   The Shares, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement, will be validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under the Transaction Agreements, applicable state and federal securities laws and liens or encumbrances created by or imposed by a Purchaser.   Assuming the accuracy of the representations of the Purchasers in Section 4 of this Agreement and subject to the filings described in Subsection 3.29(ii) below, the Shares will be issued in compliance with all applicable federal and state securities laws.  The Common Stock issuable upon conversion of the Shares has been duly reserved for issuance, and upon issuance in accordance with the terms of the Restated Certificate, will be validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under the Related Agreements, applicable federal and state securities laws and liens or encumbrances created by or imposed by a Purchaser.   Based in part upon the representations of the Purchasers in Section 4 of this Agreement, and subject to Subsection 3.29 below, the Common Stock issuable upon conversion of the Shares will be issued in compliance with all applicable federal and state securities laws.

16

**3.29   Governmental Consents and Filings.**   Assuming the accuracy of the representations made by the Purchaser in Section 4 of this Agreement, no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority is required on the part of the Company in connection with the consummation of the transactions contemplated by this Agreement, except for (i) the filing of the Restated Certificate, which will have been filed as of the Closing, and (ii) filings pursuant to Regulation D of the Securities Act, and applicable state securities laws, which have been made or will be made in a timely manner.

**3.30   Data Privacy.**   In connection with its collection, storage, transfer (including, without limitation, any transfer across national borders) and/or use of any personally identifiable information from any individuals, including, without limitation, any customers, prospective customers, employees and/or other third parties (collectively "**Personal Information**"), the Company is and has been, to the Company's knowledge, in compliance with all applicable laws in all relevant jurisdictions, the Company's privacy policies and the requirements of any contract or codes of conduct to which the Company is a party. The Company has commercially reasonable physical, technical, organizational and administrative security measures and policies in place to protect all Personal Information collected by it or on its behalf from and against unauthorized access, use and/or disclosure. The Company is and has been, to the Company's knowledge, in compliance in all material respects with all laws relating to data loss, theft and breach of security notification obligations.

4.   **REPRESENTATIONS AND WARRANTIES OF PURCHASERS.**

Subject to the terms and conditions of this Agreement, Purchaser hereby represents and warrants to the Company, as of the applicable Closing, as follows (provided that such representations and warranties do not lessen or obviate the representations and warranties of the Company set forth in this Agreement):

**4.1   Requisite Power and Authority.**   Purchaser has all necessary power and authority to execute and deliver this Agreement and the Related Agreements and to carry out their provisions. All action on Purchaser's part required for the lawful execution and delivery of this Agreement and the Related Agreements has been taken. Upon their execution and delivery, this Agreement and the Related Agreements will be valid and binding obligations of Purchaser, enforceable in accordance with their terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights; (b) as limited by general principles of equity that restrict the availability of equitable remedies; and (c) to the extent that the enforceability of the indemnification provisions of the Investor Rights Agreement may be limited by applicable laws.

**4.2   Investment Representations.**   Purchaser understands that neither the Shares nor the Conversion Shares have been registered under the Securities Act. Purchaser also understands that the Shares are being offered and sold pursuant to an exemption from registration contained in the Securities Act based in part upon Purchaser's representations contained in the Agreement. Purchaser hereby represents and warrants as follows:

17

(a)     **Purchaser Bears Economic Risk.**   Purchaser has substantial experience in evaluating and investing in private placement transactions of securities in companies similar to the Company so that it is capable of evaluating the merits and risks of its investment in the Company and has the capacity to protect its own interests.  Purchaser must bear the economic risk of this investment indefinitely unless the Shares (or the Conversion Shares) are registered pursuant to the Securities Act, or an exemption from registration is available.  Purchaser understands that the Company has no present intention of registering the Shares, the Conversion Shares or any shares of its Common Stock.  Purchaser also understands that there is no assurance that any exemption from registration under the Securities Act will be available and that, even if available, such exemption may not allow Purchaser to transfer all or any portion of the Shares or the Conversion Shares under the circumstances, in the amounts or at the times Purchaser might propose.

(b)     **Acquisition for Own Account.**   Purchaser is acquiring the Shares and the Conversion Shares for Purchaser's own account for investment only, and not with a view towards their distribution.

(c)     **Purchaser Can Protect Its Interest.**   Purchaser represents that by reason of its, or of its management's, business or financial experience, Purchaser has the capacity to protect its own interests in connection with the transactions contemplated in this Agreement and the Related Agreement.  Further, Purchaser is aware of no publication of any advertisement in connection with the transactions contemplated in the Agreement.

(d)     **Accredited Investor.**   Purchaser represents that it is an accredited investor within the meaning of Regulation D under the Securities Act.

(e)     **Company Information.**   Purchaser has had an opportunity to discuss the Company's business, management and financial affairs with directors, officers and management of the Company and has had the opportunity to review the Company's operations and facilities.  Purchaser also has had the opportunity to ask questions of and receive answers from, the Company and its management regarding the terms and conditions of this investment.

(f)     **Rule 144.**   Purchaser acknowledges and agrees that the Shares, and, if issued, the Conversion Shares are "restricted securities" as defined in Rule 144 promulgated under the Securities Act as in effect from time to time and must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available.  Purchaser has been advised or is aware of the provisions of Rule 144, which permits limited resale of shares purchased in a private placement subject to the satisfaction of certain conditions, including, among other things:  the availability of certain current public information about the Company, the resale occurring following the required holding period under Rule 144 and the number of shares being sold during any three-month period not exceeding specified limitations.

(g)     **Residence.**   If Purchaser is an individual, then Purchaser resides in the state or province identified in the address of Purchaser set forth on **EXHIBIT A**; if Purchaser is a partnership, corporation, limited liability company or other entity, then the office or offices

18

of Purchaser in which its investment decision was made is located at the address or addresses of Purchaser set forth on **EXHIBIT A;**.

(h)     **Foreign Investors.**  If Purchaser is not a United States person (as defined by Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended), Purchaser hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Shares or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Shares, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any government or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale or transfer of the Shares.  Purchaser's subscription and payment for and continued beneficial ownership of the Shares will not violate any applicable securities or other laws of Purchaser's jurisdiction.

**4.3     Transfer Restrictions.**  Each Purchaser acknowledges and agrees that the Shares and, if issued, the Conversion Shares, are subject to restrictions on transfer as set forth in the Investor Rights Agreement.

5.     CONDITIONS TO CLOSINGS AND POST CLOSING MATTERS.

**5.1     Conditions to Closing.**  Purchasers' obligations to purchase the Shares at each Closing (or to the extent specified below, such specified Closing) are subject to the satisfaction, at or prior to the Closing Date, of the following conditions:

(a)     **Representations and Warranties True; Performance of Obligations.**  The representations and warranties made by the Company in Section 3 hereof shall be true and correct as of each Closing Date with the same force and effect as if they had been made as of the Closing Date, and the Company shall have performed all obligations and conditions herein required to be performed or observed by it on or prior to such Closing.

(b)     **Legal Investment.**  On each Closing Date, the sale and issuance of the Shares and the proposed issuance of the Conversion Shares shall be legally permitted by all laws and regulations to which Purchasers and the Company are subject.

(c)     **Consents, Permits, and Waivers.**  The Company shall have obtained any and all consents, permits and waivers necessary or appropriate for consummation of the transactions contemplated by the Agreement and the Related Agreements except for such as may be properly obtained subsequent to such Closing.

(d)     **Filing of Restated Charter.**  The Restated Charter shall have been filed with the Secretary of State of the State of Delaware and shall continue to be in full force and effect as of each Closing Date.

(e)     **Reservation of Conversion Shares.**  The Conversion Shares issuable upon conversion of the Shares shall have been duly authorized and reserved for issuance upon such conversion.

19

(f) **Stock Options.** The Company shall have reserved under its incentive equity plan 4,500,000 shares of common stock, representing approximately 13.16% of the fully diluted total outstanding common stock after the Second Closing, and except for those grants listed on Schedule 5.1(f), all options granted to employees under such plan shall have a 4-year vesting schedule providing cliff vesting as to 25% of the granted total after one year of service, and ratable vesting at 1/36th per month over the next three years.

(g) **Compliance Certificate.** The Company shall have delivered to Purchaser a Compliance Certificate, executed by the President of the Company, dated the Closing Date, to the effect that the conditions specified in subsections (a), (c), (d), (e) and (f) of this Section 5.1 have been satisfied.

(h) **Secretary's Certificate.** Purchasers shall have received from the Company's Secretary, a certificate having attached thereto (i) the Company's Restated Charter as in effect at the time of the Closing, (ii) the Company's Bylaws, as amended, as in effect at the time of such Closing, (iii) resolutions approved by the Board authorizing the transactions contemplated hereby, (iv) resolutions approved by the Company's stockholders authorizing the filing of the Restated Charter, and (v) good standing certificates (including tax good standing) with respect to the Company from the applicable authority(ies) in Delaware and any other jurisdiction in which the Company is qualified to do business, dated a recent date before such Closing.

(i) **Investor Rights Agreement**. The Investor Rights Agreement shall have been executed and delivered by the parties thereto.

(j) **Co-Sale Agreement.** The Co-Sale Agreement shall have been executed and delivered by the parties thereto. The stock certificates representing the outstanding shares subject to the Co-Sale Agreement shall have been delivered to the Secretary of the Company and shall have had appropriate legends placed upon them to reflect the restrictions on transfer set forth in the Co-Sale Agreement.

(k) **Voting Agreement.** The Voting Agreement shall have been executed and delivered by the parties thereto. The stock certificates representing the outstanding shares subject to the Voting Agreement shall have been delivered to the Secretary of the Company and shall have had appropriate legends placed upon them to reflect the restrictions on transfer set forth in the Voting Agreement.

(l) **Board of Directors.** Within 30 days after the Initial Closing, the authorized size of the Board shall be five (5) members and the Board shall consist of the Company's CEO, one (1) director designated by the Purchaser, three (3) directors designated by the majority of the holders of Common Stock, who shall initially be Davide Vigano, Maurizio Macagno, and Mario Esposito, and one (1) independent director satisfactory to the holders of a majority of the Shares and the holders of a majority of the Common Stock, as provided in the Voting Agreement.

(m) **Proceedings and Documents.** All corporate and other proceedings in connection with the transactions contemplated at such Closing and as required by

this Agreement and all documents and instruments incident to such transactions shall be reasonably satisfactory in substance and form to Purchasers and their special counsel, and Purchasers and their special counsel shall have received all such counterpart originals or certified or other copies of such documents as they may reasonably request.

(n) **Fees of Counsel.** The Company shall have paid fees of counsel in accordance with Section 7.9.

(o) **No Material Adverse Change.** There shall not have been a Material Adverse Change upon the Company or its business or assets since the date of this Agreement and such Closing.

(p) **Blue Sky.** The Shares shall have been qualified under applicable Blue Sky laws.

(q) **Due Diligence.** The Purchasers shall be reasonably satisfied with the results of its legal and financial due diligence.

5.2 **Conditions to Obligations of the Company.** The Company's obligation to issue and sell the Shares at each Closing is subject to the satisfaction, on or prior to such Closing, of the following conditions:

(a) **Representations and Warranties True.** The representations and warranties in Section 4 made by Purchaser shall be true and correct at the date of the Closing, with the same force and effect as if they had been made on and as of said date.

(b) **Performance of Obligations.** Purchaser shall have performed and complied with all agreements and conditions herein required to be performed or complied with by Purchaser on or before the Closing.

(c) **Filing of Restated Charter.** The Restated Charter shall have been filed with the Secretary of State of the State of Delaware.

(d) **Investor Rights Agreement.** The Investor Rights Agreement shall have been executed and delivered by Purchasers.

(e) **Co-Sale Agreement.** The Co-Sale Agreement shall have been executed and delivered by the parties thereto.

(f) **Voting Agreement.** The Voting Agreement shall have been executed and delivered by the parties thereto.

(g) **Consents, Permits, and Waivers.** The Company shall have obtained any and all consents, permits and waivers necessary or appropriate for consummation of the transactions contemplated by the Agreement and the Related Agreements.

5.3 **Post-Closing Matters.** Subject to the consummation of the Initial Closing, the Company shall satisfy following conditions after the Initial Closing:

21

(a)     **Insurance Coverage.** Promptly after the Initial Closing, and in any event within no later than 60 days from such date, the Company shall obtain director's and officer's insurance coverage in the amount of no less than $1,000,000.

6.     INDEMNIFICATION.

(a)     In addition to all other rights and remedies available to Purchaser, the Company shall indemnify, defend and hold harmless Purchaser and its affiliates and their respective partners, members, officers, directors, employees, agents and representatives (collectively, the *"Purchaser Representatives"*; and together with such Purchaser, the *"Purchaser Indemnified Persons"*) against all losses, assessments, damages, liabilities, costs and expenses (including, but not limited to, interest, penalties and reasonable legal and accounting fees and expenses) (collectively, *"Damages"*) and none of the Purchaser Indemnified Persons shall be liable to the Company or any other stockholder of the Company for or with respect to any and all Damages related thereto or incurred in enforcing this Section 6, in connection with:

(1)     any misrepresentation or breach of a representation or warranty on the part of the Company under Section 3 of this Agreement or under the Related Agreements;

(2)     without duplication of Section 6(a)(1), any material misrepresentation in or omission from any of the representations or warranties contained in this Agreement, or any of the exhibits or schedules hereto, or any of the certificates or other documents furnished to such person by the Company and contemplated by this Agreement;

(3)     any nonfulfillment or breach of any covenant or agreement on the part of the Company under the Related Agreements or any facts or circumstances constituting such breach;

(4)     any claim by any third party (including governmental agencies) against or affecting the Company which, if successful, would give rise to or evidence the existence of or relate to a breach of (A) any of the representations or warranties at the time made or (B) covenants of the Company, in each case, in this Agreement; or

(5)     any claim (whenever made), resulting from or caused by any transaction, status, event, condition, occurrence or situation relating to, arising out of or in connection with (A) the status of, or conduct of the business and affairs of, the Company or (B) the execution, delivery and performance of this Agreement and the related documents and agreements contemplated hereby and thereby.

(b)     All indemnification rights hereunder shall survive the execution and delivery of this Agreement and the consummation of the transactions contemplated herein and therein, notwithstanding any inquiry or examination made for or on behalf of, or any knowledge of the Purchaser and/or any of the other Purchaser Indemnified Persons or the acceptance by the Purchaser of any certificate or opinion.

(c)     By executing this Agreement, the Company (i) agrees no Purchaser Indemnified Person shall have any liability to the Company pursuant to this Agreement (the

22

"*Covered Conduct*") except to the extent that a court of competent jurisdiction shall have determined by final judgment, no longer subject to appeal, that the losses resulting from such Covered Conduct primarily resulted from or were based primarily on such Purchaser Indemnified Person's willful misconduct, gross negligence or fraud, (ii) agrees that it will not make under any circumstances, and it will cause its subsidiaries, if any, not to make under any circumstances, any claim against any Purchaser Indemnified Person, with respect to a claim or loss with respect to which such person is entitled to consequential damages in respect of any breach or wrongful conduct (whether the claim therefore is based on contract, tort or duty imposed by law) in connection with this Agreement or any act, omission or event occurring in connection therewith, and (iii) waives, releases and agrees not to sue upon, and it agrees to cause its subsidiaries, if any, not to sue upon, any such claim under clause (ii) above for any such damages, whether or not accrued and whether or not known or suspected to exist in any such party's favor.

(d)     Notwithstanding anything to the contrary contained herein, the indemnification liability of the Company with respect to all Damages by any Purchaser Indemnified Person shall not exceed in any event the aggregate dollar amount invested by the respective Purchaser Indemnified Person in the Company pursuant to this Agreement.

(e)     The right to indemnification, reimbursement or other remedy based upon the Company's representations, warranties, covenants and obligations shall not be affected by any investigation conducted with respect to, or any knowledge acquired (or capable of being acquired) by the Purchaser at any time, whether before or after the execution and delivery of this Agreement, the Initial Closing Date or the Second Tranche Closing Date, with respect to the accuracy or inaccuracy of or compliance with any such representation, warranty, covenant or obligation made by the Company.

7.     **MISCELLANEOUS.**

7.1     **Governing Law.**  This Agreement shall be governed by and construed under the laws of the State of Delaware in all respects as such laws are applied to agreements among Delaware residents entered into and performed entirely within Delaware.  The parties agree that any action brought by either party under or in relation to this Agreement, including without limitation to interpret or enforce any provision of this Agreement, shall be brought in, and each party agrees to and does hereby submit to the jurisdiction and venue of, any state court located in Wilmington, Delaware or federal court located in the District of Delaware.  THE PARTIES TO THIS AGREEMENT HEREBY WAIVE THEIR RIGHT TO A TRIAL BY JURY WITH RESPECT TO DISPUTES ARISING UNDER THIS AGREEMENT AND THE RELATED AGREEMENTS AND CONSENT TO A BENCH TRIAL WITH THE APPROPRIATE JUDGE ACTING AS THE FINDER OF FACT.

7.2     **Survival.**  Unless otherwise set forth in this Agreement, the warranties, representations and covenants of the Company and the Purchasers contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closings, and shall in no way be affected by any investigation of the subject matter thereof made by or on behalf of Purchaser, its counsel or the Company, as the case may be.  All statements as to factual matters contained in any certificate or other instrument delivered by or on behalf of the Company

23

pursuant hereto in connection with the transactions contemplated hereby shall be deemed to be representations and warranties by the Company hereunder solely as of the date of such certificate or instrument.

      **7.3    Successors and Assigns.** Except as otherwise expressly provided herein, the provisions hereof shall inure to the benefit of, and be binding upon the parties hereto and their respective successors, assigns, heirs, executors and administrators and shall inure to the benefit of and be enforceable by each person who shall be a holder of the Shares from time to time (including transferees of any Shares and Conversion Shares); *provided, however*, that prior to the receipt by the Company of adequate written notice of the transfer of any Shares specifying the full name and address of the transferee, and subject to compliance with applicable federal and state securities laws governing the resale of the Shares, the Company may deem and treat the person listed as the holder of such Shares in its records as the absolute owner and holder of such Shares for all purposes. Nothing in this Agreement, express or implied, is intended to confer upon any party, other than the parties hereto or their respective successors and assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement. Purchaser may not assign any of its rights or delegate any of its obligations hereunder to any other person or entity, except that Purchaser: (a) may assign its rights, in whole or in part, and delegate its obligations hereunder, to purchase Shares to one or more of such Purchaser's affiliates (including, without limitation, any person holding a direct or indirect ownership interest in such Purchaser, and any partnership or other entity as to which such Purchaser or any affiliate of such Purchaser is a general partner or has investment discretion, or any employee, officer, director, manager or agent of the foregoing (collectively, the "*Affiliates*")); *provided, however*, that (i) any such assignee shall, as a condition to purchasing such Shares and replacing Purchaser's obligation to purchase such Shares, execute a counterpart signature page to this Agreement and the Related Agreements agreeing to be bound by the provisions of this Agreement and the Related Agreements as Purchaser would have been bound in connection with the purchase of such Shares, and (ii) EXHIBIT A hereto shall be updated by the Company without the need of any prior approval of Purchaser to reflect the purchase of such Shares by the assignee; and (b) may assign to its Affiliates up to all of the Shares purchased by Purchaser, including, without limitation, the rights and obligations under this Agreement and the Related Agreements pertaining to such assigned Shares; *provided, however*, that any such assignee shall, as a condition to acquiring such Shares, (i) agree to be bound by the provisions of this Agreement and the Related Agreements as they apply to such acquired Shares, and (ii) sign an investment letter in form and substance satisfactory to the Company.

      **7.4    Entire Agreement.** This Agreement, the exhibits and schedules hereto, the Related Agreements, and the other documents delivered pursuant hereto constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and no party shall be liable or bound to any other in any manner by any oral or written representations, warranties, covenants and agreements except as specifically set forth herein and therein.

      **7.5    Severability.** In the event one or more of the provisions of this Agreement should, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this

24

Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

### 7.6 Amendment and Waiver.

(a)     This Agreement may be amended or modified upon the written consent of the Company and holders of at least a majority of the then outstanding Shares (treated as if converted and including any Conversion Shares into which the then outstanding Shares have been converted that have not been sold to the public); provided, that Sections 1.2 and 1.3 of this Agreement may not be amended or modified without the written consent of a majority of the holders of the Series A Preferred Stock.

(b)     The obligations of the Company and the rights of the holders of the Shares and the Conversion Shares under this Agreement may be waived with the written consent of the holders of at least a majority of the then outstanding Shares (treated as if converted and including any Conversion Shares into which the then outstanding Shares have been converted that have not been sold to the public); provided, that Company obligations in Section 1.3 of this Agreement may not be waived without the written consent of a majority of the holders of the Series A Preferred Stock.

### 7.7 Delays or Omissions.   Unless expressly otherwise provided in this Agreement by establishing a specific time period in which something must occur, it is agreed that no delay or omission to exercise any right, power or remedy accruing to any party, upon any breach, default or noncompliance by another party under this Agreement, the Related Agreements or the Restated Charter, shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach, default or noncompliance, or any acquiescence therein, or of or in any similar breach, default or noncompliance thereafter occurring. It is further agreed that any waiver, permit, consent or approval of any kind or character on any party's part of any breach, default or noncompliance under this Agreement, the Related Agreements or under the Restated Charter or any waiver on such party's part of any provisions or conditions of the Agreement, the Related Agreements, or the Restated Charter must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement, the Related Agreements, the Restated Charter, by law, or otherwise afforded to any party, shall be cumulative and not alternative.

### 7.8 Notices.  All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by electronic mail or confirmed facsimile if sent during normal business hours of the recipient, if not, then on the next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the Company at the address as set forth on the signature page hereof and to Purchaser at the address set forth on **EXHIBIT A** attached hereto or at such other address or electronic mail address as the Company or Purchaser may designate by ten (10) days advance written notice to the other parties hereto.

25

**7.9    Expenses and Fees of Counsel.** Each party shall pay all costs and expenses that it incurs with respect to the negotiation, execution, delivery and performance of the Agreement; provided, however, that the Company shall, at the Initial Closing, pay the reasonable fees, costs and expenses of Company counsel, and reimburse the reasonable fees of, costs and expenses of Purchaser's counsel an aggregate amount not to exceed Fifty Thousand Dollars ($50,000).

**7.10    Attorneys' Fees.** In the event that any suit or action is instituted under or in relation to this Agreement, including without limitation to enforce any provision in this Agreement, the prevailing party in such dispute shall be entitled to recover from the losing party all fees, costs and expenses of enforcing any right of such prevailing party under or with respect to this Agreement, including without limitation, such reasonable fees and expenses of attorneys and accountants, which shall include, without limitation, all fees, costs and expenses of appeals.

**7.11    Titles and Subtitles.** The titles of the sections and subsections of the Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

**7.12    Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

**7.13    Broker's Fees.** Each party hereto represents and warrants that no agent, broker, investment banker, person or firm acting on behalf of or under the authority of such party hereto is or will be entitled to any broker's or finder's fee or any other commission directly or indirectly in connection with the transactions contemplated herein. Each party hereto further agrees to indemnify each other party for any claims, losses or expenses incurred by such other party as a result of the representation in this Section 7.13 being untrue.

**7.14    Pronouns.** All pronouns contained herein, and any variations thereof, shall be deemed to refer to the masculine, feminine or neutral, singular or plural, as to the identity of the parties hereto may require.

**7.15    Publicity.** The Company shall consult with Purchaser prior to issuing any press releases or otherwise making public statements with respect to the transactions contemplated hereby. The Company shall not issue any press release or make any public disclosure indicating that Purchaser is a party to this Agreement unless such press release or public disclosure shall be approved by Purchaser in advance.

*[Signature page follows]*

26

IN WITNESS WHEREOF, the parties hereto have executed the SERIES A PREFERRED STOCK PURCHASE AGREEMENT as of the date set forth in the first paragraph hereof.

COMPANY:

SENSORIA INC.

By: _____
Name: DAN, DE          V. LANG
Title: LEO

[Signature Page to *Series A Preferred Stock Purchase Agreement*]

IN WITNESS WHEREOF, the parties hereto have executed the SERIES A PREFERRED STOCK PURCHASE AGREEMENT as of the date set forth in the first paragraph hereof.

PURCHASER:

REPLY S.P.A.

By: _____

Name:

Title:

**REPLY S.p.A.**
Mario Rizzante
Presidente

[Signature Page to *Series A Preferred Stock Purchase Agreement*]

43

## LIST OF EXHIBITS

| | |
|---|---|
| Closing Schedule | Exhibit A |
| Restated Charter | Exhibit B |
| Investor Rights Agreement | Exhibit C |
| Co-Sale Agreement | Exhibit D |
| Voting Agreement | Exhibit E |

EXHIBIT A

## CLOSING SCHEDULE

| Purchaser Name | Shares | Purchase Price |
|---|---|---|
| REPLY S.p.A. | | |
| Initial Closing | 3,421,550 | $2,500,000.00 |
| Second Tranche Closing | 3,421,550 | $2,500,000.00 |
| TOTAL | 6,843,100 | $5,000,000.00 |

**Purchaser address:**
Corso Francia, 110
10143 - Torino – ITALY

556281/3/SANFRANCISCO

1

State of Delaware
Secretary of State
Division of Corporations
Delivered 01:27 PM 07/18/2014
FILED 01:18 PM 07/18/2014
SRV 140971539 - 5553337 FILE

Execution Copy

# AMENDED AND RESTATED CERTIFICATE OF INCORPORATION
## OF
## SENSORIA INC.

(Pursuant to Sections 242 and 245 of the
General Corporation Law of the State of Delaware)

Sensoria, Inc., a corporation organized and existing under and by virtue of the provisions of the General Corporation Law of the State of Delaware (the *"DGCL"*),

**DOES HEREBY CERTIFY:**

1.   That the name of this corporation is Sensoria Inc., and that this corporation was originally incorporated pursuant to the DGCL on June 17, 2014.

2.   That the Board of Directors duly adopted resolutions proposing to amend and restate the Certificate of Incorporation of this corporation in accordance with Sections 242 and 245 of the DGCL, which resolutions setting forth the proposed amendment and restatement are set forth below:

3.   That this Amended and Restated Certificate of Incorporation, which restates and integrates and further amends the provisions of this corporation's Certificate of Incorporation, has been duly adopted in accordance with Sections 242 and 245 of the DGCL.

**RESOLVED**, that the Certificate of Incorporation of this corporation be amended and restated in its entirety to read as follows:

### I.

The name of this company is Sensoria Inc. (the *"Company"*).

### II.

The address of the registered office of this Company in the State of Delaware is 2711 Centerville Road, Wilmington, New Castle County, Delaware 19808, and the name of the registered agent of this Company in the State of Delaware at such address is Corporation Service Company.

### III.

The purpose of the Company is to engage in any lawful act or activity for which a corporation may be organized under the Delaware General Corporation Law (*"DGCL"*).

556280/1/SANFRANCISCO

## IV.

**A.** The Company is authorized to issue two classes of stock to be designated, respectively, "*Common Stock*" and "*Preferred Stock*." The total number of shares which the Company is authorized to issue is Seventy Million (70,000,000) shares, Fifty Million (50,000,000) shares of which shall be Common Stock (the "*Common Stock*") and Twenty Million (20,000,000) shares of which shall be Preferred Stock (the "*Preferred Stock*"). The Common Stock and the Preferred Stock shall each have a par value of $0.001 per share.

**B.** The number of authorized shares of Common Stock may be increased or decreased (but not below the number of shares of Common Stock then outstanding) by (in addition to any vote of the holders of one or more series of Preferred Stock that may be required by the terms of this Amended and Restated Certificate of Incorporation) the affirmative vote of the holders of shares of capital stock of the Company representing a majority of the votes represented by all outstanding shares of capital stock of the Company entitled to vote, irrespective of the provisions of Section 242(b)(2) of the DGCL.

**C.** Nine Million Six Hundred Twenty Nine Thousand Five Hundred Thirteen (9,629,513) shares of the authorized shares of Preferred Stock are hereby designated "*Series A Preferred Stock*" (also referred to as the "*Series Preferred*"). Unless otherwise indicated, references to "Section" or "Sections" in this Part C of this Article IV refer to a Section and Sections of Part C of this Article IV. The rights, preferences, privileges, restrictions and other matters relating to the Series Preferred are as follows:

1. CERTAIN DEFINITIONS.

    (a) The "*Original Issue Price*" shall be $0.730663 per share for the Series A Preferred Stock (as adjusted for stock splits, dividends, recapitalizations and the like after the filing date hereof).

    (b) The "*Board*" means the Board of Directors of the Company, as in office from time to time.

2. VOTING RIGHTS.

    (a) **General Rights.** Each holder of shares of the Series Preferred shall be entitled to the number of votes equal to the number of shares of Common Stock into which such shares of Series Preferred could be converted (pursuant to Section 5 hereof) immediately after the close of business on the record date fixed for such meeting or the effective date of such written consent and shall have voting rights and powers equal to the voting rights and powers of the Common Stock and shall be entitled to notice of any stockholders' meeting in accordance with the bylaws of the Company. Except as otherwise provided herein or as required by law, the Series Preferred shall vote together with the Common Stock at any annual or special meeting of the stockholders and not as a separate class, and may act by written consent in the same manner as the Common Stock.

2.

(b) **Separate Vote of Series Preferred.** For so long as at least Four Million Five Hundred Fifty Five Thousand Four Hundred Seventy (4,557,470) shares of Series Preferred remain outstanding (as adjusted for any stock dividends, combinations, splits, recapitalizations and the like with respect to such shares after the filing date hereof), in addition to any other vote or consent required herein or by law, the vote or written consent of the holders of at least a majority of the outstanding shares of Series Preferred, voting together as a single class on an as-if converted to Common Stock basis, shall be necessary for the Company to effect or validate any of the following actions (whether by merger, reclassification, consolidation or otherwise) or to permit any subsidiary of the Company to effect or validate any of the following actions (whether by merger, reclassification, consolidation or otherwise):

(i) any authorization, issuance or any designation, whether by reclassification or otherwise, of any new or existing class or series of stock or any other securities convertible into, or exercisable for, equity securities of the Company having rights, preferences or privileges senior to or on parity with the Series Preferred;

(ii) any increase or decrease in the authorized number of shares of Preferred Stock or Common Stock;

(iii) any adverse change in the voting or other powers, preferences, or other special rights or privileges, or restrictions of any of the Series Preferred;

(iv) any Liquidation Event;

(v) any establishment of or investment in any subsidiary that will not be wholly-owned, directly or indirectly, by the Company, or dispose of any stock in any subsidiary stock or all or substantially all of any subsidiary assets;

(vi) any amendment, alteration, waiver or repeal of any provision of the Certificate of Incorporation or the Bylaws of the Company (including any filing of a Certificate of Designation);

(vii) any issuance of stock options (or stock or similar rights) to employees, consultants or directors in excess of those currently issued or reserved for issuance under existing plans, unless approved by the Board of Directors, including the Series Designee;

(viii) any increase or decrease in the authorized number of members of the Board or election procedure for members to serve on the Board, whether set forth in the Bylaws of the Company or elsewhere;

(ix) any redemption or repurchase of the Company's Common Stock or Preferred Stock (except for acquisitions of Common Stock by the Company in connection with repurchase or redemption of stock from former employees or consultants in connection with cessation of employment or services);

(x) any action that results in the payment or declaration of a dividend on any shares of Common Stock or Preferred Stock; or

3.

(xi)    any action that creates, or authorizes the creation of, or issues, or authorizes the issuance of any debt security, or permits any subsidiary to take any such action with respect to any debt security, if the aggregate indebtedness of the Company and its subsidiaries for borrowed money following such action would exceed $500,000, other than bank or market counter-party lines of credit and similar debt securities, the purpose of which will be to provide trade credit for financing of trading collateral, trade credit for working capital for commodities purchases, bonding for trading counter parties or licensing and accounts receivable financing.

(c) **Election of Board of Directors.** The holders of Common Stock and Series Preferred shall be entitled to vote on the election of the members of the Board and to remove from office such directors and to fill any vacancy caused by the resignation, death or removal of such directors, voting together as a single class on an as-if converted to Common Stock basis. If anyone (1) director serving on the board is designated as the "Preferred Director" pursuant to that certain Voting Agreement, dated on or about the date of filing hereof, between certain stockholders of the Company, then such director shall be deemed to be the "*Series Designee*" for purposes hereof.

3.    LIQUIDATION RIGHTS.

(a) **Series Preferred.** Upon any liquidation, dissolution, or winding up of the Company, whether voluntary or involuntary, or any Deemed Liquidation (collectively, a "*Liquidation Event*"), before any distribution or payment shall be made to the holders of any Common Stock or any other security ranking junior to the Series Preferred (including options), the holders of Series Preferred shall be entitled to be paid out of the assets of the Company legally available for distribution (or the consideration received by the Company or its stockholders in such Acquisition or Asset Transfer), for each share of Series Preferred held by them, an amount per share of Series Preferred equal to the greater of (A) the sum of (i) the applicable Original Issue Price plus (ii) all accrued dividends and all declared and unpaid dividends on the Series Preferred (as adjusted for any stock dividends, combinations, splits, recapitalizations and the like with respect to such shares after the filing date hereof), or (B) such amount per share as would have been payable if all shares of the Series Preferred had been converted into Common Stock immediately prior to the Liquidation Event.

(b) **Insufficient Assets.** If, upon any such Liquidation Event, the assets of the Company (or the consideration received in such transaction) shall be insufficient to make payment in full to all holders of Series Preferred of the liquidation preference set forth in this Section 3(a), then such assets (or consideration) shall be distributed among the holders of Series Preferred at the time outstanding, ratably in proportion to the full amounts to which they would otherwise be respectively entitled if such amounts had been paid in full.

4.    ASSET TRANSFER OR ACQUISITION RIGHTS.

(a) An Acquisition or Asset Transfer (each as hereinafter defined) shall be deemed to be a liquidation of the Company, unless the holders of at least a majority of the outstanding Series Preferred, voting together as a single class on an as-converted to Common

4.

Stock basis, elect otherwise by written notice given to the Company at least five (5) days prior to the effective date of any such Acquisition or Asset Transfer (a *"Deemed Liquidation"*).   The Company shall not have the power to effect any transaction constituting a Deemed Liquidation unless the agreement or plan of merger or consolidation provides that the consideration payable to the stockholders of the Company shall be allocated among the holders of capital stock of the Company in accordance with Sections 3(a) and (b) above.   The amount deemed paid or distributed to holders of capital stock of the Company upon any Deemed Liquidation shall be determined in accordance with Section 4(c) below.

(b) For the purposes of this Article IV: (i) *"Acquisition"* shall mean (A) any consolidation, stock exchange, merger of the Company with or into any other corporation or other entity or person, or any other corporate reorganization, in which the stockholders of the Company immediately prior to such consolidation, stock exchange, merger or reorganization, own less than fifty percent (50%) of the voting power of the surviving entity (or if the surviving entity is a wholly-owned subsidiary, its parent) immediately after such consolidation, stock exchange, merger or reorganization; or (B) any transaction or series of related transactions to which the Company is a party in which in excess of fifty percent (50%) of the Company's voting power is transferred; *provided* that an Acquisition shall not include any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by the Company or any successor or indebtedness of the Company is cancelled or converted or a combination thereof; and (ii) *"Asset Transfer"* shall mean a sale, lease transfer or other disposition of all or substantially all of the assets of the Company or the sale, exclusive license, conveyance, exchange or other transfer of all or substantially all of the intellectual property of the Company.

(c) In any Acquisition or Asset Transfer, if the consideration to be received is securities of a corporation or other property other than cash its fair market value as determined in good faith by the Board (including the affirmative approval of the Series Designee), on the date such determination is made shall be used in calculating the total consideration being paid for the business and the holders of Series Preferred shall receive the amount due to them pursuant to Section 3(a) and 3(b) based on the same determination; *provided, however,* that any publicly-traded securities to be distributed to stockholders will be valued as follows:

(i)      Securities not subject to investment letter or other similar restrictions on free marketability:

(A) If traded on a securities exchange, the value shall be deemed to be the average of the closing prices of the securities on such exchange over the thirty (30)-day period ending three (3) calendar days prior to the closing; and

(B) If actively traded over-the-counter, the value shall be deemed to be the average of the closing bid or sale prices (whichever are applicable) over the thirty (30)-day period ending three (3) calendar days prior to the closing.

5.

558280/1/SANFRANCISCO

(ii)    The method of valuation of securities subject to investment letter or other restrictions on free marketability (other than restrictions arising solely by virtue of a stockholder's status as an affiliate or former affiliate) shall be to make an appropriate discount from the market value determined as above in Sections 4(c)(i)(A) and (B) to reflect the approximate fair market value thereof, as determined in good faith by the Board.

(d) Notwithstanding anything to the contrary in this Section 4, if the definitive transaction documents for an Acquisition or Asset Transfer provide for a different method of valuation, the method of valuation set forth in such documents shall control.

(e) **Allocation of Escrow.**  In the event of a Deemed Liquidation, unless otherwise determined by holders of a majority of the Series Preferred, if any portion of the consideration payable to the stockholders of the Company is placed into escrow or is payable to the stockholders of the Company subject to contingencies, the definitive acquisition agreement relating thereto shall provide that (a) the portion of such consideration that is not placed in escrow and not subject to any contingencies (the *"Initial Consideration"*) shall be allocated among the holders of capital stock of the Company in accordance with Sections 3(a) and 3(b) as if the Initial Consideration were the only consideration payable in connection with such Deemed Liquidation and (b) any additional consideration which becomes payable to the stockholders of the Company upon release from escrow or satisfaction of contingencies shall be allocated among the holders of capital stock of the Company in accordance with Sections 3(a) and 3(b) after taking into account the previous payment of the Initial Consideration as part of the same transaction.

5.    CONVERSION RIGHTS.

The holders of the Series Preferred shall have the following rights with respect to the conversion of the Series Preferred into shares of Common Stock (the *"Conversion Rights"*):

(a) **Optional Conversion.**    Subject to and in compliance with the provisions of this Section 5, any shares of Series Preferred may, at the option of the holder, be converted at any time into fully-paid and nonassessable shares of Common Stock.  The number of shares of Common Stock to which a holder of Series Preferred shall be entitled upon conversion shall be the product obtained by multiplying the applicable *"Series Preferred Conversion Rate"* then in effect for the Series Preferred (determined as provided in Section 5(b)) by the number of shares of Series Preferred being converted.

(b) **Series Preferred Conversion Rate.**  The conversion rate in effect at any time for conversion of the Series Preferred (the *"Series Preferred Conversion Rate"*) shall be the quotient obtained by dividing the applicable Original Issue Price for such series of Series Preferred by the applicable *"Conversion Price"* for such series of Series Preferred, calculated as provided in Section 5(c).

(c) **Conversion Price.**  The conversion price with respect to the Series A Preferred Stock shall initially be the Original Issue Price applicable to such series (as applicable,

the "*Conversion Price*"). Such initial Conversion Price shall be adjusted from time to time in accordance with this Section 5. All references to the Conversion Price herein shall mean the applicable Conversion Price as so adjusted.

(d) **Mechanics of Conversion.** Each holder of Series Preferred who desires to convert the same into shares of Common Stock pursuant to this Section 5 shall surrender the certificate or certificates therefor, duly endorsed, at the office of the Company or any transfer agent for the Series Preferred, and shall give written notice to the Company at such office that such holder elects to convert the same. Such notice shall state the number of shares of Series Preferred being converted. Thereupon, the Company shall promptly issue and deliver at such office to such holder a certificate or certificates for the number of shares of Common Stock to which such holder is entitled and shall promptly pay (i) at the election of each holder of Series Preferred in his, her or its sole discretion, in cash or in Common Stock (at the Common Stock's fair market value determined by the Board as of the date of such conversion), all accrued dividends and all declared and unpaid dividends on the shares of Series Preferred being converted and (ii) in cash (at the Common Stock's fair market value determined by the Board as of the date of conversion) the value of any fractional share of Common Stock otherwise issuable to any holder of Series Preferred. Such conversion shall be deemed to have been made at the close of business on the date of such surrender of the certificates representing the shares of Series Preferred to be converted, and the person or entity entitled to receive the shares of Common Stock issuable upon such conversion shall be treated for all purposes as the record holder of such shares of Common Stock on such date.

(e) **Adjustment for Stock Splits and Combinations.** If at any time or from time to time after the date that the first share of Series Preferred is issued (the "*Original Issue Date*") the Company effects a subdivision of the outstanding Common Stock without a corresponding subdivision of the Series Preferred, the Conversion Price in effect immediately before that subdivision shall be proportionately decreased. Conversely, if at any time or from time to time after the Original Issue Date the Company combines the outstanding shares of Common Stock into a smaller number of shares without a corresponding combination of the Series Preferred, the Conversion Price in effect immediately before the combination shall be proportionately increased. Any adjustment under this Section 5(e) shall become effective at the close of business on the date the subdivision or combination becomes effective.

(f) **Adjustment for Common Stock Dividends and Distributions.** If at any time or from time to time on or after the Original Issue Date the Company pays to holders of Common Stock a dividend or other distribution on the Common Stock in additional shares of Common Stock without a corresponding dividend or other distribution to holders of Series Preferred, the Conversion Price that is then in effect shall be decreased as of the time of such issuance, as provided below:

(i) Each Conversion Price for each series of Series Preferred shall be adjusted by multiplying each applicable Conversion Price then in effect by a fraction:

(A) the numerator of which is the total number of shares of Common Stock issued and outstanding immediately prior to the time of such issuance, and

7.

(B) the denominator of which is the total number of shares of Common Stock issued and outstanding immediately prior to the time of such issuance plus the number of shares of Common Stock issuable in payment of such dividend or distribution;

(ii)   If the Company fixes a record date to determine which holders of Common Stock are entitled to receive such dividend or other distribution, each Conversion Price shall be fixed as of the close of business on such record date and the number of shares of Common Stock shall be calculated immediately prior to the close of business on such record date; and

(iii)   If such record date is fixed and such dividend is not fully paid or if such distribution is not fully made on the date fixed therefor, each Conversion Price shall be recomputed accordingly as of the close of business on such record date and thereafter each Conversion Price shall be adjusted pursuant to this Section 5(f) to reflect the actual payment of such dividend or distribution.

(g) **Adjustment for Reclassification, Exchange, Substitution, Reorganization, Merger or Consolidation.** If at any time or from time to time on or after the Original Issue Date, the Common Stock issuable upon the conversion of the Series Preferred is changed into the same or a different number of shares of any class or classes of stock, whether by recapitalization, reclassification, merger, consolidation or otherwise (other than an Acquisition or Asset Transfer as defined in Section 4 or a subdivision or combination of shares or stock dividend or a reorganization, merger, consolidation or sale of assets provided for elsewhere in this Section 5), in any such event each holder of Series Preferred shall then have the right to convert such stock into the kind and amount of stock and other securities and property receivable upon such recapitalization, reclassification, merger, consolidation or other change by holders of the maximum number of shares of Common Stock into which such shares of Series Preferred could have been converted immediately prior to such recapitalization, reclassification, merger, consolidation or change, all subject to further adjustment as provided herein or with respect to such other securities or property by the terms thereof. In any such case, appropriate adjustment shall be made in the application of the provisions of this Section 5 with respect to the rights of the holders of Series Preferred after the capital reorganization to the end that the provisions of this Section 5 (including adjustment of any applicable Conversion Price then in effect and the number of shares issuable upon conversion of the Series Preferred) shall be applicable after that event and be as nearly equivalent as practicable.

(h) **Sale of Shares Below Conversion Price.**

(i)   If at any time or from time to time after the Original Issue Date, the Company issues or sells, or is deemed by the express provisions of this Section 5(h) to have issued or sold, Additional Shares of Common Stock (as defined below), other than as provided in Section 5(e), 5(f) or 5(g) above, for an Effective Price (as defined below) less than any applicable then effective Conversion Price (a "*Qualifying Dilutive Issuance*"), then and in each such case, the applicable then existing Conversion Price shall be reduced, as of the opening of business on the date of such issue or sale, to a price determined by multiplying the applicable Conversion Price in effect immediately prior to such issuance or sale by a fraction:

8.

(A) the numerator of which shall be (i) the number of shares of Common Stock deemed outstanding (as determined below) immediately prior to such issue or sale, plus (ii) the number of shares of Common Stock which the Aggregate Consideration (as defined below) received or deemed received by the Company for the total number of Additional Shares of Common Stock so issued would purchase at such then-effective Conversion Price for such series of Series Preferred, and

(B) the denominator of which shall be the number of shares of Common Stock deemed outstanding (as determined below) immediately prior to such issue or sale plus the total number of Additional Shares of Common Stock so issued.

(ii)     For the purposes of the preceding sentence, the number of shares of Common Stock deemed to be outstanding as of a given date shall be the sum of (A) the number of actually issued and outstanding shares of Common Stock on the day immediately preceding the given date, plus (B) the number of shares of Common Stock into which the then outstanding shares of Series Preferred could be converted if fully converted on the day immediately preceding the given date, plus (C) the number of shares of Common Stock which could be obtained through the exercise or conversion of all other rights, options and convertible securities outstanding on the day immediately preceding the given date.

(iii)    No adjustment shall be made to any Conversion Price in an amount less than one cent per share. Any adjustment otherwise required by this Section 5(h) that is not required to be made due to the preceding sentence shall be included in any subsequent adjustment to the applicable Conversion Price. Before taking any action which would cause an adjustment reducing the Conversion Price below the then par value of the shares of Common Stock issuable upon conversion of the Series Preferred, the Company will take any corporate action which may, in the opinion of its counsel, be necessary in order that the Company may validly and legally issue fully paid and nonassessable shares of Common Stock at such adjusted Conversion Price.

(iv)    For the purpose of making any adjustment required under this Section 5(h), the aggregate consideration received by the Company for any issue or sale of securities (the "*Aggregate Consideration*") shall be computed as follows: (A) to the extent it consists of cash, Aggregate Consideration shall be computed at the gross amount of cash received by the Company without deduction of any commissions or other expenses payable by the Company, (B) to the extent it consists of property other than cash, Aggregate Consideration shall be computed at the fair value of that property as determined in good faith by the Board, and (C) if Additional Shares of Common Stock, Convertible Securities (as defined below) or rights or options to purchase either Additional Shares of Common Stock or Convertible Securities are issued or sold together with other stock or securities or other assets of the Company for a consideration which covers both, Aggregate Consideration shall be computed as the portion of the consideration so received that may be reasonably determined in good faith by the Board to be allocable to such Additional Shares of Common Stock, Convertible Securities or rights or options.

9.

(v)    For the purpose of the adjustment required under this Section 5(h), if the Company issues or sells (x) Preferred Stock or other stock, options, warrants, purchase rights or other securities convertible into, Additional Shares of Common Stock (such convertible stock or securities being herein referred to as "*Convertible Securities*") or (y) rights or options for the purchase of Additional Shares of Common Stock or Convertible Securities and if the Effective Price of such Additional Shares of Common Stock is less than any Conversion Price, in each case the Company shall be deemed to have issued at the time of the issuance of such rights or options or Convertible Securities the maximum number of Additional Shares of Common Stock issuable upon exercise or conversion thereof and to have received as consideration for the issuance of such shares an amount equal to the total amount of the consideration, if any, received by the Company for the issuance of such rights or options or Convertible Securities plus:

(A) in the case of such rights or options, the minimum amounts of consideration, if any, payable to the Company upon the exercise of such rights or options; and

(B) in the case of Convertible Securities, the minimum amounts of consideration, if any, payable to the Company upon the conversion thereof (other than by cancellation of liabilities or obligations evidenced by such Convertible Securities); *provided* that if the minimum amounts of such consideration cannot be ascertained, but are a function of antidilution or similar protective clauses, the Company shall be deemed to have received the minimum amounts of consideration without reference to such clauses, or based on the applicable conversion cap, if any.

(C) If the minimum amount of consideration payable to the Company upon the exercise or conversion of rights, options or Convertible Securities is reduced over time or on the occurrence or non-occurrence of specified events other than by reason of antidilution adjustments, the Effective Price shall be recalculated using the figure to which such minimum amount of consideration is reduced; *provided further*, that if the minimum amount of consideration payable to the Company upon the exercise or conversion of such rights, options or Convertible Securities is subsequently increased, the Effective Price shall be again recalculated using the increased minimum amount of consideration payable to the Company upon the exercise or conversion of such rights, options or Convertible Securities.

(D) No further adjustment of any Conversion Price, as adjusted upon the issuance of such rights, options or Convertible Securities, shall be made as a result of the actual issuance of Additional Shares of Common Stock or the exercise of any such rights or options or the conversion of any such Convertible Securities. If any such rights or options or the conversion privilege represented by any such Convertible Securities shall expire without having been exercised, the applicable Conversion Price as adjusted upon the issuance of such rights, options or Convertible Securities shall be readjusted to the Conversion Price which would have been in effect had an adjustment been made on the basis that the only Additional Shares of Common Stock so issued were the Additional Shares of Common Stock, if any, actually issued or sold on the exercise of such rights or options or rights of conversion of such Convertible Securities, and such Additional Shares of Common Stock, if any, were issued or sold

10.

for the consideration actually received by the Company upon such exercise, plus the consideration, if any, actually received by the Company for the granting of all such rights or options, whether or not exercised, plus the consideration received for issuing or selling the Convertible Securities actually converted, plus the consideration, if any, actually received by the Company (other than by cancellation of liabilities or obligations evidenced by such Convertible Securities) on the conversion of such Convertible Securities, *provided* that such readjustment shall not apply to prior conversions of Series Preferred.

(vi)     For the purpose of making any adjustment to the Conversion Price for any series of Series Preferred required under this Section 5(h), "*Additional Shares of Common Stock*" shall mean all shares of Common Stock issued by the Company or deemed to be issued pursuant to this Section 5(h) (including shares of Common Stock subsequently reacquired or retired by the Company), other than:

(A)     shares of Common Stock issued upon conversion of the Series Preferred or as a dividend or distribution on the Series Preferred;

(B)     shares of Common Stock issued or issuable pursuant to the conversion of any debenture, warrant, option or other convertible security outstanding as of the Original Issue Date, or issued or issuable pursuant to the Sensoria, Inc. 2014 Equity Incentive Plan or any plan approved by the Board of Directors with the approval of the Series A Director;

(C)     shares of Common Stock issued in connection with any stock split, stock dividend or recapitalization by the Company;

(D)     shares of Common Stock issued pursuant to any equipment loan or leasing arrangement, real property leasing arrangement, or debt financing from a bank or similar financial or lending institution approved by the Board (including the affirmative approval of the Series Designee);

(E)     shares of Common Stock issued in connection with strategic transactions involving the Company and other entities, including (i) joint ventures, manufacturing, marketing or distribution arrangements or (ii) sponsored research, collaboration, technology license, technology transfer or development arrangements; *provided* that the issuance of shares therein has been approved by the Board (including the affirmative approval of the Series Designee);

(F) securities issued in an underwritten initial public offering of the Company; or

(G) any other securities issued by the Company so long as such transaction was approved by the Board (including the affirmative approval of the Series Designee) and by a majority of the Series Preferred.

References to Common Stock in the subsections of this clause (vi) above shall mean all shares of Common Stock issued by the Company or deemed to be issued pursuant to this

11.

Section 5(h).  The "*Effective Price*" of Additional Shares of Common Stock shall mean the quotient determined by dividing the total number of Additional Shares of Common Stock issued or sold, or deemed to have been issued or sold by the Company under this Section 5(h), into the Aggregate Consideration received, or deemed to have been received by the Company for such issue under this Section 5(h), for such Additional Shares of Common Stock. In the event that the number of shares of Additional Shares of Common Stock or the Effective Price cannot be ascertained at the time of issuance, such Additional Shares of Common Stock shall be deemed issued immediately upon the occurrence of the first event that makes such number of shares or the Effective Price, as applicable, ascertainable.

(vii)   In the event that the Company issues or sells, or is deemed to have issued or sold, Additional Shares of Common Stock in a Qualifying Dilutive Issuance (the "*First Dilutive Issuance*"), then in the event that the Company issues or sells, or is deemed to have issued or sold, Additional Shares of Common Stock in a Qualifying Dilutive Issuance other than the First Dilutive Issuance as part of the same transaction or series of related transactions as the First Dilutive Issuance (a "*Subsequent Dilutive Issuance*"), then and in each such case upon a Subsequent Dilutive Issuance each applicable Conversion Price shall be reduced to the Conversion Price that would have been in effect had the First Dilutive Issuance and each Subsequent Dilutive Issuance all occurred on the closing date of the First Dilutive Issuance.

(i) **Waiver of Antidilution Protection.**  Notwithstanding anything to the contrary, any provision of Section 5(h) and any adjustments made or required to be made to the Conversion Price pursuant hereto may be waived on behalf of all shares of Series Preferred by the vote or written consent of the holders of at least a majority of the outstanding shares of Series Preferred (voting on an as-converted to Common Stock basis).

(j) **Certificate of Adjustment.**  In each case of an adjustment or readjustment of any Conversion Price for the number of shares of Common Stock or other securities issuable upon conversion of any series of Series Preferred, if such series of Series Preferred is then convertible pursuant to this Section 5, the Company, at its expense, shall compute such adjustment or readjustment in accordance with the provisions hereof and prepare a certificate showing such adjustment or readjustment, and shall mail such certificate, by first class mail, postage prepaid, to each registered holder of such series of Series Preferred at the holder's address as shown in the Company's books. The certificate shall set forth such adjustment or readjustment, showing in detail the facts upon which such adjustment or readjustment is based, including a statement of (i) the consideration received or deemed to be received by the Company for any Additional Shares of Common Stock issued or sold or deemed to have been issued or sold, (ii) the applicable Conversion Price at the time in effect, (iii) the number of Additional Shares of Common Stock and (iv) the type and amount, if any, of other property which at the time would be received upon conversion of such series of Series Preferred.

(k) **Notices of Record Date.**  Upon (i) any taking by the Company of a record of the holders of any class of securities for the purpose of determining the holders thereof who are entitled to receive any dividend or other distribution, or (ii) any Acquisition or other capital reorganization of the Company, any reclassification or recapitalization of the capital stock

12.

of the Company, any merger or consolidation of the Company with or into any other corporation, or any Asset Transfer, or any voluntary or involuntary dissolution, liquidation or winding up of the Company, the Company shall mail to each holder of Series Preferred at least ten (10) days prior to (x) the record date, if any, specified therein; or (y) if no record date is specified, the date upon which such action is to take effect (or, in either case, such shorter period approved by the holders of at least a majority of the outstanding Series Preferred, voting together as a single class on an as-if converted to Common Stock basis) a notice specifying (A) the date on which any such record is to be taken for the purpose of such dividend or distribution and a description of such dividend or distribution, (B) the date on which any such Acquisition, reorganization, reclassification, transfer, consolidation, merger, Asset Transfer, dissolution, liquidation or winding up is expected to become effective, and (C) the date, if any, that is to be fixed as to when the holders of record of Common Stock (or other securities) shall be entitled to exchange their shares of Common Stock (or other securities) for securities or other property deliverable upon such Acquisition, reorganization, reclassification, transfer, consolidation, merger, Asset Transfer, dissolution, liquidation or winding up.

(l) **Automatic Conversion to Common Stock.**

(i)      Each share of Series Preferred shall automatically be converted into shares of Common Stock, based on the then-effective applicable Conversion Price, (A) at any time upon the affirmative election of the holders of at least a majority of the outstanding shares of the Series Preferred, voting together as a single class on an as-if converted to Common Stock basis, or (B) immediately upon the closing of a firmly underwritten public offering pursuant to an effective registration statement under the Securities Act of 1933, as amended, covering the offer and sale of Common Stock for the account of the Company in which the gross cash proceeds to the Company (before deduction of underwriting discounts, commissions and expenses) are at least $100,000,000 (a "*Qualified Public Offering*"). Upon any such automatic conversion, all accrued dividends and all declared but unpaid dividends shall be paid in accordance with the provisions of Section 5(d).

(ii)      Upon the occurrence of either of the events specified in Sections 5(l)(i) (A) or (B) above, the outstanding shares of Series Preferred shall be converted automatically without any further action by the holders of such shares and whether or not the certificates representing such shares are surrendered to the Company or its transfer agent; *provided, however*, that the Company shall not be obligated to issue certificates evidencing the shares of Common Stock issuable upon such conversion unless the certificates evidencing shares of Series Preferred are either delivered to the Company or its transfer agent as provided below, or the holder notifies the Company or its transfer agent that such certificates have been lost, stolen or destroyed and executes an agreement satisfactory to the Company to indemnify the Company from any loss incurred by it in connection with such certificates. Upon the occurrence of such automatic conversion of the Series Preferred, the holders of Series Preferred shall surrender the certificates representing such shares at the office of the Company or any transfer agent for the Series Preferred. Thereupon, there shall be issued and delivered to such holder promptly at such office and in its name as shown on such surrendered certificate or certificates, a certificate or certificates for the number of shares of Common Stock into which such shares of Series Preferred surrendered were convertible on the date on which such automatic conversion occurred, and all

13.

accrued dividends and all declared but unpaid dividends shall be paid in accordance with the provisions of Section 5(d).

(m)**Fractional Shares.**  No fractional shares of Common Stock shall be issued upon conversion of Series Preferred.  All shares of Common Stock (including fractions thereof) issuable upon conversion of more than one share of Series Preferred by a holder thereof shall be aggregated for purposes of determining whether the conversion would result in the issuance of any fractional share.  If, after the aforementioned aggregation, the conversion would result in the issuance of any fractional share, the Company shall, in lieu of issuing any fractional share, pay cash equal to the product of such fraction multiplied by the fair market value of one share of Common Stock (as determined by the Board) on the date of conversion.

(n) **Reservation of Stock Issuable Upon Conversion.**  The Company shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock, solely for the purpose of effecting the conversion of the shares of the Series Preferred, such number of its shares of Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding shares of the Series Preferred.  If at any time the number of authorized but unissued shares of Common Stock shall not be sufficient to effect the conversion of all then outstanding shares of the Series Preferred, the Company will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Common Stock to such number of shares as shall be sufficient for such purpose.

(o) **Notices.**  Any notice required by the provisions of this Section 5 shall be in writing and shall be deemed effectively given: (i) upon personal delivery to the party to be notified, (ii) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient; if not, then on the next business day, (iii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (iv) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with verification of receipt.  All notices shall be addressed to each holder of record at the address of such holder appearing on the books of the Company.

(p) **Payment of Taxes.**  The Company will pay all taxes (other than taxes based upon income) and other governmental charges that may be imposed with respect to the issue or delivery of shares of Common Stock upon conversion of shares of Series Preferred, excluding any tax or other charge imposed in connection with any transfer involved in the issue and delivery of shares of Common Stock in a name other than that in which the shares of Series Preferred so converted were registered.

6.    NO REISSUANCE OF SERIES PREFERRED.

No shares of Series Preferred acquired by the Company by reason of redemption, purchase, conversion or otherwise shall be reissued.

556260/1/SANFRANCISCO

## V.

A.     The liability of the directors of the Company for monetary damages shall be eliminated to the fullest extent under applicable law.

B.     To the fullest extent permitted by applicable law, the Company is authorized to provide indemnification of, and advancement of expenses to, directors, officers, employees, other agents of the Company and any other persons to which the DGCL permits the Company to provide indemnification.

C.     Any repeal or modification of this Article V shall only be prospective and shall not affect the rights under this Article V in effect at the time of the alleged occurrence of any action or omission to act giving rise to liability.

## VI.

For the management of the business and for the conduct of the affairs of the Company, and in further definition, limitation and regulation of the powers of the Company, of its directors and of its stockholders or any class thereof, as the case may be, it is further provided that:

A.     The management of the business and the conduct of the affairs of the Company shall be vested in its Board. The number of directors which shall constitute the whole Board shall be fixed by the Board in the manner provided in the Bylaws, subject to any restrictions which may be set forth in this Amended and Restated Certificate of Incorporation.

B.     The Board is expressly empowered to adopt, amend or repeal the Bylaws of the Company. The stockholders shall also have the power to adopt, amend or repeal the Bylaws of the Company; provided, however, that, in addition to any vote of the holders of any class or series of stock of the Company required by law or by this Amended and Restated Certificate of Incorporation, the affirmative vote of the holders of at least a majority of the voting power of all of the then-outstanding shares of the capital stock of the Company entitled to vote generally in the election of directors, voting together as a single class, shall be required to adopt, amend or repeal any provision of the Bylaws of the Company.

C.     The directors of the Company need not be elected by written ballot unless the Bylaws so provide.

## VII.

The Company renounces, to the fullest extent permitted by law, any interest or expectancy of the Company in, or in being offered an opportunity to participate in, any Excluded Opportunity. An "**Excluded Opportunity**" is any matter, transaction or interest that is presented to, or acquired, created or developed by, or which otherwise comes into the possession of (i) any director of the Corporation who is not an employee of the Company or any of its subsidiaries, or (ii) any holder of Series Preferred or any partner, member, director, stockholder, employee or agent of any such holder, other than someone who is an employee of the Company or any of its subsidiaries (collectively, "**Covered Persons**"), unless such matter,

15.

transaction or interest is presented to, or acquired, created or developed by, or otherwise comes into the possession of, a Covered Person expressly and solely in such Covered Person's capacity as a director of the Company.

* * * *

[Remainder of page intentionally left blank.]

16.

IN WITNESS WHEREOF, Sensoria Inc. has caused this Amended and Restated Certificate of Incorporation to be signed by its Chief Executive Officer this 16th day of July, 2014.

SENSORIA INC.

By: _____

Name: Davide Vigano

Title: Chief Executive Officer

# EXHIBIT C

## SENSORIA INC.
## INVESTOR RIGHTS AGREEMENT

THIS INVESTOR RIGHTS AGREEMENT (the "*Agreement*") is entered into as of the 18th day of July, 2014, by and among SENSORIA INC., a Delaware corporation (the "*Company*"), and certain purchasers of Series A Preferred Stock, as set forth on the signature page hereunder (the "*Series A Investors*").

### RECITALS

WHEREAS, the Company and the Series A Investors are parties to that certain Series A Preferred Stock Purchase Agreement, dated as of even date herewith (the "*Series A Purchase Agreement*"), pursuant to which the Company is selling, and the Series A Investors are purchasing, shares of the Company's Series A Preferred Stock, par value $0.001 per share (the "*Series A Stock*"); and

WHEREAS, certain of the Company's and the Series A Investors' obligations under the Series A Purchase Agreement are conditioned on the execution and delivery of this Agreement by the parties hereto.

NOW, THEREFORE, in consideration of these premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## SECTION 1. GENERAL.

**1.1     Definitions.** As used in this Agreement the following terms shall have the following respective meanings:

(a)     "*Board*" means the Board of Directors of the Company.

(b)     "*Common Stock*" means the Company's common stock.

(c)     "*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

(d)     "*Form S-3*" means such form under the Securities Act as in effect on the date hereof or any successor or similar registration form under the Securities Act subsequently adopted by the SEC which permits inclusion or incorporation of substantial information by reference to other documents filed by the Company with the SEC.

(e)     "*Holder*" means any person owning of record Registrable Securities that have not been sold to the public or any assignee of record of such Registrable Securities in accordance with Section 2.9.

(f)     *"Initial Offering"* means the Company's first firm commitment underwritten public offering of its Common Stock registered under the Securities Act.

(g)     *"Major Investor"* means an Investor who has purchased no less than $250,000 in Series A Stock from the Company.

(h)     *"Preferred Stock"* means the Series A Stock.

(i)     *"Register," "registered,"* and *"registration"* refer to a registration effected by preparing and filing a registration statement in compliance with the Securities Act, and the declaration or ordering of effectiveness of such registration statement or document.

(j)     *"Registrable Securities"* means (a) Common Stock held by the Series A Investors or issuable or issued upon conversion of the Shares; (b) any Common Stock issued as (or issuable upon the conversion or exercise of any warrant, right or other security which is issued as) a dividend or other distribution with respect to, or in exchange for or in replacement of, the securities described in clause (a).  Notwithstanding the foregoing, Registrable Securities shall not include any securities (i) sold by a person to the public either pursuant to a registration statement or Rule 144; (ii) sold or otherwise transferred in a private transaction in which the transferor's rights under Section 2 of this Agreement are not assigned; or (iii) held by a Holder (together with its affiliates) if the Company has completed its Initial Offering and all shares of Common Stock issuable or issued upon conversion of the Shares held by and issuable to such Holder (and its affiliates) constitute less than one percent (1%) of the shares of Common Stock then outstanding as shown on the then most recent report or statement filed by the Company with the SEC.

(k)     *"Registrable Securities then Outstanding"* shall be the number of shares of the Common Stock that are Registrable Securities and either (a) are then issued and outstanding or (b) are issuable upon conversion of the Shares.

(l)     *"Registration Expenses"* shall mean all expenses (other than Selling Expenses) incurred by the Company in complying with Sections 2.2, 2.3 and 2.4, including all registration and filing fees, printing expenses, fees and disbursements of counsel for the Company, reasonable fees and disbursements of a single special counsel for the Holders, blue sky fees and expenses and the expense of any special audits incident to or required by any such registration (but excluding the compensation of regular employees of the Company which shall be paid in any event by the Company).

(m)     *"Restated Certificate"* means the Company's Amended and Restated Certificate of Incorporation, as amended.

(n)     *"SEC"* or *"Commission"* means the Securities and Exchange Commission.

(o)     *"Securities Act"* shall mean the Securities Act of 1933, as amended.

2

(p)  **"Selling Expenses"** shall mean all underwriting discounts, selling commissions and stock transfer taxes applicable to the sale and fees and disbursements of counsel for any Holder, except for fees and disbursements of a single special counsel for the Holders borne and paid by the Company as provided in subsection (l) above.

(q)  **"Shares"** shall mean the shares of Series A Stock issued pursuant to the Purchase Agreement and shares of Preferred Stock held from time to time by the Investors listed on **Exhibit A** hereto and their permitted assigns.

(r)  **"Special Registration Statement"** shall mean (i) a registration statement relating to any employee benefit plan or (ii) with respect to any corporate reorganization or transaction under Rule 145 of the Securities Act, any registration statements related to the issuance or resale of securities issued in such a transaction or (iii) a registration related to stock issued upon conversion of debt securities.

## SECTION 2.  REGISTRATION; RESTRICTIONS ON TRANSFER.

### 2.1   Restrictions on Transfer.

(a)  Each Holder agrees not to make any disposition of all or any portion of the Shares or Registrable Securities unless and until:

(i)  there is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or

(ii)  (A) The transferee has agreed in writing to be bound by the terms of this Agreement, (B) such Holder shall have notified the Company of the proposed disposition and shall have furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, (C) the Company has consented in writing to the proposed transfer and (D) if reasonably requested by the Company, such Holder shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of such shares under the Securities Act. It is agreed that the Company will not require opinions of counsel for transactions made pursuant to Rule 144, except in unusual circumstances. After its Initial Offering, the Company will not require any transferee pursuant to Rule 144 to be bound by the terms of this Agreement if the shares so transferred do not remain Registrable Securities hereunder following such transfer.

(b)  Notwithstanding the provisions of subsection (a) above, no such restriction shall apply to a transfer by a Holder that is (i) a partnership transferring to its partners or former partners in accordance with partnership interests, (ii) a corporation transferring to a wholly-owned subsidiary or a parent corporation that owns a majority of the capital stock of the Holder, (iii) a limited liability company transferring to its members or former members in accordance with their interest in the limited liability company, (iv) subject to applicable securities laws, a venture capital fund transferring to any investment fund now or hereafter existing that is controlled by one or more general partners or managing members of, or shares the same management company with, such venture capital fund, or (v) an individual transferring to the

3

Holder's family member, trust for the benefit of an individual Holder or entity controlled by that individual; *provided* that in each case the transferee will agree in writing to be subject to the terms of this Agreement to the same extent as if he were an original Holder hereunder.

(c)     Each certificate representing Shares or Registrable Securities shall be stamped or otherwise imprinted with legends substantially similar to the following (in addition to any legend required under applicable state securities laws):

> THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "*ACT*") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, ASSIGNED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER THE ACT OR UNLESS THE COMPANY HAS RECEIVED AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY AND ITS COUNSEL THAT SUCH REGISTRATION IS NOT REQUIRED.

> THE SALE, PLEDGE, HYPOTHECATION OR TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS AND CONDITIONS OF A CERTAIN INVESTOR RIGHTS AGREEMENT BY AND BETWEEN THE STOCKHOLDER AND THE COMPANY. COPIES OF SUCH AGREEMENT MAY BE OBTAINED UPON WRITTEN REQUEST TO THE SECRETARY OF THE COMPANY.

(d)     The Company shall be obligated to reissue promptly unlegended certificates at the request of any Holder thereof if the Company has completed its Initial Offering and the Holder shall have obtained an opinion of counsel (which counsel may be counsel to the Company) reasonably acceptable to the Company to the effect that the securities proposed to be disposed of may lawfully be so disposed of without registration, qualification and legend, *provided that* the second legend listed above shall be removed only at such time as the Holder of such certificate is no longer subject to any restrictions hereunder.

(e)     Any legend endorsed on an instrument pursuant to applicable state securities laws and the stop-transfer instructions with respect to such securities shall be removed upon receipt by the Company of an order of the appropriate blue sky authority authorizing such removal.

**2.2     Piggyback Registrations.** The Company shall notify all Holders of Registrable Securities in writing at least fifteen (15) days prior to the filing of any registration statement under the Securities Act for purposes of a public offering of securities of the Company (including, but not limited to, registration statements relating to secondary offerings of securities of the Company, but excluding Special Registration Statements) and will afford each such Holder an opportunity to include in such registration statement all or part of such Registrable Securities held by such Holder. Each Holder desiring to include in any such registration

4

statement all or any part of the Registrable Securities held by it shall, within fifteen (15) days after the above-described notice from the Company, so notify the Company in writing. Such notice shall state the intended method of disposition of the Registrable Securities by such Holder. If a Holder decides not to include all of its Registrable Securities in any registration statement thereafter filed by the Company, such Holder shall nevertheless continue to have the right to include any Registrable Securities in any subsequent registration statement or registration statements as may be filed by the Company with respect to offerings of its securities, all upon the terms and conditions set forth herein.

(a) **Underwriting.** If the registration statement of which the Company gives notice under this Section 2.2 is for an underwritten offering, the Company shall so advise the Holders of Registrable Securities. In such event, the right of any such Holder to include Registrable Securities in a registration pursuant to this Section 2.2 shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein. All Holders proposing to distribute their Registrable Securities through such underwriting shall enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by the Company. Notwithstanding any other provision of this Agreement, if the underwriter determines in good faith that marketing factors require a limitation of the number of shares to be underwritten, the number of shares that may be included in the underwriting shall be allocated, first, to the Company; second, to the Investors on a *pro rata* basis based on the total number of Registrable Securities held by the Investors; and third to any stockholder of the Company (other than an Investor) on a *pro rata* basis; *provided, however,* that no such reduction shall reduce the amount of securities of the selling Investors included in the registration below twenty-five percent (25%) of the total amount of securities included in such registration, unless such offering is the Initial Offering and such registration does not include shares of any other selling stockholders, in which event any or all of the Registrable Securities of the Investors may be excluded in accordance with the immediately preceding clause. In no event will shares of any other selling stockholder be included in such registration that would reduce the number of shares which may be included by Investors without the written consent of Investors holding not less than a majority of the Registrable Securities proposed to be sold in the offering. If any Holder disapproves of the terms of any such underwriting, such Holder may elect to withdraw therefrom by written notice to the Company and the underwriter, delivered at least ten (10) business days prior to the effective date of the registration statement. Any Registrable Securities excluded or withdrawn from such underwriting shall be excluded and withdrawn from the registration. For any Holder which is a partnership, limited liability company or corporation, the partners, retired partners, members, retired members and stockholders of such Holder, or the estates and family members of any such partners, retired partners, members and retired members and any trusts for the benefit of any of the foregoing person shall be deemed to be a single "*Holder,*" and any *pro rata* reduction with respect to such "*Holder*" shall be based upon the aggregate amount of shares carrying registration rights owned by all entities and individuals included in such "Holder," as defined in this sentence or as otherwise provided in Section 5.10.

(b) **Right to Terminate Registration.** The Company shall have the right to terminate or withdraw any registration initiated by it under this Section 2.2 whether or not any Holder has elected to include securities in such registration, and shall promptly notify any Holder

5

that has elected to include shares in such registration of such termination or withdrawal. The Registration Expenses of such withdrawn registration shall be borne by the Company in accordance with Section 2.4.

**2.3    Form S-3 Registration.** In case the Company shall receive from any Holder or Holders of at least 50% of the then outstanding Registrable Securities a written request or requests that the Company effect a registration on Form S-3 (or any successor to Form S-3) or any similar short-form registration statement and any related qualification or compliance with respect to all or a part of the Registrable Securities owned by such Holder or Holders, the Company will:

(a)    promptly give written notice of the proposed registration, and any related qualification or compliance, to all other Holders of Registrable Securities; and

(b)    as soon as practicable, effect such registration and all such qualifications and compliances as may be so requested and as would permit or facilitate the sale and distribution of all or such portion of such Holder's or Holders' Registrable Securities as are specified in such request, together with all or such portion of the Registrable Securities of any other Holder or Holders joining in such request as are specified in a written request given within fifteen (15) days after receipt of such written notice from the Company; *provided, however*, that the Company shall not be obligated to effect any such registration, qualification or compliance pursuant to this Section 2.3:

(i)    if Form S-3 is not available for such offering by the Holders;

(ii)    if the Holders, together with the holders of any other securities of the Company entitled to inclusion in such registration, propose to sell Registrable Securities and such other securities (if any) at an aggregate price to the public of less than one million dollars ($1,000,000);

(iii)    if within thirty (30) days of receipt of a written request from any Holder or Holders pursuant to this Section 2.3, the Company gives notice to such Holder or Holders of the Company's intention to make a public offering within ninety (90) days, other than pursuant to a Special Registration Statement;

(iv)    if the Company shall furnish to the Holders a certificate signed by the Chairman of the Board stating that in the good faith judgment of the Board, it would be seriously detrimental to the Company and its stockholders for such Form S-3 registration to be effected at such time, in which event the Company shall have the right to defer the filing of the Form S-3 registration statement for a period of not more than one hundred eighty (180) days after receipt of the request of the Holder or Holders under this Section 2.3; *provided*, that such right to delay a request shall be exercised by the Company not more than once in any twelve (12) month period;

(v)    if the Company has, within the twelve (12) month period preceding the date of such request, already effected two (2) registrations on Form S-3 or four (4) registrations on Form S-3 in total for the Holders pursuant to this Section 2.3; or

6

(vi)   in any particular jurisdiction in which the Company would be required to qualify to do business or to execute a general consent to service of process in effecting such registration, qualification or compliance.

(c)   Subject to the foregoing, the Company shall file a Form S-3 registration statement covering the Registrable Securities and other securities so requested to be registered as soon as practicable after receipt of the requests of the Holders.

**2.4   Expenses of Registration.**   Except as specifically provided herein, all Registration Expenses incurred in connection with any registration, qualification or compliance pursuant to Section 2.2, or 2.3, including costs of special counsel appointed to represent the Holders, shall be borne by the Company.  All Selling Expenses incurred in connection with any registrations hereunder, shall be borne by the Holders of the securities so registered *pro rata* on the basis of the number of shares so registered.  The Company shall not, however, be required to pay for expenses of any registration proceeding begun pursuant to Section 2.3, the request of which has been subsequently withdrawn by the Initiating Holders unless (a) the withdrawal is based upon material adverse information concerning the Company of which the Initiating Holders were not aware at the time of such request or (b) the Holders of a majority of Registrable Securities agree to deem such registration to have been effected as of the date of such withdrawal for purposes of determining whether the Company shall be obligated pursuant to Section 2.3(b)(v), as applicable, to undertake any subsequent registration, in which event such right shall be forfeited by all Holders.  If the Holders are required to pay the Registration Expenses, such expenses shall be borne by the Holders of securities (including Registrable Securities) requesting such registration in proportion to the number of shares for which registration was requested.  If the Company is required to pay the Registration Expenses of a withdrawn offering pursuant to clause (a) above, then such registration shall not be deemed to have been effected for purposes of determining whether the Company shall be obligated pursuant to Section 2.3(b)(v), as applicable, to undertake any subsequent registration.

**2.5   Obligations of the Company.**   Whenever required to effect the registration of any Registrable Securities, the Company shall, as expeditiously as reasonably possible:

(a)   Prepare and file with the SEC a registration statement with respect to such Registrable Securities and use all reasonable efforts to cause such registration statement to become effective, and, upon the request of the Holders of a majority of the Registrable Securities registered thereunder, keep such registration statement effective for up to thirty (30) days or, if earlier, until the Holder or Holders have completed the distribution related thereto; provided, however, that at any time, upon written notice to the participating Holders and for a period not to exceed ninety (90) days thereafter (the "*Suspension Period*"), the Company may delay the filing or effectiveness of any registration statement or suspend the use or effectiveness of any registration statement (and the Initiating Holders hereby agree not to offer or sell any Registrable Securities pursuant to such registration statement during the Suspension Period) if the Company reasonably believes that there is or may be in existence material nonpublic information or events involving the Company, the failure of which to be disclosed in the prospectus included in the registration statement could result in a Violation (as defined below).  In the event that the Company shall exercise its right to delay or suspend the filing or effectiveness of a registration hereunder, the applicable time period during which the registration statement is to remain

7

effective shall be extended by a period of time equal to the duration of the Suspension Period. The Company may extend the Suspension Period for up to an additional consecutive ninety (90) days with the consent of the holders of a majority of the Registrable Securities registered under the applicable registration statement, which consent shall not be unreasonably withheld. No more than two (2) such Suspension Periods shall occur in any twelve (12) month period. In no event shall any Suspension Period, when taken together with all prior Suspension Periods, exceed 180 days in the aggregate in any twelve (12) month period. If so directed by the Company, all Holders registering shares under such registration statement shall (i) not offer to sell any Registrable Securities pursuant to the registration statement during the period in which the delay or suspension is in effect after receiving notice of such delay or suspension; and (ii) use their best efforts to deliver to the Company (at the Company's expense) all copies, other than permanent file copies then in such Holders' possession, of the prospectus relating to such Registrable Securities current at the time of receipt of such notice. Notwithstanding the foregoing, the Company shall not be required to file, cause to become effective or maintain the effectiveness of any registration statement other than a registration statement on Form S-3 that contemplates a distribution of securities on a delayed or continuous basis pursuant to Rule 415 under the Securities Act.

   **(b)**   To the extent the Company is a "*well-known seasoned issuer*" (as defined in Rule 405 under the Securities Act) at the time any written request for registration is submitted to the Company by any Holder or Holders of Registrable Securities in accordance with Section 2.4, if specifically requested to do so in such written request for registration, file an "*automatic shelf registration statement*" (as defined in Rule 405 under the Securities Act) to effect such registration, and use reasonable efforts to remain a well-known seasoned issuer (and not become an "*ineligible issuer*" (as defined in Rule 405 under the Securities Act)) during the period during which such automatic shelf registration statement is required to remain effective in accordance with this Agreement.

   **(c)**   If at any time when the Company is required to re-evaluate its status as a well-known seasoned issuer for purposes of an automatic shelf registration statement used to effect a written request for registration in accordance with Section 2.4, (i) the Company determines that it is not a well-known seasoned issuer, (ii) the registration statement is required to be kept effective in accordance with this Agreement, and (iii) the registration rights of the applicable Holders have not terminated, promptly, to the extent the Company is eligible to do so, amend the registration statement to provide for the continuing effectiveness of the registration statement on Form S-3 or file a new registration statement on Form S-3, and keep such registration statement effective in accordance with the requirements otherwise applicable under this Agreement.

   **(d)**   Prepare and file with the SEC such amendments and supplements to such registration statement and the prospectus used in connection with such registration statement as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement for the period set forth in subsection (a) above.

   **(e)**   Furnish to the Holders such number of copies of a prospectus, including a preliminary prospectus, in conformity with the requirements of the Securities Act, and such other

8

documents as they may reasonably request in order to facilitate the disposition of Registrable Securities owned by them.

(f)    Use its reasonable efforts to register and qualify the securities covered by such registration statement under such other securities or Blue Sky laws of such jurisdictions as shall be reasonably requested by the Holders; *provided* that the Company shall not be required in connection therewith or as a condition thereto to qualify to do business or to file a general consent to service of process in any such states or jurisdictions.

(g)    In the event of any underwritten public offering, enter into and perform its obligations under an underwriting agreement, in usual and customary form, with the managing underwriter(s) of such offering.  Each Holder participating in such underwriting shall also enter into and perform its obligations under such an agreement.

(h)    Notify each Holder of Registrable Securities covered by such registration statement at any time when a prospectus relating thereto is required to be delivered under the Securities Act of the happening of any event as a result of which the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances then existing. The Company will use reasonable efforts to amend or supplement such prospectus in order to cause such prospectus not to include any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances then existing.

2.6    **Delay of Registration; Furnishing Information.**

(a)    No Holder shall have any right to obtain or seek an injunction restraining or otherwise delaying any such registration as the result of any controversy that might arise with respect to the interpretation or implementation of this Section 2.

(b)    It shall be a condition precedent to the obligations of the Company to take any action pursuant to Section 2.3 or 2.4 that the selling Holders shall furnish to the Company such information regarding themselves, the Registrable Securities held by them and the intended method of disposition of such securities as shall be required to effect the registration of their Registrable Securities.

(c)    The Company shall have no obligation with respect to any registration requested pursuant to Section 2.4 if the number of shares or the anticipated aggregate offering price of the Registrable Securities to be included in the registration does not equal or exceed the number of shares or the anticipated aggregate offering price required to originally trigger the Company's obligation to initiate such registration as specified in Section 2.2 or Section 2.4, whichever is applicable.

2.7    **Indemnification.**  In the event any Registrable Securities are included in a registration statement under Sections 2.3 or 2.4:

9

(a)    To the extent permitted by law, the Company will indemnify and hold harmless each Holder, the partners, members, officers and directors of each Holder, any underwriter (as defined in the Securities Act) for such Holder and each person, if any, who controls such Holder or underwriter within the meaning of the Securities Act or the Exchange Act, against any losses, claims, damages, or liabilities (joint or several) to which they may become subject under the Securities Act, the Exchange Act or other federal or state law, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon any of the following statements, omissions or violations (collectively a "*Violation*") by the Company: (i) any untrue statement or alleged untrue statement of a material fact contained in such registration statement or incorporated by reference therein, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto, or any issuer free writing prospectus (as defined in Rule 433 of the Securities Act) or issuer information (as defined in Rule 433 of the Securities Act) filed or required to be filed pursuant to Rule 433(d) under the Securities Act prepared by or on behalf of the Company or used or referred to by the Company, (ii) the omission or alleged omission to state therein a material fact required to be stated therein, or necessary to make the statements therein not misleading, or (iii) any violation or alleged violation by the Company of the Securities Act, the Exchange Act, any state securities law or any rule or regulation promulgated under the Securities Act, the Exchange Act or any state securities law in connection with the offering covered by such registration statement; and the Company will reimburse each such Holder, partner, member, officer, director, underwriter or controlling person for any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability or action; *provided, however*, that the indemnity agreement contained in this Section 2.7(a) shall not apply to amounts paid in settlement of any such loss, claim, damage, liability or action if such settlement is effected without the consent of the Company, which consent shall not be unreasonably withheld, nor shall the Company be liable in any such case for any such loss, claim, damage, liability or action to the extent that it arises out of or is based upon a Violation which occurs in reliance upon and in conformity with written information furnished expressly for use in connection with such registration by such Holder, partner, member, officer, director, underwriter or controlling person of such Holder.

(b)    To the extent permitted by law, each Holder will, if Registrable Securities held by such Holder are included in the securities as to which such registration qualifications or compliance is being effected, indemnify and hold harmless the Company, each of its directors, its officers and each person, if any, who controls the Company within the meaning of the Securities Act, any underwriter and any other Holder selling securities under such registration statement or any of such other Holder's partners, directors or officers or any person who controls such Holder, against any losses, claims, damages or liabilities (joint or several) to which the Company or any such director, officer, controlling person, underwriter or other such Holder, or partner, director, officer or controlling person of such other Holder may become subject under the Securities Act, the Exchange Act or other federal or state law, insofar as such losses, claims, damages or liabilities (or actions in respect thereto) arise out of or are based upon any of the following statements: (i) any untrue statement or alleged untrue statement of a material fact contained in such registration statement or incorporated by reference therein, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto, or any issuer free writing prospectus (as defined in Rule 433 of the Securities Act) or

10

issuer information (as defined in Rule 433 of the Securities Act) filed or required to be filed pursuant to Rule 433(d) under the Securities Act prepared by or on behalf of the Company or used or referred to by the Company, (ii) the omission or alleged omission to state therein a material fact required to be stated therein, or necessary to make the statements therein not misleading, or (iii) any violation or alleged violation by the Company of the Securities Act (collectively, a *"Holder Violation"*), in each case to the extent (and only to the extent) that such Holder Violation occurs in reliance upon and in conformity with written information furnished by such Holder under an instrument duly executed by such Holder and stated to be specifically for use in connection with such registration; and each such Holder will reimburse any legal or other expenses reasonably incurred by the Company or any such director, officer, controlling person, underwriter or other Holder, or partner, officer, director or controlling person of such other Holder in connection with investigating or defending any such loss, claim, damage, liability or action if it is judicially determined that there was such a Holder Violation; *provided, however,* that the indemnity agreement contained in this Section 2.7(b) shall not apply to amounts paid in settlement of any such loss, claim, damage, liability or action if such settlement is effected without the consent of the Holder, which consent shall not be unreasonably withheld; *provided further,* that in no event shall any indemnity under this Section 2.7 exceed the net proceeds from the offering received by such Holder.

(c)     Promptly after receipt by an indemnified party under this Section 2.7 of notice of the commencement of any action (including any governmental action), such indemnified party will, if a claim in respect thereof is to be made against any indemnifying party under this Section 2.7, deliver to the indemnifying party a written notice of the commencement thereof and the indemnifying party shall have the right to participate in, and, to the extent the indemnifying party so desires, jointly with any other indemnifying party similarly noticed, to assume the defense thereof with counsel mutually satisfactory to the parties; *provided, however,* that an indemnified party shall have the right to retain its own counsel, with the fees and expenses thereof to be paid by the indemnifying party, if representation of such indemnified party by the counsel retained by the indemnifying party would be inappropriate due to actual or potential differing interests between such indemnified party and any other party represented by such counsel in such proceeding. The failure to deliver written notice to the indemnifying party within a reasonable time of the commencement of any such action shall relieve such indemnifying party of any liability to the indemnified party under this Section 2.7 to the extent, and only to the extent, prejudicial to its ability to defend such action, but the omission so to deliver written notice to the indemnifying party will not relieve it of any liability that it may have to any indemnified party otherwise than under this Section 2.7.

(d)     If the indemnification provided for in this Section 2.7 is held by a court of competent jurisdiction to be unavailable to an indemnified party with respect to any losses, claims, damages or liabilities referred to herein, the indemnifying party, in lieu of indemnifying such indemnified party thereunder, shall to the extent permitted by applicable law contribute to the amount paid or payable by such indemnified party as a result of such loss, claim, damage or liability in such proportion as is appropriate to reflect the relative fault of the indemnifying party on the one hand and of the indemnified party on the other in connection with the Violation(s) or Holder Violation(s) that resulted in such loss, claim, damage or liability, as well as any other relevant equitable considerations. The relative fault of the indemnifying party and of the

11

indemnified party shall be determined by a court of law by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission to state a material fact relates to information supplied by the indemnifying party or by the indemnified party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission; *provided, that* in no event shall any contribution by a Holder hereunder exceed the net proceeds from the offering received by such Holder except in the case of willful misconduct or fraud by such Holder.

(e)     The obligations of the Company and Holders under this Section 2.7 shall survive completion of any offering of Registrable Securities in a registration statement and, with respect to liability arising from an offering to which this Section 2.7 would apply that is covered by a registration filed before termination of this Agreement, such termination. No indemnifying party, in the defense of any such claim or litigation, shall, except with the consent of each indemnified party, consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party of a release from all liability in respect to such claim or litigation.

**2.8     Assignment of Registration Rights.** The rights to cause the Company to register Registrable Securities pursuant to this Section 2 may be assigned by a Holder to a transferee or assignee of Registrable Securities (for so long as such shares remain Registrable Securities) that (a) is a subsidiary, parent, general partner, limited partner, retired partner, member or retired member, or stockholder of a Holder that is a corporation, partnership or limited liability company, (b) is a Holder's family member or trust for the benefit of an individual Holder, (c) acquires at least 10,000 shares of Registrable Securities (as adjusted for stock splits and combinations), (d) is an entity affiliated by common control (or other related entity) with such Holder, or (e) already has such registration rights; *provided, however,* that (i) the transferor shall, within ten (10) days after such transfer, furnish to the Company written notice of the name and address of such transferee or assignee and the securities with respect to which such registration rights are being assigned and (ii) such transferee shall agree to be subject to all restrictions set forth in this Agreement.

**2.9     Limitation on Subsequent Registration Rights.** Other than as provided in Section 5.10, after the date of this Agreement, the Company shall not, without the prior written consent of the Holders holding a majority of the outstanding shares of Series A Stock, enter into any agreement with any holder or prospective holder of any securities of the Company that would grant such holder rights to demand the registration of shares of the Company's capital stock, or to include such shares in a registration statement that would reduce the number of shares includable by the Holders.

**2.10     "Market Stand-Off" Agreement.** Each Holder hereby agrees that such Holder shall not sell, transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale of, any Common Stock (or other securities) of the Company held by such Holder (other than those included in the registration), during the 180-day period following the effective date of the Initial Offering (or such longer period as the underwriters or the Company shall request as is necessary to enable such underwriter to issue a research report or make a public appearance that relates to an earnings release or announcement by the Company within 15 days prior to or after the date that is

12

180 days after the effective date of the registration statement relating to such offering, but in any event not to exceed 210 days following the effective date of the registration statement relating to such offering), provided, that all officers and directors of the Company and stockholders holding at least 1% of the Company's capital stock are bound by and have entered into similar agreements. The obligations described in this Section 2.10 shall not apply to a registration relating solely to employee benefit plans on Form S-1 or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a transaction on Form S-4 or similar forms that may be promulgated in the future. The underwriters in connection with any such registration are intended third-party beneficiaries of this Section 2.10 and shall have the right, power, and authority to enforce the provisions hereof as though they were a party hereto. Each Holder further agrees to execute such agreements as may be reasonably requested by the underwriters in connection with such registrations that are consistent with this Section 2.10 or that are necessary to give further effect thereto. Any discretionary waiver or termination of the restrictions of any or all of such agreements by the Company or the underwriters shall apply pro rata to all Holders subject to such agreements.

**2.11    Agreement to Furnish Information.** Each Holder agrees to execute and deliver such other agreements as may be reasonably requested by the Company or the underwriter that are consistent with the Holder's obligations under Section 2.10 or that are necessary to give further effect thereto. In addition, if requested by the Company or the representative of the underwriters of Common Stock (or other securities) of the Company, each Holder shall provide, within ten (10) days of such request, such information as may be required by the Company or such representative in connection with the completion of any public offering of the Company's securities pursuant to a registration statement filed under the Securities Act. The obligations described in Section 2.10 and this Section 2.11 shall not apply to a Special Registration Statement. The Company may impose stop-transfer instructions with respect to the shares of Common Stock (or other securities) subject to the foregoing restriction until the end of said ten day period. Each Holder agrees that any transferee of any shares of Registrable Securities shall be bound by Sections 2.10 and 2.11. The underwriters of the Company's stock are intended third party beneficiaries of Sections 2.10 and 2.11 and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto.

**2.12    Rule 144 Reporting.** With a view to making available to the Holders the benefits of certain rules and regulations of the SEC which may permit the sale of the Registrable Securities to the public without registration, the Company agrees to use commercially reasonable efforts to:

**(a)**    Make and keep public information available, as those terms are understood and defined in SEC Rule 144 or any similar or analogous rule promulgated under the Securities Act, at all times after the effective date of the first registration filed by the Company for an offering of its securities to the general public;

**(b)**    File with the SEC, in a timely manner, all reports and other documents required of the Company under the Exchange Act; and

**(c)**    So long as a Holder owns any Registrable Securities, furnish to such Holder forthwith upon request: a written statement by the Company as to its compliance with the

13

reporting requirements of said Rule 144 of the Securities Act, and of the Exchange Act (at any time after it has become subject to such reporting requirements); a copy of the most recent annual or quarterly report of the Company filed with the Commission; and such other reports and documents as a Holder may reasonably request in connection with availing itself of any rule or regulation of the SEC allowing it to sell any such securities without registration.

**2.13    Termination of Registration Rights.**   The right of any Holder to request registration or inclusion of Registrable Securities in any registration pursuant to Sections 2.3 and 2.4 shall terminate upon the earliest to occur of:

**(a)**    the closing of a Liquidation Event (as such term is defined in the Restated Certificate);

**(b)**    such time as Rule 144 or another similar exemption under the Securities Act is available for the sale of all of such Holder's shares without limitation during a three-month period without registration; or

**(c)**    the Initial Offering.

## SECTION 3.  COVENANTS OF THE COMPANY.

**3.1    Basic Financial Information and Reporting.**

**(a)**    The Company will maintain true books and records of account in which full and correct entries will be made of all its business transactions pursuant to a system of accounting established and administered in accordance with generally accepted accounting principles consistently applied (except as noted therein), and will set aside on its books all such proper accruals and reserves as shall be required under generally accepted accounting principles consistently applied.

**(b)**    As soon as commercially reasonable after the end of each fiscal year of the Company, the Company will furnish each Major Investor the unaudited financial statements of the Company, as at the end of such fiscal year, and a statement of income and a statement of cash flows of the Company, for such year, all prepared in accordance with generally accepted accounting principles consistently applied (except as noted therein) and setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail.

**(c)**    The Company will furnish each Major Investor at least thirty (30) days prior to the beginning of each fiscal year an annual budget and operating plans, including a forecast of cash position on a month to month basis for the Company for such fiscal year (and as soon as available, any subsequent written revisions thereto) (the *"Budget"*).

**(d)**    The Company will furnish each Major Investor on a monthly basis, as soon as commercially reasonable, monthly year end forecasting.

**(e)**    The Company will furnish each Major Investor promptly at the end of each quarter, an up to date capitalization table as well as an unaudited balance sheet and unaudited statements of operations and cash flows for the quarter ended.

14

If, for any period, the Company has any subsidiary whose accounts are consolidated with those of the Company, then in respect of such period the financial statements delivered pursuant to the foregoing sections shall be the consolidated and consolidating financial statements of the Company and all such consolidated subsidiaries.

    **3.2    Inspection Rights.** Each Major Investor shall have the right to visit and inspect any of the properties of the Company or any of its subsidiaries, and to discuss the affairs, finances and accounts of the Company or any of its subsidiaries with its officers, and to review such information as is reasonably requested all at such reasonable times and as often as may be reasonably requested; *provided, however,* that the Company shall not be obligated under this Section 3.2 with respect to a competitor of the Company or with respect to information which the Board determines in good faith is confidential or attorney-client privileged and should not, therefore, be disclosed; *provided, further,* that each Major Investor shall not have the right to exercise such inspection rights any more often than four times in any one fiscal year.

    **3.3    Confidentiality of Records.** Each Investor agrees to use the same degree of care as such Investor uses to protect its own confidential information to keep confidential any information furnished to such Investor, including information furnished pursuant to Section 3.1 and 3.2, that the Company identifies as being confidential or proprietary (so long as such information is not in the public domain), except that such Investor may disclose such proprietary or confidential information (i) to any partner, subsidiary or parent of such Investor as long as such partner, subsidiary or parent is advised of and agrees or has agreed to be bound by the confidentiality provisions of this Section 3.3 or comparable restrictions; (ii) at such time as it enters the public domain through no fault of such Investor; (iii) that is communicated to it free of any obligation of confidentiality; (iv) that is developed by Investor or its agents independently of and without reference to any confidential information communicated by the Company; or (v) as required by applicable law.

    **3.4    Reservation of Common Stock.** The Company will at all times reserve and keep available, solely for issuance and delivery upon the conversion of the Series A Stock, all Common Stock issuable from time to time upon such conversion.

    **3.5    Insurance.** The Company will obtain within thirty (30) days of the date hereof, and thereafter will maintain, from financially sound and reputable insurers (i) Directors and Officers liability insurance in an amount of at least $1,000,000, and will cause such insurance policies to be maintained until such time as the Board determines that such insurance should be discontinued.

    **3.6    Assignment of Right of First Refusal.** In the event the Company elects not to exercise any right of first offer the Company may have on a proposed transfer of any of the Company's outstanding capital stock pursuant to the Company's charter documents, by contract or otherwise, the Company shall, to the extent it may do so, assign such right of first offer to each Major Investor. In the event of such assignment, each Major Investor shall have a right to purchase its *pro rata* portion of the capital stock proposed to be transferred. Each Major Investor's pro rata portion shall be equal to the product obtained by multiplying (i) the aggregate number of shares proposed to be transferred by (ii) a fraction, the numerator of which is the

15

number of shares of Registrable Securities held by such Major Investor at the time of the proposed transfer and the denominator of which is the total number of Registrable Securities owned by all Major Investors at the time of such proposed transfer.

### 3.7 Rights Pertaining to the Board.

(a)    Unless otherwise determined by the Board (including the approval of the Series A Designee), the Board shall meet at least once every other month.

(b)    Prior consent of a majority of the Board (including the affirmative approval of the Series A Designee) is required for any of the following actions: So long as the holders of Series A Preferred are entitled to elect a Series A Designee, the Company will not, without Board approval, which approval must include the affirmative vote of the Series A Designee: (1) making of any loan or advance to, or own any stock or other securities of, any subsidiary or other corporation, partnership, or other entity unless it is wholly owned by the Company; (2) the making any loan or advance to any person, including, any employee or director, except advances and similar expenditures in the ordinary course of business or under the terms of a employee stock or option plan approved by the Board of Directors with the approval of the Series A Designee; (3) any guarantee, any indebtedness except for trade accounts of the Company or any subsidiary arising in the ordinary course of business; (4) the making of any investment inconsistent with any investment policy approved by the Board with the approval of the Series A Designee; (5) incurrence any aggregate indebtedness in excess of $500,000.00 that is not already included in a Board-approved budget with the approval of the Series A Designee, other than trade credit incurred in the ordinary course of business; (6) entering into or becoming a party to any transaction with any director, officer or employee of the Company or any "associate" (as defined in Rule 12b-2 promulgated under the Exchange Act) of any such person except transactions made in the ordinary course of business and pursuant to reasonable requirements of the Company's business and upon fair and reasonable terms that are approved by a majority of the Board of Directors with the approval of the Series A Designee; (7) hiring, firing, or changing the compensation of the executive officers, including approving any option grants; (8) changing the principal business of the Company, enter new lines of business, or exit the current line of business; (9) selling, assigning, licensing, pledging or encumbering material technology or intellectual property, other than licenses granted in the ordinary course of business; or (10) entering into any corporate strategic relationship involving the payment contribution or assignment by the Company or to the Company of assets greater than $250,000.00.

(c)    **Employee Pool.**   The Company will reserve 4,500,000 shares of its Common Stock for issuances to directors, officers, employees, advisors, consultants and other service providers (the "***Employee Pool***"). The shares in the Employee Pool will be issued from time to time to directors, officers, employees, advisors, consultants and other service providers of the Company under such arrangements, contracts or plans as are recommended by management and approved by the Board.

### 3.8 Incentive Equity Vesting.

16

(a)     Unless otherwise approved by the Board (including the affirmative approval of the Series A Designee), all stock options and other stock equivalents (including restricted stock) issued after the date of this Agreement pursuant to the Company's equity incentive plan to employees, directors, consultants, advisors and other service providers shall be subject to vesting as follows: (a) twenty-five percent (25%) of such stock shall vest at the end of the first year following the date of issuance, and (b) seventy-five percent (75%) of such stock shall vest monthly over the following 36 months, subject to continued service.  Unless otherwise approved by the Board (including the affirmative approval of the Series A Designee), the Company's stock option plans and other agreements shall not provide for any acceleration of this vesting schedule upon an Acquisition or Asset Transfer.

(b)     With respect to restricted stock and stock issued as a result of early exercised options, the Company's repurchase option shall provide that, upon termination of the employment of the stockholder, with or without cause, the Company or its assignee (to the extent permissible under applicable securities law qualification) shall retain the option to repurchase at the lower of cost or fair market value any unvested shares held by such stockholder.

**3.9     Director, Employee and Founder Agreements.**   Within fifteen (15) days following the Initial Closing (as defined in the Series A Purchase Agreement):

(a)     The Company shall cause all directors to enter into a Director Indemnification Agreement substantially in a form approved by the Board.

(b)     The Company shall cause each of Davide Vigano, Mario Esposito and Maurizio Macagno (the "*Founders*") to enter into a non-competition and non-solicitation agreement, or functional equivalent, substantially in a form reasonably approved by the Board (including the Series A Designee), which agreements shall also provide that 50% of each Founder's stock in the Company is subject to a repurchase right by the Company at the original purchase price, which repurchase right shall lapse ratably over 24 months from the Initial Closing.

(c)     The Company shall require all employees and consultants to execute and deliver a Proprietary Information and Inventions Agreement, or the functional equivalent, substantially in a form approved by the Board.

**3.10     Termination of Covenants.**   All covenants of the Company contained in Section 3 of this Agreement (other than the provisions of Sections 3.3) shall expire and terminate upon the earlier of (a) the completion of the Initial Offering or (b) the closing of a transaction that constitutes an Acquisition or an Asset Transfer (as defined in the Restated Certificate).

**3.11     Director Expenses.**   The Company shall reimburse the reasonable out-of-pocket expenses of the Series A Director for costs incurred in traveling to and attending meetings of the Board of Directors and other meetings or events attended at the request and on behalf of the Company, provided that a reimbursement budget is agreed upon in writing in advance by the Company and the Series A Director.

17

**3.12    Successor Indemnification.** If the Company or any of its successors or assignees consolidates with or merges into any other person and is not the continuing or surviving corporation or entity of such consolidation or merger, then to the extent necessary, proper provision shall be made so that the successors and assignees of the Company assume the obligations of the Company with respect to indemnification of members of the Board as in effect immediately before such transaction, whether such obligations are contained in the Company's Bylaws, Restated Certificate, or elsewhere, as the case may be.

## SECTION 4.  RIGHTS OF FIRST OFFER.

**4.1    Subsequent Offerings.** Subject to applicable securities laws, each Investor shall have a right of first offer to purchase its *pro rata* share of all Equity Securities, as defined below, that the Company may, from time to time, propose to sell and issue after the date of this Agreement, other than the Equity Securities excluded by Section 4.6. Each Investor's *pro rata* share is equal to the ratio of (a) the number of shares of the Company's Common Stock (including all shares of Common Stock issuable or issued upon conversion of the Shares or upon the exercise of outstanding warrants or options) of which such Investor is deemed to be a holder immediately prior to the issuance of such Equity Securities to (b) the total number of shares of the Company's outstanding Common Stock (including all shares of Common Stock issued or issuable upon conversion of the Shares or upon the exercise of any outstanding warrants or options) immediately prior to the issuance of the Equity Securities.   The term *"Equity Securities"* shall mean (i) any Common Stock, Preferred Stock or other security of the Company, (ii) any security convertible into or exercisable or exchangeable for, with or without consideration, any Common Stock, Preferred Stock or other security (including any option to purchase such a convertible security), (iii) any security carrying any warrant or right to subscribe to or purchase any Common Stock, Preferred Stock or other security or (iv) any such warrant or right.

**4.2    Exercise of Rights.** If the Company proposes to issue any Equity Securities, it shall give each Investor written notice of its intention, describing the Equity Securities, the price and the terms and conditions upon which the Company proposes to issue the same.   Each Investor shall have fifteen (15) days from the giving of such notice to agree to purchase its *pro rata* share of the Equity Securities for the price and upon the terms and conditions specified in the notice by giving written notice to the Company and stating therein the quantity of Equity Securities to be purchased. Notwithstanding the foregoing, the Company shall not be required to offer or sell such Equity Securities to any Investor who would cause the Company to be in violation of applicable federal securities laws by virtue of such offer or sale.

**4.3    Issuance of Equity Securities to Other Persons.** If not all of the Investors elect to purchase their *pro rata* share of the Equity Securities, then the Company shall promptly notify in writing the  Investors who do so elect and shall offer such Investors the right to acquire such unsubscribed shares on a *pro rata* basis.  The Investors shall have five (5) business days after receipt of such notice to notify the Company of its election to purchase all or a portion thereof of the unsubscribed shares. The Company shall have ninety (90) days thereafter to sell the Equity Securities in respect of which the Investor's rights were not exercised, at a price not lower and

18

upon general terms and conditions not materially more favorable to the purchasers thereof than specified in the Company's notice to the Investors pursuant to Section 4.2. If the Company has not sold such Equity Securities within ninety (90) days of the notice provided pursuant to Section 4.2, the Company shall not thereafter issue or sell any Equity Securities, without first offering such securities to the Investors in the manner provided above.

**4.4    Termination.**  The rights of first refusal established by this Section 4 shall not apply to, and shall terminate upon, the earlier to occur of (a) the completion of the Initial Offering or (b) the completion of a transaction that constitutes an Acquisition or an Asset Transfer.

**4.5    Next Equity Financing.**  The Holders will be entitled to receive registration rights on a pari passu basis with and in substantially the same way as any registration rights granted to Holders of equity securities of the Company issued in the next equity financing of the Company.

**4.6    Assignment of Right of First Offer.**  The right of first offer of each Major Investor under this Section 4 may be assigned to the same parties, subject to the same restrictions as any transfer of registration rights pursuant to Section 2.8.

**4.7    Excluded Securities.**  The rights of first refusal established by this Section 4 shall have no application to any of the following Equity Securities: (a) Equity Securities that are excluded from the definition of Additional Shares of Common Stock (as defined in the Restated Certificate) and (b) Equity Securities issued in the Initial Offering.

## SECTION 5. MISCELLANEOUS.

**5.1    Governing Law.**  This Agreement shall be governed by and construed under the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof and regardless of the laws that might otherwise govern under applicable principles of conflicts of law.

**5.2    Successors and Assigns.**  Except as otherwise expressly provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the parties hereto and their respective successors, assigns, heirs, executors, and administrators and shall inure to the benefit of and be enforceable by each person who shall be a holder of Registrable Securities from time to time; *provided, however*, that prior to the receipt by the Company of adequate written notice of the transfer of any Registrable Securities specifying the full name and address of the transferee, the Company may deem and treat the person listed as the holder of such shares in its records as the absolute owner and holder of such shares for all purposes, including the payment of dividends or any redemption price.

**5.3    Entire Agreement.**  This Agreement, the Exhibits and Schedules hereto, the Purchase Agreement and the other documents delivered pursuant thereto constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and no party shall be liable or bound to any other in any manner by any oral or written representations, warranties, covenants and agreements except as specifically set forth herein and therein. Each

19

party expressly represents and warrants that it is not relying on any oral or written representations, warranties, covenants or agreements outside of this Agreement.

**5.4     Severability.**  In the event one or more of the provisions of this Agreement should, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

**5.5     Amendment, Termination and Waiver.**

**(a)**     Except as otherwise expressly provided, this Agreement may be amended, terminated or modified, and the obligations of the Company and the rights of the Holders under this Agreement may be waived, only upon the written consent of (i) the Company (ii) the holders of a majority of the Series A Stock, voting together as a single class on an as-if converted to Common Stock basis; and (iii) the Holders of a majority of the Registrable Securities then Outstanding.

**(b)**     For the purposes of determining the number of Holders or Investors entitled to vote or exercise any rights hereunder, the Company shall be entitled to rely solely on the list of record holders of its stock as maintained by or on behalf of the Company.

**5.6     Delays or Omissions.**  It is agreed that no delay or omission to exercise any right, power, or remedy accruing to any party, upon any breach, default or noncompliance by another party under this Agreement shall impair any such right, power, or remedy, nor shall it be construed to be a waiver of any such breach, default or noncompliance, or any acquiescence therein, or of any similar breach, default or noncompliance thereafter occurring.  It is further agreed that any waiver, permit, consent, or approval of any kind or character on any party's part of any breach, default or noncompliance under the Agreement or any waiver on such party's part of any provisions or conditions of this Agreement must be in writing and shall be effective only to the extent specifically set forth in such writing.  All remedies, either under this Agreement, by law, or otherwise afforded to any party, shall be cumulative and not alternative.

**5.7     Notices.**  All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient; if not, then on the next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.  All communications shall be sent, if to the Company, to the address set forth on the signature page hereto, and if to an Investor, at the address as set forth on **Exhibit A** hereto or at such other address or electronic mail address as such party may designate by ten (10) days advance written notice to the other parties hereto.

**5.8     Attorneys' Fees.**  In the event that any suit or action is instituted under or in relation to this Agreement, including to enforce any provision in this Agreement, the prevailing party in such dispute shall be entitled to recover from the losing party all fees, costs and expenses

20

of enforcing any right of such prevailing party under or with respect to this Agreement, including such reasonable fees and expenses of attorneys and accountants, which shall include all fees, costs and expenses of appeals.

**5.9**     **Titles and Subtitles.**  The titles of the sections and subsections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

**5.10**     **Additional Investors.**  Notwithstanding anything to the contrary contained herein, if the Company shall issue additional shares of its Preferred Stock after the date of this Agreement, the purchaser of such shares of its Preferred Stock may, with the consent of the holders of a majority of the outstanding Preferred Stock, become a party to this Agreement by executing and delivering an additional counterpart signature page to this Agreement and thereafter shall be deemed an "*Investor*," a "*Holder*" and a party hereunder.

**5.11**     **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

**5.12**     **Aggregation of Stock.**  All shares of Registrable Securities held or acquired by affiliated entities or persons or persons or entities under common management or control shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

**5.13**     **Pronouns.**  All pronouns contained herein, and any variations thereof, shall be deemed to refer to the masculine, feminine or neutral, singular or plural, as to the identity of the parties hereto may require.

**[THIS SPACE INTENTIONALLY LEFT BLANK]**

21

IN WITNESS WHEREOF, the parties hereto have executed this INVESTOR RIGHTS AGREEMENT as of the date set forth in the first paragraph hereof.

**COMPANY:**

SENSORIA INC.

By: _____

Name: Davide Viganò
Title: Chief Executive Officer

**Address for Notices:**

[Signature Page to *Investor Rights Agreement*]

IN WITNESS WHEREOF, the parties hereto have executed this INVESTOR RIGHTS AGREEMENT as of the date set forth in the first paragraph hereof.

INVESTOR:

REPLY S.P.A.

By: _____

Name:

Title:

**REPLY S.p.A.**
Mario Rizzante
Presidente

550283/2/SANFRANCISCO

85

### EXHIBIT A
### LIST OF INVESTORS

| NAME AND ADDRESS | SHARES |
| --- | --- |
| Reply S.P.A.<br>Corso Francia, 110<br>10143 - Torino – ITALY | 6,843,100 |
| Philip Lee<br>c/o SENSORIA INC.<br>16225 NE 87th Street, Suite A-10<br>Redmond, WA 98052 | 143,418 |
| Cristiano Ventura<br>c/o SENSORIA INC.<br>16225 NE 87th Street, Suite A-10<br>Redmond, WA 98052 | 143,418 |
| Scott Anderson<br>c/o SENSORIA INC.<br>16225 NE 87th Street, Suite A-10<br>Redmond, WA 98052 | 204,883 |
| Roberto Cazzaro<br>c/o SENSORIA INC.<br>16225 NE 87th Street, Suite A-10<br>Redmond, WA 98052 | 204,883 |
| Davide Colombo<br>c/o SENSORIA INC.<br>16225 NE 87th Street, Suite A-10<br>Redmond, WA 98052 | 143,418 |
| Nicola Martelli<br>c/o SENSORIA INC.<br>16225 NE 87th Street, Suite A-10<br>Redmond, WA 98052 | 143,418 |
| MTS Fund<br>c/o SENSORIA INC.<br>16225 NE 87th Street, Suite A-10<br>Redmond, WA 98052 | 204,883 |
| StartCaps SP<br>c/o SENSORIA INC.<br>16225 NE 87th Street, Suite A-10<br>Redmond, WA 98052 | 184,395 |

2

Robertjan Tuit
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

122,930

TA McCann
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

24,586

Mauro Meanti
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

245,860

Edward Berman
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

86,051

Mauro Rizzi
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

122,930

Alejandro Buschel
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

36,879

Robertjan Tuit
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

172,102

Moga Investments LLC
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

245,860

Luciana Simoncini
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

24,586

Riccardo Sacco
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

24,586

MTS Fund
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

245,860

3

| | |
|---|---|
| Prashant Mahajan<br>c/o SENSORIA INC.<br>16225 NE 87th Street, Suite A-10<br>Redmond, WA 98052 | 36,879 |
| The Lai Family Trust<br>c/o SENSORIA INC.<br>16225 NE 87th Street, Suite A-10<br>Redmond, WA 98052 | <u>24,586</u> |
| Total | 9,629,513 |

Execution Copy

### EXHIBIT D

### SENSORIA INC.
### RIGHT OF FIRST REFUSAL AND CO-SALE AGREEMENT

THIS RIGHT OF FIRST REFUSAL AND CO-SALE AGREEMENT (the "*Agreement*") is made and entered into as of this 18th day of July 2014, by and among SENSORIA INC., a Delaware corporation (the "*Company*"), each of the persons and entities listed on **Exhibit A** hereto (each referred to herein as a "*Key Holder*" and collectively as the "*Key Holders*") and each of the persons and entities listed on **EXHIBIT B** hereto (the "*Investors*").

### RECITALS

WHEREAS, the Company and certain Investors (the "*Series A Investors*") are parties to that certain Series A Preferred Stock Purchase Agreement, dated of even date herewith (as amended from time to time, the "*Series A Purchase Agreement*"), pursuant to which the Company is selling, and the Series A Investors are purchasing, shares of the Company's Series A Preferred Stock, par value $0.001 per share (the "*Preferred Stock*"); and

WHEREAS, certain of the Company's and the Series A Investors' obligations under the Series A Purchase Agreement are conditioned on the execution and delivery of this Agreement by the parties hereto.

### AGREEMENT

NOW, THEREFORE, in consideration of these premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **DEFINITIONS.**

   1.1   "*Key Holder Stock*" shall mean (a) shares of the Company's Common Stock, par value $0.001 per share (the "*Common Stock*"), and (b) shares of Common Stock issued or issuable upon exercise or conversion, as applicable, of stock options, warrants or other convertible securities of the Company, in each case now owned or subsequently acquired by any Key Holder, by gift, purchase, dividend, stock split, conversion, exchange, warrant exercise, option exercise or any other means whether or not such securities are only registered in a Key Holder's name or beneficially or legally owned by such Key Holder, including any interest of a spouse in any of the Key Holder Stock, whether that interest is asserted pursuant to marital property laws or otherwise. The number of shares of Key Holder Stock owned by the Key Holders as of the date hereof are set forth on **EXHIBIT A**, which Exhibit may be amended from time to time by the Company to reflect changes in the number of shares owned by the Key Holders, but the failure to so amend shall have no effect on such Key Holder Stock being subject to this Agreement.

   1.2   "*Investor Stock*" shall mean the shares of Common Stock and Preferred Stock now owned or subsequently acquired by the Investors by gift, purchase, dividend, stock split,

Right of First Refusal and Co-Sale Agreement – Page 2

conversion, exchange, warrant exercise, option exercise or any other means whether or not such securities are only registered in an Investor's name or beneficially or otherwise legally owned by such Investor. The number of shares of Investor Stock owned by the Investors as of the date hereof are set forth on **EXHIBIT B**, which Exhibit may be amended from time to time by the Company to reflect changes in the number of shares owned by the Investors, but the failure to so amend shall have no effect on such Investor Stock being subject to this Agreement.

**1.3** For purposes of this Agreement, the term *"Transfer"* shall include any sale, assignment, encumbrance, hypothecation, pledge, conveyance in trust, gift, transfer by request, devise or descent, or other transfer or disposition of any kind, including transfers to receivers, levying creditors, trustees or receivers in bankruptcy proceedings or general assignees for the benefit of creditors, whether voluntary or by operation of law, directly or indirectly, of any of the Key Holder Stock that is either (i) held by a Founder (as defined hereafter) or (ii) which represents greater than 50% of the issued nd outstanding capital stock of the Company (whether by direct purchase, merger, share exchange or otherwise).

**2.    TRANSFERS BY A KEY HOLDER.**

**2.1    Notice of Transfer.** If a Key Holder proposes to Transfer any shares of Key Holder Stock, then the Key Holder shall promptly give written notice (the *"Notice"*) simultaneously to the Company and to each of the Investors at least thirty (30) days prior to the closing of such Transfer. The Notice shall describe in reasonable detail the proposed Transfer, including the material terms and conditions of such Transfer, the number and type of shares of Key Holder Stock to be transferred, the nature of such Transfer, the consideration to be paid (including price and form of consideration), and the name and address of each prospective purchaser or transferee. In the event that the Transfer is being made pursuant to the provisions of Section 3.1, the Notice shall state under which clause of Section 3.1 the Transfer is being made. Any such Notice must include an offer to acquire a proportional amount of the outstanding Series A Preferred Stock.

**2.2    Company Right of First Refusal.** For a period of ten (10) days following receipt of any Notice described in Section 2.1, the Company shall have the right to purchase all or a portion of the Key Holder Stock subject to such Notice on the same terms and conditions as set forth therein. The Company's purchase right shall be exercised by written notice signed by an officer of the Company (the *"Company Notice"*) and delivered to the Key Holder within such ten (10) day period. The Company shall effect the purchase of the Key Holder Stock, including payment of the purchase price, not more than ten (10) business days after delivery of the Company's Notice, and at such time the Key Holder shall deliver to the Company the certificate(s) representing the Key Holder Stock to be purchased by the Company (free and clear of all claims, liens and other encumbrances), each certificate to be properly endorsed for transfer. The Key Holder Stock so purchased shall be cancelled and cease to be issued and outstanding shares of Common Stock.

**2.3    Investor Right of First Refusal.**

(a)    In the event that the Company does not elect to purchase all of the Key Holder Stock available pursuant to its rights under Section 2.2 within the period set forth therein,

Right of First Refusal and Co-Sale Agreement – Page 3

the Key Holder shall promptly give written notice (the *"Second Notice"*) to each of the Investors who then holds no less than a number of shares (as adjusted for stock splits, combinations and the like) of Preferred Stock equivalent to no less than $250,000 in original purchase price paid to the Company pursuant to the Series A Purchase Agreement (each, a *"Qualifying Investor"*), which shall set forth the number and type of shares of Key Holder Stock not purchased by the Company and which shall include the terms of Notice set forth in Section 2.1. Each Qualifying Investor shall have the right, exercisable upon written notice to the Key Holder (the *"Investor Notice"*) within ten (10) days after the receipt of the Second Notice, to purchase its *pro rata* share of the Key Holder Stock subject to the Second Notice and on the same terms and conditions as set forth therein. Except as set forth in Section 2.3(c), the Qualifying Investors who so exercise their rights (the *"Participating Investors"*) shall effect the purchase of the Key Holder Stock, including payment of the purchase price, not more than ten (10) business days after delivery of the Investor Notice, and at such time the Key Holder shall deliver to the Participating Investors the certificate(s) representing the Key Holder Stock to be purchased by the Participating Investors, each certificate to be properly endorsed for transfer, together with stock powers, free and clear of all claims, liens and other encumbrances.

(b)     Each Qualifying Investor's *pro rata* share shall be equal to the product obtained by multiplying (i) the aggregate number of shares of Key Holder Stock covered by the Second Notice and (ii) a fraction, the numerator of which is the number of shares of Common Stock issued or issuable upon the conversion or exercise of Preferred Stock or other rights to acquire shares of Common Stock held by the Participating Investor at the time of the Notice, and the denominator of which is the total number of shares of Common Stock issued or issuable upon the conversion or exercise of Preferred Stock or other rights to acquire shares of Common Stock at the time of the Notice held by all Qualifying Investors.

(c)     In the event that not all of the Qualifying Investors elect to purchase their *pro rata* share of the Key Holder Stock available pursuant to their rights under Section 2.3(a) within the time period set forth therein, then the Key Holder shall promptly give written notice to each of the Participating Investors (the *"Overallotment Notice"*), which shall set forth the number and type of shares of Key Holder Stock not purchased by the other Qualifying Investors, and shall offer such Participating Investors the right to acquire such unsubscribed shares. Each Participating Investor shall have seven (7) days after receipt of the Overallotment Notice to deliver a written notice to the Key Holder (the *"Participating Investors Overallotment Notice"*) indicating the number of unsubscribed shares that such Participating Investor desires to purchase, and each such Participating Investor shall be entitled to purchase such number of unsubscribed shares on the same terms and conditions as set forth in the Second Notice. In the event that the Participating Investors desire to purchase, in the aggregate, a number of shares that exceeds the total number of available unsubscribed shares, then the number of unsubscribed shares that each Participating Investor may purchase shall be reduced on a *pro rata* basis. For purposes of this Section 2.3(c), each Participating Investor's *pro rata* share shall be equal to the product obtained by multiplying (i) the aggregate number of shares of Key Holder Stock covered by the Overallotment Notice and (ii) a fraction, the numerator of which is the number of shares of Common Stock issued or issuable upon the conversion or exercise of Preferred Stock or other rights to acquire shares of Common Stock held by the Participating Investor electing to purchase unsubscribed shares at the time of the Notice, and the denominator of which is the total number of shares of Common Stock issued or issuable upon the conversion or exercise of Preferred

Right of First Refusal and Co-Sale Agreement – Page 4

Stock or other rights to acquire shares of Common Stock held by all Participating Investors electing to purchase unsubscribed shares at the time of the Notice. The Participating Investors shall then effect the purchase of the Key Holder Stock, including payment of the purchase price, not more than ten (10) business days after delivery of the Participating Investors Overallotment Notice, and at such time, the Key Holder shall deliver to the Investors the certificates representing the Key Holder Stock to be purchased by the Participating Investors, each certificate to be properly endorsed for transfer, together with stock powers, free and clear of all claims, liens and other encumbrances.

**(d)**     If the consideration proposed to be paid for the shares of Key Holder Stock set forth in a Notice is in property, services or other non-cash consideration, then the fair market value of the consideration shall be as determined in good faith by the Company's Board of Directors, and the Company shall send written notice of such fair market value determination, signed by an officer of the Company (the "*FMV Notice*"), to the Key Holder and each Investors within 10 days after the Company's receipt of such Notice. If the Company or any Investor cannot for any reason pay for such Key Holder Stock in the same form of non-cash consideration, then the Company or such Investor may pay the cash value equivalent thereof, as set forth in the FMV Notice.

**2.4     Right of Co-Sale.**

**(a)**     In the event the Company and the Investors fail to exercise their respective rights to purchase all of the Key Holder Stock subject to Sections 2.2 and 2.3, following the exercise or expiration of the rights of purchase set forth in Sections 2.2 and 2.3, then the Key Holder shall deliver to the Company and each Qualifying Investor written notice (the "*Co-Sale Notice*") that each Qualifying Investor shall have the right, exercisable upon written notice to such Key Holder with a copy to the Company within fifteen (15) days after receipt of the Co-Sale Notice, to participate in such Transfer of Key Holder Stock (excluding, for the avoidance of doubt, shares of Key Holder Stock purchased by the Company and/or the Participating Investors pursuant to Section 2.2 or 2.3) on the same terms and conditions. Such notice shall indicate the number and type of shares of Investor Stock up to that number of shares determined under Section 2.4(b) such Qualifying Investor wishes to sell under his or her right to participate. To the extent one or more of the Qualifying Investors exercise such right of participation in accordance with the terms and conditions set forth below, the number of shares of Key Holder Stock that such Key Holder may sell in the transaction shall be correspondingly reduced based on their *pro rata* ownership.

**(b)**     Each Qualifying Investor may sell all or any part of that number of shares equal to the product obtained by multiplying (i) the aggregate number of shares of Key Holder Stock covered by the Co-Sale Notice and not purchased by the Company or its assignees or Qualifying Investors pursuant to Section 2.2 or 2.3 by (ii) a fraction the numerator of which is the number of shares of Common Stock issued or issuable upon the conversion or exercise of Preferred Stock or other rights to acquire shares of Common Stock held by such Qualifying Investor at the time of the Co-Sale Notice and the denominator of which is the total number of shares of Common Stock held by such Key Holder (excluding shares purchased by the Company and/or Qualifying Investors pursuant to Section 2.2 or 2.3) plus the number of shares of Common Stock issued or issuable upon the conversion or exercise of Preferred Stock or other

rights to acquire shares of Common Stock held by all Qualifying Investors at the time of the Co-Sale Notice.

(c)    Each Qualifying Investor who elects to participate in the Transfer pursuant to this Section 2 (a *"Co-Sale Participant"*) shall effect its participation in the Transfer by promptly delivering to such Key Holder for transfer to the prospective purchaser one or more certificates, properly endorsed for transfer, which represent:

(i)    the number of shares of Common Stock which such Co-Sale Participant elects to sell; or

(ii)    that number of shares of Preferred Stock which is at such time convertible into the number of shares of Common Stock which such Co-Sale Participant elects to sell; provided, however, that if the prospective purchaser objects to the delivery of Preferred Stock in lieu of Common Stock, such Co-Sale Participant shall convert such Preferred Stock into Common Stock and deliver Common Stock as provided in Section 2.4(c)(i).  The Company agrees to make any such conversion concurrent with and contingent upon the actual transfer of such shares to the purchaser.

(d)    The stock certificate or certificates that the Co-Sale Participant delivers to such Key Holder pursuant to Section 2.4(c) shall be transferred to the prospective purchaser in consummation of the sale of the Common Stock pursuant to the terms and conditions specified in the Co-Sale Notice, and the Key Holder shall concurrently therewith remit to such Co-Sale Participant that portion of the sale proceeds to which such Co-Sale Participant is entitled by reason of its participation in such sale.  To the extent that any prospective purchaser or purchasers prohibits such assignment or otherwise refuses to purchase shares or other securities from a Co-Sale Participant exercising its rights of co-sale hereunder, such Key Holder shall not sell to such prospective purchaser or purchasers any Key Holder Stock unless and until, simultaneously with such sale, such Key Holder shall purchase such shares or other securities from such Co-Sale Participant on the same terms and conditions specified in the Co-Sale Notice.

(e)    The exercise or non-exercise of the rights of any Qualifying Investor hereunder to participate in one or more Transfers of Key Holder Stock made by any Key Holder shall not adversely affect such Qualifying Investor's right to participate in subsequent Transfers of Key Holder Stock subject to Section 2.

(f)    To the extent that the Qualifying Investors do not elect to participate in the sale of the Key Holder Stock subject to the Co-Sale Notice, such Key Holder may, not later than sixty (60) days following delivery to the Company of the Co-Sale Notice, enter into an agreement providing for the closing of the Transfer of such Key Holder Stock covered by the Co-Sale Notice within thirty (30) days of such agreement on terms and conditions not materially more favorable to the transferor than those described in the Co-Sale Notice.  Any proposed Transfer on terms and conditions materially more favorable than those described in the Co-Sale Notice, as well as any subsequent proposed Transfer of any of the Key Holder Stock by a Key Holder, shall again be subject to the first refusal and co-sale rights of the Company and/or Qualifying Investors and shall require compliance by a Key Holder with the procedures described in this Section 2.

Right of First Refusal and Co-Sale Agreement – Page 6

**(g)** Any purchaser of shares of Key Holder Stock from a Key Holder (excluding the Company or any Investor) shall, as a condition to the acquisition of such shares, enter into a written agreement to be bound by and comply with all provisions of this Agreement, as if it were an original Key Holder hereunder, including this Section 2. Such Transferred Key Holder Stock shall remain *"Key Holder Stock"* hereunder, and such purchaser shall be treated as the *"Key Holder"* for purposes of this Agreement.

3.   **EXEMPT TRANSFERS.**

**3.1** Notwithstanding the foregoing, the right of first refusal and co-sale rights of the Company and/or the Qualifying Investors set forth in Section 2 above shall not apply: (a) in the case of a Key Holder who is a natural person, to any Transfer without consideration to the Key Holder's ancestors, descendants or spouse or to trusts for the benefit of such persons or the Key Holder, or to an entity controlled by the Key Holder, (b) in the case of a Key Holder that is an entity, upon a Transfer without consideration by such Key Holder to its stockholders, members, partners or other equity holders, (c) to a repurchase of Key Holder Stock from a Key Holder by the Company at a price no greater than that originally paid by such Key Holder for such Key Holder Stock and pursuant to an agreement containing vesting and/or repurchase provisions approved by a majority of the Board of Directors; *provided* that in the event of any Transfer made pursuant to clauses (a) and (b), (A) the Key Holder shall inform, in writing, the Investors of such Transfer prior to effecting it and (B) the transferee or donee shall, as a condition to such Transfer, enter into a written agreement to be bound by and comply with all provisions of this Agreement, as if it were an original Key Holder hereunder, including Section 2. Such Transferred Key Holder Stock shall remain *"Key Holder Stock"* hereunder, and such transferee or donee shall be treated as the *"Key Holder"* for purposes of this Agreement.

**3.2** Notwithstanding the foregoing, the provisions of Section 2 shall not apply to the sale of any Key Holder Stock to the public pursuant to a registration statement filed with, and declared effective by, the Securities and Exchange Commission under the Securities Act of 1933 (the *"Securities Act"*) or any Transfer of Key Holder Stock in connection with a Deemed Liquidation Event (as defined in the Company's certificate of incorporation (as the same may be amended, restated or otherwise modified from time to time, the *"Restated Certificate"*) which is approved by holders of a majority of the Preferred Stock.

**3.3** This Agreement is subject to, and shall in no manner limit the right which the Company may have to repurchase securities from a Key Holder who performed services for the Company or any subsidiary who acquired such shares directly from the Company, if such purchase is made upon the termination of employment or other business relationship of such Key Holder as a former employee, officer, director, consultant or other service provider pursuant to contractual rights held by the Company relating to the termination of employment or other business relationship of such Key Holder and the purchase price does not exceed the lesser of (i) the original purchase price paid the Key Holder for such shares or (ii) the then fair market value of such shares.

**3.4** Notwithstanding the foregoing, no Key Holder shall Transfer any Key Holder Stock to (a) any entity which, in the determination of the Company's Board of Directors, directly or indirectly competes with the Company or (b) any customer, distributor or supplier of the

Right of First Refusal and Co-Sale Agreement – Page 7

Company, if the Company's Board of Directors should determine that such Transfer would result in such customer, distributor or supplier receiving information that would place the Company at a competitive disadvantage with respect to such customer, distributor or supplier.

4. **PROHIBITED TRANSFERS.**

    **4.1** **Call Option.** In the event of a Transfer in contravention of Section 2.3 hereof (a "*Prohibited Transaction*"), each Qualifying Investor, in addition to such other remedies as may be available at law, in equity or hereunder, shall have the option to purchase from the pledgee, purchaser or transferee of the Key Holder Stock transferred in contravention of Section 2.3, the number of shares that such Qualifying Investor would have been entitled to purchase had such Prohibited Transaction been effected in accordance with Section 2.3 hereof, on the following terms and conditions:

        **(a)** the price per share at which the shares are to be purchased by such Qualifying Investor shall be equal to the price per share paid to such Key Holder by the third party purchaser or purchasers of such Key Holder Stock that is subject to the Prohibited Transaction; and

        **(b)** the Key Holder effecting such Prohibited Transaction shall reimburse such Qualifying Investor for any and all fees and expenses, including reasonable legal fees and expenses, incurred in effecting such purchase.

    **4.2** **Put Option.** In the event that a Key Holder should Transfer any Key Holder Stock in contravention of the co-sale rights of each Qualifying Investor under Section 2.4 of this Agreement (a "*Prohibited Transfer*"), each Qualifying Investor, in addition to such other remedies as may be available at law, in equity or hereunder, shall have the put option provided by this Section 4.2, and such Key Holder shall be bound by the applicable provisions of such option. In the event of a Prohibited Transfer, each Qualifying Investor shall have the right to sell to such Key Holder the type and number of shares of Common Stock equal to the number of shares each Qualifying Investor would have been entitled to transfer to the purchaser under Section 2.4 had the Prohibited Transfer been effected pursuant to and in compliance with the terms hereof. Such sale shall be made on the following terms and conditions:

        **(a)** The price per share at which the shares are to be sold to the Key Holder shall be equal to the price per share paid by the purchaser to such Key Holder in such Prohibited Transfer. The Key Holder shall also reimburse each Qualifying Investor for any and all fees and expenses, including reasonable legal fees and expenses, incurred in connection with the exercise or the attempted exercise of the Qualifying Investor's rights under Section 2.4.

        **(b)** Within ninety (90) days after the date on which a Qualifying Investor received notice of the Prohibited Transfer, such Qualifying Investor shall, if exercising the option created hereby, deliver to the Key Holder the certificate or certificates representing the shares to be sold, each certificate to be properly endorsed for transfer.

        **(c)** Such Key Holder shall, upon receipt of the certificate or certificates for the shares to be sold by a Qualifying Investor, pursuant to this Section 4.2, pay the aggregate

purchase price therefor and the amount of reimbursable fees and expenses, as specified in Section 4.2(b), in cash or by other means acceptable to such Qualifying Investor.

**4.3    Voidability of Transfer.** Notwithstanding the foregoing, any purported Transfer by a Key Holder of Key Holder Stock in contravention of Section 2 and/or Section 3 hereof shall be null and void ab initio, shall not be recorded on the books of the Company or its transfer agent, and shall not be recognized by the Company. Each party hereto acknowledges and agrees that any breach of this Agreement would result in substantial harm to the other parties hereto for which monetary damages alone could not adequately compensate. Therefore, the parties hereto unconditionally and irrevocably agree that any non-breaching party hereto shall be entitled to seek protective orders, injunctive relief and other remedies available at law or in equity (including, without limitation, seeking specific performance or the rescission of any Transfer of Key Holder Stock not made in strict compliance with this Agreement).

## 5.    LEGEND.

**5.1**    Each certificate representing shares of Key Holder Stock now or hereafter owned by the Key Holder or issued to any person or entity (excluding the Company and any Co-Sale Participant) in connection with a Transfer pursuant to Section 2.4, 3.1 or Section 3.3 hereof shall be endorsed with the following legend:

> "THE SALE, PLEDGE, HYPOTHECATION OR TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO, AND IN SOME CASES PROHIBITED BY, THE TERMS AND CONDITIONS OF A CERTAIN RIGHT OF FIRST REFUSAL AND CO-SALE AGREEMENT BY AND AMONG THE STOCKHOLDER, THE CORPORATION AND CERTAIN HOLDERS OF STOCK OF THE CORPORATION.    COPIES OF SUCH AGREEMENT MAY BE OBTAINED UPON WRITTEN REQUEST TO THE SECRETARY OF THE CORPORATION."

**5.2**    The Key Holders agree that the Company may instruct its transfer agent to impose transfer restrictions on the shares represented by certificates bearing the legend referred to in Section 5.1 above to enforce the provisions of this Agreement and the Company agrees to promptly do so. The legend shall be removed at the request of any Key Holder following termination of this Agreement.

## 6.    MISCELLANEOUS.

**6.1    Conditions to Exercise of Rights.** Exercise of the parties' rights under this Agreement shall be subject to and conditioned upon, and the Key Holders, the Investors and the Company shall use their best efforts to assist each Investor in, compliance with applicable laws.

**6.2    Governing Law.** This Agreement shall be governed by and construed under the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof and regardless of the laws that might otherwise govern under applicable principles of conflicts of law.

Right of First Refusal and Co-Sale Agreement – Page 9

**6.3    Amendment.** Any provision of this Agreement may be amended or modified and/or the observance thereof may be waived or this Agreement terminated, only with the written consent of (i) the Company; (ii) the Investors holding a majority of the outstanding shares of Preferred Stock, voting together as a single class on an as-if converted to Common Stock basis and (iii) the parties hereto holding a majority of the outstanding shares of Common Stock and Preferred Stock (voting or consenting together as a single class); provided, that no consent of any Key Holder or Investor shall be necessary for any amendment and/or restatement which merely includes additional holders of Preferred Stock or other preferred stock of the Company as "*Investors*" as parties hereto or other employees or holders of Common Stock of the Company as "*Key Holders*" and parties hereto.  Any amendment or waiver effected in accordance with clauses (i), (ii), and (iii) of this Section 6.3 shall be binding upon each Investor, and his, her or its successors and assigns, the Company and each of the Key Holders and his, her or its successors and assigns.  No consent of any party hereto shall be necessary to include as a party to this Agreement any transferee required to become a party hereto pursuant to Section 2.4, 3.1 or Section 3.3 hereof.

**6.4    Successors and Assigns.** The provisions hereof shall inure to the benefit of, and be binding upon, the parties hereto and their respective successors, assigns, heirs, executors and administrators and other legal representatives.

**6.5    Term.** This Agreement shall continue in full force and effect from the date hereof through the earliest of the following dates, on which date it shall terminate in its entirety:

**(a)**    the date of the closing of a Qualified Public Offering (as defined in the Restated Certificate);

**(b)**    the date of the closing of a Liquidation Event (as defined in the Restated Certificate) or Deemed Liquidation (as defined in the Restated Certificate); or

**(c)**    the date as of which the parties hereto terminate this Agreement by written consent of (i) the Company; (ii) the Investors holding a majority of the outstanding shares of Preferred Stock, voting together as a single class on an as-if converted to Common Stock basis, and (iii) the parties hereto holding a majority of the outstanding shares of Common Stock and Preferred Stock (voting or consenting together as a single class).

**6.6    Ownership.** Each Key Holder represents and warrants that he, she or it is the sole legal and beneficial owner of those shares of Key Holder Stock he, she or it currently holds subject to the Agreement and that no other person or entity has any interest (other than a community property interest as to which the holder thereof has acknowledged and agreed in writing to the restrictions and obligations under this Agreement) in such shares

**6.7    Lock-Up.** Each Key Holder hereby agrees that such Key Holder shall not lend, offer, pledge, purchase any option to sell or contract to sell, sell any option or contract to purchase, sell, contract to sell, transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale of, any Common Stock (or other securities) of the Company held by such Key Holder (other than those included in the registration) during the 180-day period following the effective date of the

Right of First Refusal and Co-Sale Agreement – Page 10

initial public offering (the *"IPO"*) (or such longer period as the underwriters or the Company shall request in order to facilitate compliance with NASD Rule 2711), provided, that all officers and directors of the Company and shareholders holding at least 5% of the Company's capital stock are bound by and have entered into similar agreements. The foregoing provisions of this Section 6.7 shall not apply to the sale of any shares to an underwriter pursuant to an underwriting agreement. The underwriters in connection with the IPO are intended third-party beneficiaries of this Section 6.7 and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto. Each Key Holder further agrees to execute such agreements as may be reasonably requested by the underwriters in the IPO that are consistent with this Section 6.7 or that are necessary to give further effect thereto. In order to enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect to the Key Holder Stock of each Key Holder (and transferees and assignees thereof) until the end of such restricted period.

6.8     **Notices.**  All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient; if not, then on the next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent, if to the Company to the address set forth on the signature page hereto, and if to any Key Holder or Investor, to the address as set forth on **EXHIBIT A** or **EXHIBIT B** hereto, or at such other address as such party may designate by ten (10) days advance written notice to the other parties hereto.

6.9     **Severability.**  In the event one or more of the provisions of this Agreement should, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

6.10     **Attorneys' Fees.**  In the event that any suit or action is instituted under or in relation to this Agreement, including to enforce any provision in this Agreement, the prevailing party in such dispute shall be entitled to recover from the losing party all fees, costs and expenses of enforcing any right of such prevailing party under or with respect to this Agreement, including such reasonable fees and expenses of attorneys and accountants, which shall include all fees, costs and expenses of appeals.

6.11     **Entire Agreement.**  This Agreement and the Exhibits hereto, along with the Purchase Agreement and the other documents delivered pursuant thereto, constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and thereof and no party shall be liable or bound to any other in any manner by any oral or written representations, warranties, covenants and agreements except as specifically set forth herein and therein. Each party expressly represents and warrants that it is not relying on any oral or written representations, warranties, covenants or agreements outside of this Agreement.

Right of First Refusal and Co-Sale Agreement – Page 11

**6.12    Additional Investors.**   Notwithstanding anything to the contrary contained herein, if the Company shall issue additional shares of its Preferred Stock pursuant to the Series A Purchase Agreement, any purchaser of such shares of Preferred Stock shall become a party to this Agreement by executing and delivering an additional counterpart signature page to this Agreement and shall be deemed an "Investor" and a party hereunder.

**6.13    Additional Key Holders.**   In the event that after the date of this Agreement, the Company issues shares of Common Stock, or options to purchase Common Stock, to any employee or consultant of the Company, which shares or options would collectively constitute with respect to such employee or consultant (taking into account all shares of Common Stock, options and other purchase rights held by such employee or consultant) one percent (1%) or more of the Company's then outstanding Common Stock (treating for this purpose all shares of Common Stock issuable upon exercise of or conversion of outstanding options, warrants or convertible securities, as if exercised or converted), the Company shall, as a condition to such issuance, cause such employee or consultant (an *"Additional Holder"*) to execute a counterpart signature page hereto as a Key Holder, and such person shall thereby be bound by, and subject to, all the terms and provisions of this Agreement applicable to a Key Holder.  This Agreement, including EXHIBIT A and EXHIBIT B hereto, shall be amended by the Company without the consent of the Key Holders or the Investors to include any Additional Holders as "Key Holders."

**6.14    Counterparts.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[THIS SPACE INTENTIONALLY LEFT BLANK]

The foregoing **RIGHT OF FIRST REFUSAL AND CO-SALE AGREEMENT** is hereby executed as of the date first above written.

**COMPANY:**

**SENSORIA INC.**

By: _____

Name:  Davide Viganò

Title:   Chief Executive Officer

**Address for Notices:**

SENSORIA INC.

16225 NE 8TH ST, SUITE A10

REDMOND - WA - 98052

Right of First Refusal and Co-Sale Agreement – Page 3

IN WITNESS WHEREOF, the parties hereto have executed this Right of First Refusal and Co-Sale Agreement as of the date first above written.

**KEY HOLDER:**

3

Right of First Refusal and Co-Sale Agreement — Page 3

IN WITNESS WHEREOF, the parties hereto have executed this Right of First Refusal and Co-Sale Agreement as of the date first above written.

**KEY HOLDER:**

3

Right of First Refusal and Co-Sale Agreement — Page 3

IN WITNESS WHEREOF, the parties hereto have executed this Right of First Refusal and Co-Sale Agreement as of the date first above written.

**KEY HOLDER:**

3

Right of First Refusal and Co-Sale Agreement – Page 3

IN WITNESS WHEREOF, the parties hereto have executed this Right of First Refusal and Co-Sale Agreement as of the date first above written.

**INVESTOR:**

REPLY S.P.A.

**REPLY S.p.A.**
Mario Rizzante
Presidente

3

559284/2/SANFRANCISCO

104

Right of First Refusal and Co-Sale Agreement – Page 4

## EXHIBIT A

## LIST OF KEY HOLDERS

Davide Viganò
Mario Esposito
Maurizio Macagno

## EXHIBIT B

## LIST OF INVESTORS

| NAME AND ADDRESS | SHARES |
|---|---|
| Reply S.P.A.<br>Corso Francia, 110<br>10143 - Torino – ITALY | 6,843,100 |
| Philip Lee<br>c/o SENSORIA INC.<br>16225 NE 87th Street, Suite A-10<br>Redmond, WA 98052 | 143,418 |
| Cristiano Ventura<br>c/o SENSORIA INC.<br>16225 NE 87th Street, Suite A-10<br>Redmond, WA 98052 | 143,418 |
| Scott Anderson<br>c/o SENSORIA INC.<br>16225 NE 87th Street, Suite A-10<br>Redmond, WA 98052 | 204,883 |
| Roberto Cazzaro<br>c/o SENSORIA INC.<br>16225 NE 87th Street, Suite A-10<br>Redmond, WA 98052 | 204,883 |
| Davide Colombo<br>c/o SENSORIA INC.<br>16225 NE 87th Street, Suite A-10<br>Redmond, WA 98052 | 143,418 |
| Nicola Martelli<br>c/o SENSORIA INC.<br>16225 NE 87th Street, Suite A-10<br>Redmond, WA 98052 | 143,418 |
| MTS Fund<br>c/o SENSORIA INC.<br>16225 NE 87th Street, Suite A-10<br>Redmond, WA 98052 | 204,883 |
| StartCaps SP<br>c/o SENSORIA INC.<br>16225 NE 87th Street, Suite A-10<br>Redmond, WA 98052 | 184,395 |

1

Right of First Refusal and Co-Sale Agreement – Page 2

Robertjan Tuit                                122,930
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

TA McCann                                      24,586
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

Mauro Meanti                                  245,860
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

Edward Berman                                  86,051
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

Mauro Rizzi                                   122,930
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

Alejandro Buschel                              36,879
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

Robertjan Tuit                                172,102
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

Moga Investments LLC                          245,860
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

Luciana Simoncini                              24,586
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

Riccardo Sacco                                 24,586
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

MTS Fund                                      245,860
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

2

Right of First Refusal and Co-Sale Agreement – Page 3

Prashant Mahajan                                    **36,879**
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

The Lai Family Trust                                <u>**24,586**</u>
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

Total                                               **9,629,513**

3

Execution Copy

## EXHIBIT E

## SENSORIA INC.
## VOTING AGREEMENT

THIS VOTING AGREEMENT (the "*Agreement*") is made and entered into as of this 18th day of July, 2014, by and among SENSORIA INC., a Delaware corporation (the "*Company*"), the holders of the Company's Common Stock, par value $0.001 per share (the "*Common Stock*"), and options or warrants to purchase Common Stock, listed on EXHIBIT A hereto (the "*Key Holders*") and the Persons listed on EXHIBIT B hereto (the "*Investors*" and collectively with the Key Holders, the "*Stockholders*").

### WITNESSETH

WHEREAS, the Company and certain Investors (the "*Series A Investors*") are parties to the Series A Preferred Stock Purchase Agreement of eve date herewith (as amended from time to time, the "*Series A Purchase Agreement*"), pursuant to which the Company is selling, and the Series A Investors are purchasing, shares of the Company's Series A Preferred Stock, par value $0.001 per share (collectively, the "*Series A Preferred Stock*"); and

WHEREAS, certain of the Company's and the Series A Investors' obligations under the Series A Purchase Agreement are conditioned on the execution and delivery of this Agreement by the parties hereto.

### AGREEMENT

NOW, THEREFORE, in consideration of these premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **VOTING.**

    1.1    **Key Holder Shares; Investor Shares.**

        (a)    Each Key Holder agrees to hold all shares of voting capital stock of the Company registered in such Key Holder's name or beneficially owned by such Key Holder as of the date hereof and any and all other securities of the Company legally or beneficially acquired (whether through stock splits, stock dividends, reclassifications, recapitalizations, similar events or otherwise) by such Key Holder after the date hereof (hereinafter collectively referred to as the "*Key Holder Shares*") subject to, and to vote such Key Holder's Key Holder Shares in accordance with, the provisions of this Agreement.

        (b)    Each Investor agrees to hold all shares of voting capital stock of the Company (including but not limited to all shares of Common Stock issued or issuable upon conversion of the Series A Preferred Stock, registered in such Investor's name or beneficially owned by such Investor as of the date hereof and any and all other securities of the Company legally or beneficially acquired (whether through stock splits, stock dividends, reclassifications,

556286/2/SANFRANCISCO

Voting Agreement – Page 2

recapitalizations, similar events or otherwise) by such Investor after the date hereof (hereinafter collectively referred to as the "***Investor Shares***" and collectively with the Key Holder Shares, the "***Shares***") subject to, and to vote such Investor's Investor Shares in accordance with, the provisions of this Agreement.

      **1.2**    **Size of the Board.**  Subject to the provisions of the Company's certificate of incorporation (as the same may be amended, restated or otherwise modified from time to time, the "***Restated Certificate***"), each Stockholder agrees to vote, or cause to be voted, all Shares owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that the size of the Board shall be set and remain at five (5) directors after the Initial Closing (the "***Initial Closing***" is defined in the Securities Purchase Agreement between the Company and each Investor of even date herewith).

      **1.3**    **Election of Directors.**  On all matters relating to the election and removal of directors of the Company, each Stockholder agrees to vote, or cause to be voted, all Shares held by such Stockholder, or over which such Stockholder has voting control from time to time and at all times, in whatever manner as shall be necessary to ensure that at each annual or special meeting of stockholders at which an election of directors is held or pursuant to any written consent of the stockholders, the following persons shall be elected to the Company's Board of Directors (the "***Board***"):

      **(a)**    One individual (the "***Series A Designee***") designated by the holders of the Series A Preferred Stock, who shall initially be Marco Cusinato. The Series A Designee shall be elected to the directorship to be elected by the holders of the Series A Preferred Stock, voting as a separate class, as contemplated by the Restated Certificate. Any vote taken to remove any director elected pursuant to this Section 1.3(a), or to fill any vacancy created by the resignation, removal or death of a director elected pursuant to this Section 1.3(a), shall also be subject to and comply with the provisions of this Section 1.3(a). Upon the written request of a majority of the holders of the Series A Preferred Stock, each Stockholder shall vote all of its respective Shares for the removal of a director elected pursuant to this Section 1.3(a).

      **(b)**    Three individuals designated by the holders of a majority of the outstanding shares of Common Stock, voting as a separate class, who shall initially be Davide Viganò, Maurizio Macagno, and Mario Esposito. Any vote taken to remove any director elected pursuant to this Section 1.3(b), or to fill any vacancy created by the resignation, removal or death of a director elected pursuant to this Section 1.3(b), shall also be subject to the provisions of this Section 1.3(b). Upon the written request of the holders of a majority of the Common Stock, each Stockholder shall vote its Shares for the removal of the director elected pursuant to this Section 1.3(b).

      **(c)**    One individual not otherwise an Affiliate (as defined below) of the Company or of any Investor (the "***Independent Director***") who is mutually acceptable to (i) the holders of a majority of the outstanding shares of Common Stock, voting as a separate class, and (ii) the holders of a majority of the outstanding shares of Series A Preferred Stock, voting as a separate class. Any vote taken to remove any director elected pursuant to this Section 1.3(c), or to fill any vacancy created by the resignation, removal or death of a director elected pursuant to

Voting Agreement – Page 3

this Section 1.3(c), shall also be subject to the provisions of this Section 1.3(c).  Upon the written request of the holders of (i) a majority of the Common Stock, and (ii) a majority of the Series A Preferred Stock, each Stockholder shall vote its Shares for the removal of the director elected pursuant to this Section 1.3(c).

For purposes of this Agreement, a Person (as defined below) shall be deemed an *"Affiliate"* of another Person who, directly or indirectly, controls, is controlled by or is under common control with such Person, including, without limitation, any general partner, managing member, officer or director of such Person or any  venture capital fund now or hereafter existing that is controlled by one or more general partners or managing members of, or shares the same management company with, such Person.

**1.4      No Liability for Election of Recommended Director.**   None of the parties hereto and no officer, director, stockholder, partner, employee, affiliate or agent of any party (a) makes any representation or warranty as to the fitness or competence of the nominee of any party hereunder to serve on the Board by virtue of such party's execution of this Agreement or by the act of such party in voting for such nominee pursuant to this Agreement, (b) shall have any liability as a result of designating a person for election as a director for any act or omission by such designated person in his or her capacity as a director of the Company, and (c) shall have any liability as a result of voting for any such designee in accordance with the provisions of this Agreement.

**1.5      Legend.**

**(a)**      Concurrently with the execution of this Agreement, there shall be imprinted or otherwise placed, on certificates representing the Shares the following restrictive legend (the *"Legend"*):

> THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS AND CONDITIONS OF A VOTING AGREEMENT WHICH PLACES CERTAIN RESTRICTIONS ON THE VOTING OF THE SHARES REPRESENTED HEREBY.   ANY PERSON ACCEPTING ANY INTEREST IN SUCH SHARES SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF SUCH AGREEMENT. A COPY OF SUCH VOTING AGREEMENT WILL BE FURNISHED TO THE RECORD HOLDER OF THIS CERTIFICATE WITHOUT CHARGE UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS.

**(b)**      The Company agrees that, during the term of this Agreement, it will not remove, and will not permit to be removed (upon registration of transfer, reissuance or otherwise), the Legend from any such certificate and will place or cause to be placed the Legend on any new certificate issued to represent Shares theretofore represented by a certificate carrying the Legend.   If at any time or from time to time any Stockholder holds any certificate representing shares of the Company's capital stock not bearing the Legend, such Stockholder

agrees to deliver such certificate to the Company promptly to have such Legend placed on such certificate.

    **1.6**    **Successors.**    The provisions of this Agreement shall be binding upon the successors in interest to any of the Shares. The Company shall not permit the transfer of any of the Shares on its books or issue a new certificate representing any of the Shares unless and until the person, corporation, limited liability company, general or limited partnership, trust, estate, joint venture, governmental entity or any other entity or organization (each, a *"Person"*) to whom such security is to be transferred shall have executed a written agreement, substantially in the form of this Agreement, pursuant to which such Person becomes a party to this Agreement and agrees to be bound by all the provisions hereof as if such Person were a Key Holder or Investor, as applicable.

    **1.7**    **Other Rights.**    Except as provided by this Agreement or any other agreement entered into in connection with the purchase and sale of Series A Preferred Stock pursuant to the Series A Purchase Agreement, each Stockholder shall be entitled to exercise the full rights of a holder of capital stock of the Company with respect to the Shares.

    **1.8**    **Drag Along.**

        **(a)**    In the event that (x) the Board of Directors, and (y) the holders of a majority of the outstanding shares of Series A Preferred Stock, voting together as a single class on an as-if converted to Common Stock basis ((x) and (y) together, the *"Requisite Approval"*), approve a transaction or series of related transactions in which a person or entity, or a group of related persons or entities, acquires from the stockholders of the Company shares representing more than fifty percent (50%) of the outstanding voting power of the Company (a *"Stock Sale"*) or a transaction that qualifies as a Liquidation Event (as defined in the Restated Certificate) (collectively, a *"Sale of the Company"*), then (i) if the Sale of the Company is structured as a merger or consolidation of the Company, or a sale of all or substantially all of the Company's assets, each Stockholder shall be present, in person or by proxy, at all meetings for the vote thereon, to vote all shares of capital stock held by such Person for and raise no objections to such Sale of the Company, and waive and refrain from exercising any dissenters rights, appraisal rights or similar rights in connection with such merger, consolidation or asset sale, and (ii) if the Sale of the Company is structured as a sale of the stock of the Company, the Stockholders shall each agree to sell their Shares on the terms and conditions approved by the Requisite Approval; provided in each case that such terms do not provide that such Stockholder would receive as a result of such Sale of the Company less than the amount that would be distributed to such Stockholder in the event the proceeds of such Sale of the Company were distributed in accordance with the liquidation preferences set forth in Restated Certificate (as if such transaction were a Deemed Liquidation Event). The Stockholders shall each take all necessary and desirable actions that received the Requisite Approval in connection with the consummation of the Sale of the Company, including, without limitation, the execution of such agreements and such instruments and other actions reasonably necessary to (i) provide the representations, warranties, indemnities, covenants, conditions, escrow agreements and other provisions and agreements relating to such Sale of the Company and (ii) effectuate the allocation and distribution of the aggregate consideration upon the Sale of the Company.

Voting Agreement – Page 5

(b)     No Stockholder shall be a party to any Stock Sale unless all holders of Series A Preferred Stock are allowed to participate in such transaction and the consideration received pursuant to such transaction is allocated among the parties thereto in the manner specified in the Restated Certificate (as if such transaction were a Liquidation Event).

**1.9     Irrevocable Proxy.**   Each party to this Agreement hereby constitutes and appoints the Secretary of the Company with full power of substitution, as the proxies of the party with respect to the matters set forth herein, including without limitation, election of individuals as members of the Board in accordance with Section 1.3, and votes regarding any Sale of the Company pursuant to Section 1.8, and hereby authorizes each of them to represent and to vote, if and only if the party (i) fails to vote or (ii) attempts to vote (whether by proxy, in person or by written consent) in a manner which is inconsistent with the terms of this Agreement, all of such party's Shares in favor of the election of individuals as members of the Board determined pursuant to and in accordance with the terms and provisions of this Agreement or approval of any Sale of the Company pursuant to and in accordance with the terms and provisions of Section 1.8.  The proxy granted pursuant to the immediately preceding sentence is given in consideration of the agreements and covenants of the Company and the parties in connection with the transactions contemplated by this Agreement and, as such, is coupled with an interest and shall be irrevocable unless and until this Agreement terminates or expires pursuant to Section 2. Each party hereto hereby revokes any and all previous proxies with respect to the Shares and shall not hereafter, unless and until this Agreement terminates or expires pursuant to Section 2, purport to grant any other proxy or power of attorney with respect to any of the Shares, deposit any of the Shares into a voting trust or enter into any agreement (other than this Agreement), arrangement or understanding with any Person, directly or indirectly, to vote, grant any proxy or give instructions with respect to the voting of any of the Shares, in each case, with respect to any of the matters set forth herein.

**2.     TERMINATION.**

**2.1**     This Agreement shall continue in full force and effect from the date hereof through the earliest of the following dates, on which date it shall terminate in its entirety:

(a)     the date of the closing of a firm underwritten public offering of the Common Stock pursuant to a registration statement filed with the Securities and Exchange Commission and declared effective under the Securities Act that results in all of the Series A Preferred Stock being converted into Common Stock;

(b)     the date of closing of a Sale of the Company and the distribution of proceeds to or escrow for the benefit of the Stockholders in accordance with the Restated Certificate, provided, that the provisions of Section 1.8 hereof will continue after the closing of any Sale of the Company to the extent necessary to enforce the provisions of Section 1.8 with respect to such Sale of the Company; or

(c)     the date as of which the parties hereto terminate this Agreement by written consent of (i) the Company; and (ii) the Investors holding a majority of the outstanding shares of Series A Preferred Stock, voting together as a single class on an as-if converted to Common Stock basis.

**3.**    **MISCELLANEOUS.**

**3.1**    **Ownership.** Each Key Holder represents and warrants to the Investors and the Company that (a) such Key Holder now owns the Key Holder Shares listed on **EXHIBIT A** hereto, free and clear of liens or encumbrances (other than the restrictions imposed in connection with the transactions contemplated under Series A Purchase Agreement), and has not, prior to or on the date of this Agreement, executed or delivered any proxy or entered into any other voting agreement or similar arrangement other than one which has expired or terminated prior to the date hereof, and (b) such Key Holder has full power and capacity to execute, deliver and perform this Agreement, which has been duly executed and delivered by, and evidences the valid and binding obligation of, such Key Holder enforceable in accordance with its terms. Each Investor represents and warrants to the Investors and the Company that (a) such Investor now owns the Investor Shares listed on **EXHIBIT B** hereto, free and clear of liens or encumbrances (other than the restrictions imposed in connection with the transactions contemplated under Series A Purchase Agreement), and has not, prior to or on the date of this Agreement, executed or delivered any proxy or entered into any other voting agreement or similar arrangement other than one which has expired or terminated prior to the date hereof, and (b) such Investor has full power and capacity to execute, deliver and perform this Agreement, which has been duly executed and delivered by, and evidences the valid and binding obligation of, such Investor enforceable in accordance with its terms.

**3.2**    **Further Action.** If and whenever any Key Holder Shares are sold, the Key Holders or the personal representative of the Key Holders shall do all things and execute and deliver all documents and make all transfers, and cause any transferee of the Key Holder Shares to do all things and execute and deliver all documents, as may be necessary to consummate such sale consistent with this Agreement.

**3.3**    **Specific Performance.** The parties hereto hereby declare that it is impossible to measure in money the damages which will accrue to a party hereto or to their heirs, personal representatives, or assigns by reason of a failure to perform any of the obligations under this Agreement and agree that the terms of this Agreement shall be specifically enforceable. If any party hereto or his heirs, personal representatives, or assigns institutes any action or proceeding to specifically enforce the provisions hereof, any Person against whom such action or proceeding is brought hereby waives the claim or defense therein that such party or such personal representative has an adequate remedy at law, and such Person shall not offer in any such action or proceeding the claim or defense that such remedy at law exists.

**3.4**    **Governing Law.** This Agreement shall be governed by and construed under the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof and regardless of the laws that might otherwise govern under applicable principles of conflicts of law.

**3.5**    **Amendment or Waiver.** This Agreement may be amended or modified (or provisions of this Agreement waived) only upon the written consent of (i) the Company; (ii) the Investors holding a majority of the outstanding shares of Series A Preferred Stock, voting together as a single class on an as-if converted to Common Stock basis, and (iii) the parties hereto holding a majority of the outstanding Shares (voting or consenting together as a single

Voting Agreement – Page 7

class); <u>provided</u>, <u>however</u>, that Section 1.3(a) of this Agreement shall not be amended, modified or waived in any manner without the prior written approval of a majority of the holders of the Series A Preferred Stock. Any amendment or waiver so effected shall be binding upon the Company, each of the parties hereto and any assignee of any such party. Notwithstanding the foregoing, this Agreement may be amended to add additional holders of Common Stock or Preferred Stock as "Key Holders" or "Investors" hereunder by an instrument in writing signed by the Company and such additional holders.

      **3.6     Severability.**  In the event one or more of the provisions of this Agreement should, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

      **3.7     Successors and Assigns.**  The provisions hereof shall inure to the benefit of, and be binding upon, the parties hereto and their respective successors, assigns, heirs, executors and administrators and other legal representatives.

      **3.8     Additional Shares.**  In the event that subsequent to the date of this Agreement any shares or other securities are issued on, or in exchange for, any of the Key Holder Shares or Investor Shares by reason of any stock dividend, stock split, combination of shares, reclassification or the like, such shares or securities shall be deemed to be Key Holder Shares or Investor Shares, as the case may be, for purposes of this Agreement.

      **3.9     Additional Investors.**  Notwithstanding anything to the contrary contained herein, if the Company shall issue additional shares of its Preferred Stock pursuant to the Series A Purchase Agreement, any purchaser of such shares of Preferred Stock shall become a party to this Agreement by executing and delivering an additional counterpart signature page to this Agreement and shall be deemed an "Investor" and a party hereunder.

      **3.10     Additional Key Holders.**  In the event that after the date of this Agreement, the Company issues shares of Common Stock, or options to purchase Common Stock, to any employee or consultant of the Company, which shares or options would collectively constitute with respect to such employee or consultant (taking into account all shares of Common Stock, options and other purchase rights held by such employee or consultant) one percent (1%) or more of the Company's then outstanding Common Stock (treating for this purpose all shares of Common Stock issuable upon exercise of or conversion of outstanding options, warrants or convertible securities, as if exercised or converted), the Company shall, as a condition to such issuance, cause such employee or consultant (an "*Additional Holder*") to execute a counterpart signature page hereto as a Key Holder, and such person shall thereby be bound by, and subject to, all the terms and provisions of this Agreement applicable to a Key Holder. This Agreement, including **EXHIBIT A** and **EXHIBIT B** hereto, shall be amended by the Company without the consent of the Key Holders or the Investors to include any Additional Holders as "Key Holders."

      **3.11     Counterparts.**  This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together shall constitute one instrument.

Voting Agreement – Page 8

**3.12   Waiver.**  No waivers of any breach of this Agreement extended by any party hereto to any other party shall be construed as a waiver of any rights or remedies of any other party hereto or with respect to any subsequent breach.

**3.13   Delays or Omissions.**  It is agreed that no delay or omission to exercise any right, power or remedy accruing to any party, upon any breach, default or noncompliance by another party under this Agreement shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach, default or noncompliance, or any acquiescence therein, or of or in any similar breach, default or noncompliance thereafter occurring.  It is further agreed that any waiver, permit, consent or approval of any kind or character on any party's part of any breach, default or noncompliance under this Agreement or any waiver on such party's part of any provisions or conditions of the Agreement must be in writing and shall be effective only to the extent specifically set forth in such writing.  All remedies, either under this Agreement by law, or otherwise afforded to any party, shall be cumulative and not alternative.

**3.14   Attorney's Fees.**  In the event that any suit or action is instituted under or in relation to this Agreement, including without limitation to enforce any provision in this Agreement, the prevailing party in such dispute shall be entitled to recover from the losing party all fees, costs and expenses of enforcing any right of such prevailing party under or with respect to this Agreement, including without limitation, such reasonable fees and expenses of attorneys and accountants, which shall include, without limitation, all fees, costs and expenses of appeals.

**3.15   Notices.**  All notices required in connection with this Agreement shall be in writing and shall be deemed effectively given:  (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient; if not, then on the next business day, (c) five (5) days after having been sent by certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written notification of receipt.  All communications shall be sent, if to the Company, to the address set forth on the signature page hereto and if to any Key Holder or Investor, to the addressee set forth on EXHIBIT A or EXHIBIT B hereto, or at such other address as such party may designate by ten (10) days advance written notice to the other parties hereto.

**3.16   Entire Agreement.**  This Agreement and the Exhibits hereto, along with the Purchase Agreement and the other documents delivered pursuant thereto constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and thereof and no party shall be liable or bound to any other in any manner by any oral or written representations, warranties, covenants and agreements except as specifically set forth herein and therein. Each party expressly represents and warrants that it is not relying on any oral or written representations, warranties, covenants or agreements outside of this Agreement.

**[THIS SPACE INTENTIONALLY LEFT BLANK]**

Voting Agreement –Signature Page

**IN WITNESS WHEREOF**, the parties hereto have executed this Voting Agreement as of the date first above written.

**COMPANY:**

**SENSORIA, INC.**

By: _David [signature]_____

Name: DAVIDE VIGANO

Title: CEO

**Address for Notices:**

Voting Agreement –Signature Page

IN WITNESS WHEREOF, the parties hereto have executed this Voting Agreement as of the date first above written.

KEY HOLDER:

REPLY S.P.A.

Name:       **REPLY  S.p.A.**
Title:          Mario Rizzante
                     Presidente

## EXHIBIT A

## LIST OF KEY HOLDERS

Davide Viganò
Mario Esposito
Maurizio Macagno

EXHIBIT B

## LIST OF INVESTORS

| NAME AND ADDRESS | SHARES |
| --- | --- |
| Reply S.P.A.<br>Corso Francia, 110<br>10143 - Torino – ITALY | 6,843,100 |
| Philip Lee<br>c/o SENSORIA INC.<br>16225 NE 87th Street, Suite A-10<br>Redmond, WA 98052 | 143,418 |
| Cristiano Ventura<br>c/o SENSORIA INC.<br>16225 NE 87th Street, Suite A-10<br>Redmond, WA 98052 | 143,418 |
| Scott Anderson<br>c/o SENSORIA INC.<br>16225 NE 87th Street, Suite A-10<br>Redmond, WA 98052 | 204,883 |
| Roberto Cazzaro<br>c/o SENSORIA INC.<br>16225 NE 87th Street, Suite A-10<br>Redmond, WA 98052 | 204,883 |
| Davide Colombo<br>c/o SENSORIA INC.<br>16225 NE 87th Street, Suite A-10<br>Redmond, WA 98052 | 143,418 |
| Nicola Martelli<br>c/o SENSORIA INC.<br>16225 NE 87th Street, Suite A-10<br>Redmond, WA 98052 | 143,418 |
| MTS Fund<br>c/o SENSORIA INC.<br>16225 NE 87th Street, Suite A-10<br>Redmond, WA 98052 | 204,883 |
| StartCaps SP<br>c/o SENSORIA INC.<br>16225 NE 87th Street, Suite A-10<br>Redmond, WA 98052 | 184,395 |

1

Robertjan Tuit                                          122,930
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

TA McCann                                               24,586
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

Mauro Meanti                                            245,860
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

Edward Berman                                           86,051
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

Mauro Rizzi                                             122,930
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

Alejandro Buschel                                       36,879
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

Robertjan Tuit                                          172,102
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

Moga Investments LLC                                    245,860
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

Luciana Simoncini                                       24,586
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

Riccardo Sacco                                          24,586
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

MTS Fund                                                245,860
c/o SENSORIA INC.
16225 NE 87th Street, Suite A-10
Redmond, WA 98052

2

# EXHIBIT

# B



Redmond, 2nd March 2016

Reply S.p.A.
Corso Francia 110
Torino

**for the attention of Mr. Daniele Angelucci**

**Subject: INFRAGROUP FINANCING CONTRACT**

Dear Sirs,

We acknowledge receipt of your letter dated March 1, 2016, according to which you offered our company an infragroup financing contract.
In sign of our acceptance we print here below the terms and conditions set out in your letter

**INFRAGROUP FINANCING CONTRACT**

**between**

- **REPLY S.p.A.**, with registered office in Turin, Corso Francia no. 110, tax code no. REDACTED, listed in the Register of Companies of Torino no. 112006/2000, represented by Dr. Daniele ANGELUCCI in his capacity as Managing Director;
  (hereafter referred to as the "Lender")

**and**

- **Sensoria Inc** a Delaware Corporation with registered office in Redmond WA 98052, 16225 NE 87th Street, Suite A-10, represented by Mr. Davide Viganò, in his capacity as Chief Executive Officer;
  (hereafter referred to as the "Borrower")

**WHEREAS**

➢ the Lender is group leader of the Reply Group, which is composed of the company Reply S.p.A. and of all those companies participated by the same (hereafter referred to as "Reply Group");

➢ the Borrower is a company participated by the Lender, forming part of

the Reply Group;

➢ the Borrower, to meet his own financial needs, has expressed to the Lender his own interest in obtaining from the latter a short-term financing (hereafter referred to as the "Loan");

➢ the Lender has declared himself disposed to grant the Loan to the Borrower on the conditions and under the terms provided for by this contract (hereafter referred to as the "Contract")

given the above, the Lender and the Borrower (hereafter jointly named the "Parties")

**HEREBY STIPULATE AND AGREE AS FOLLOWS**

**1.** **PRELIMINARY REMARKS**

1.1  The preliminary remarks of this Contract form a fundamental and integral part of the same.

**2.** **SUBJECT**

2.1  The Lender undertakes to grant to the Borrower a short-term Loan to a maximum sum of **Euro 230.000,00.= (two hundred and thirty thousand)** starting from the data of execution of this agreement (**Start Date)** and ending on August the 31st, 2016 (**End Date).**

2.2  The Lender will grant the Loan to the Borrower only after a specific of request made by the latter in writing, according to the terms of art. 7 which follows.

**3.** **WITHDRAWALS**

3.1  The Borrower may make use of the Loan by means of periodical withdrawals made over time.

3.2  On the occasion of each withdrawal, the Borrower shall notify the Lender the date of the withdrawal and the specific amount (which shall not exceed the liquid assets held by the Lender in Whatsoever bank or other available account on the date of the withdrawal or prior to the same).

**4.** **INTEREST**

4.1  The interest on the Loan shall accrue on a daily basis at a rate of annual return equivalent to the three-months EURIBOR rate in force on the date of calculation of the interest raised by a 3% *spread* (the interest shall be calculated, in relation to the initial withdrawal, on the

Start Date and subsequently on the date of the first day of each following quarter).

4.2 For the purposes of the calculation of the interest the year is understood as being of a duration of 360 days.

4.3 The Borrower and the Lender may over time agree in writing on defining alternative methods of calculating the interest.

4.4 Interest will be calculated and invoiced by the Lender on quarterly basis. The Borrower will pay the interest within 30 days from the receipt of the periodical invoice.

**5.    REPAYMENT OF THE LOAN**

5.1 The Loan shall be repaid in its entirety (including the interest accrued and unpaid up until such date) and the availability of the Loan shall be annulled on request of the Lender, with prior written notification to be sent to the Borrower with at least 30 days' notice or, at latest on the End Date.

5.2 The Borrower may at any moment whatsoever repay in advance all or part of the Loan (together with the relevant portion of unpaid interest), with prior written notification to the Lender with at least 5 days' notice.

**6.    PAYMENTS AND TAXES**

6.1 The interest as determined in the preceding art. 4 is understood to be before any taxes provided for under the laws in force at the moment of payment. Lender and Borrower will cooperate in order to deliver the required documentation for the application, if possible, of treaties against double taxation or directives aimed to reduce the rate of the tax to be withheld on the interest in the country of source.

**7.    COMMUNICATIONS**

7.1 All communications or requests provided for by this Contract shall be made in writing and delivered or sent by ordinary post to the respective registered offices of the Parties.

7.2 Whatsoever communication or request sent by priority post to the Borrower shall be considered delivered forty-eight hours after its sending.

7.3 Whatsoever communication sent to the Lender according to the provisions of the preceding paragraph 7.1 shall be considered delivered only at the moment of its actual receipt by the Lender.

**8.    APPLICABLE LAW AND JURISDICTION**

8.1 This Contract is governed by Italian law.

8.2  All disputes arising from the execution or interpretation of this Contract shall be subject to the exclusive jurisdiction of the Law Courts of Turin, leaving untouched the entitlement for the Lender alone to have resort to whatsoever other judicial authority which may be appropriate.

**9.**  **FINAL PROVISIONS**

9.1  All amendments to this Contract shall perforce take written form.

9.2.  This Contract renders null and void and replaces every previous understanding, agreement or deliberation between the parties in relation to the Loan.

Best Regards

Sensoria Inc

Dr. Davide Viganò

# EXHIBIT

# C



16225 NE 87th Street, Suite A-10
Redmond, WA 98052
United States of America
Phone: +1(425)533-2928   Fax: +1(425)636-8639
Tax ID: REDACTED

Redmond, 18th October 2016

Reply S.p.A.
Corso Francia 110
Torino

**for the attention of Mr. Daniele Angelucci**

**Subject: INFRAGROUP FINANCING CONTRACT**

Dear Sirs,

We acknowledge receipt of your letter dated October 17, 2016, according to which you offered our company an infragroup financing contract.
In sign of our acceptance we print here below the terms and conditions set out in your letter

### INFRAGROUP FINANCING CONTRACT

#### between

- **REPLY S.p.A.**, with registered office in Turin, Corso Francia no. 110, tax code no. REDACTED, listed in the Register of Companies of Torino no. 112006/2000, represented by Dr. Daniele ANGELUCCI in his capacity as Managing Director;
  (hereafter referred to as the "Lender")

**and**

- **Sensoria Inc** a Delaware Corporation with registered office in Redmond WA 98052, 16225 NE 87th Street, Suite A-10, represented by Mr. Davide Viganò, in his capacity as Chief Executive Officer;
  (hereafter referred to as the "Borrower")

## WHEREAS

➢ the Lender is group leader of the Reply Group, which is composed of the company Reply S.p.A. and of all those companies participated by the same (hereafter referred to as "Reply Group");

➢ the Borrower is a company participated by the Lender, forming part of the Reply Group;

➢ the Borrower, to meet his own financial needs, has expressed to the Lender his own interest in obtaining from the latter a short-term financing (hereafter referred to as the "Loan");

➢ the Lender has declared himself disposed to grant the Loan to the Borrower on the conditions and under the terms provided for by this contract (hereafter referred to as the "Contract")

given the above, the Lender and the Borrower (hereafter jointly named the "Parties")

## HEREBY STIPULATE AND AGREE AS FOLLOWS

**1.** **PRELIMINARY REMARKS**

1.1   The preliminary remarks of this Contract form a fundamental and integral part of the same.

**2.** **SUBJECT**

2.1   The Lender undertakes to grant to the Borrower a short-term Loan to a maximum sum of **Euro 1.000.000,00.= (one million)** starting from the data of execution of this agreement (**Start Date**) and ending on October the 17th, 2017 (**End Date**).

2.2   The Lender will grant the Loan to the Borrower only after a specific of request made by the latter in writing, according to the terms of art. 7 which follows.

**3.** **WITHDRAWALS**

3.1   The Borrower may make use of the Loan by means of periodical withdrawals made over time.

3.2   On the occasion of each withdrawal, the Borrower shall notify the Lender the date of the withdrawal and the specific amount (which shall not exceed the liquid assets held by the Lender in Whatsoever bank

or other available account on the date of the withdrawal or prior to the same).

**4.** **INTEREST**

4.1 The interest on the Loan shall accrue on a daily basis at a rate of annual return equivalent to the three-months EURIBOR rate in force on the date of calculation of the interest raised by a 3% *spread* (the interest shall be calculated, in relation to the initial withdrawal, on the Start Date and subsequently on the date of the first day of each following quarter).

4.2 For the purposes of the calculation of the interest the year is understood as being of a duration of 360 days.

4.3 The Borrower and the Lender may over time agree in writing on defining alternative methods of calculating the interest.

4.4 Interest will be calculated and invoiced by the Lender on quarterly basis. The Borrower will pay the interest within 30 days from the receipt of the periodical invoice.

**5.** **REPAYMENT OF THE LOAN**

5.1 The Loan shall be repaid in its entirety (including the interest accrued and unpaid up until such date) and the availability of the Loan shall be annulled on request of the Lender, with prior written notification to be sent to the Borrower with at least 30 days' notice or, at latest on the End Date.

5.2 The Borrower may at any moment whatsoever repay in advance all or part of the Loan (together with the relevant portion of unpaid interest), with prior written notification to the Lender with at least 5 days' notice.

**6.** **PAYMENTS AND TAXES**

6.1 The interest as determined in the preceding art. 4 is understood to be before any taxes provided for under the laws in force at the moment of payment. Lender and Borrower will cooperate in order to deliver the required documentation for the application, if possible, of treaties against double taxation or directives aimed to reduce the rate of the tax to be withheld on the interest in the country of source.

**7.** **COMMUNICATIONS**

7.1 All communications or requests provided for by this Contract shall be made in writing and delivered or sent by ordinary post to the respective registered offices of the Parties.

7.2  Whatsoever communication or request sent by priority post to the Borrower shall be considered delivered forty-eight hours after its sending.

7.3  Whatsoever communication sent to the Lender according to the provisions of the preceding paragraph 7.1 shall be considered delivered only at the moment of its actual receipt by the Lender.

**8.  APPLICABLE LAW AND JURISDICTION**

8.1  This Contract is governed by Italian law.

8.2  All disputes arising from the execution or interpretation of this Contract shall be subject to the exclusive jurisdiction of the Law Courts of Turin, leaving untouched the entitlement for the Lender alone to have resort to whatsoever other judicial authority which may be appropriate.

**9.  FINAL PROVISIONS**

9.1  All amendments to this Contract shall perforce take written form.

9.2.  This Contract renders null and void and replaces every previous understanding, agreement or deliberation between the parties in relation to the Loan.

Best Regards

Sensoria Inc

Dr. Davide Viganò

# EXHIBIT

# D



Redmond, 26th May 2017

**Reply S.p.A.**
Corso Francia 110
10146 Turin
ITALY

**To the attention of  Mr. Daniele Angelucci**

**Subject: Amendment to the INFRAGROUP FINANCING CONTRACT
dated on 18 October 2017.**

Dear Sirs,

we acknowledge receipt of your amendment dated May 25, 2017 to the
INFRAGROUP FINANCING CONTRACT dated as of 18 October 2016.
In sign of our acceptance we print here below the terms and conditions set
out in your letter.

"Dear Sirs,

further to our conversation, we propose to amend the INFRAGROUP
FINANCING CONTRACT dated as of 18 October 2016 in order to extend
the loan amount by USD 75,000 and include Reply's right to convert the
loan according to the terms and conditions set forth below:

The article 2
## 2. SUBJECT
2.1   *The Lender undertakes to grant to the Borrower a Loan to a
maximum sum of USD 1,000,000.00 (one million) starting from the
data of execution of this agreement (Start Date) and ending on
October the 17th, 2017 (End Date).*
2.2   *The Lender will grant the Loan to the Borrower only after a specific of
request made by the latter in writing, according to the terms of art. 7
with follow.*

1



should now be read as follow:

## *2. SUBJECT*

2.1   *The Lender undertakes to grant to the Borrower a Loan to a maximum sum of USD 1,075,000.00 (one million seventy-five thousand) starting from the data of execution of this agreement (Start Date) and ending on October the 17th, 2017 (End Date).*

2.2   *The Lender will grant the Loan to the Borrower only after a specific of request made by the latter in writing, according to the terms of art. 7 with follow.*

2.3   *The Lender retains the option to convert the loan amount of USD 1,075,000 (one million seventy-five thousand) plus accrued interest into Ordinary shares of the Company at the next equity funding round. The conversion will happen at a price per share discounted by 25% against the price per share of the equity round.*

***

If you agree upon the above amendment, please confirm in writing your acceptance by printing the content of this letter on your commercial headed paper and send it to us duly signed.

The Amendment will be entered into in the place and as of the day we receive your acceptance."

Best Regards

Sensoria Inc.

Dr. Davide Viganò

CEO, Sensoria Inc.

2

# EXHIBIT

# E

BRYAN CAVE

BRYAN CAVE LLP   161 North Clark Street, Suite 4300, Chicago, IL 60601-3315
T: 312 602 5000 F: 312 602 5050 **bryancave.com**

August 14, 2017

Jason J. DeJonker
Direct: (312) 602-5005
Fax: (312) 6987405
jason.dejonker@bryancave.com

**CONFIDENTIAL**
**VIA EMAIL AND OVERNIGHT MAIL**

Sensoria, Inc.
16225 NE 87th Street, Suite A-10B
Redmond WA 98052
Attention: Dr. Davide Viganò
davide.vigano@sensoriainc.com

Re:     Sensoria, Inc. ("Sensoria")

To Whom It May Concern:

We represent Reply S.P.A.  We write with respect to: (a) a demand for payment by Reply under and with respect to certain loans made by Reply to Sensoria; and (b) the failure by Sensoria, its management, and its board of directors to take all actions to maximize the value of Sensoria and its assets for the benefit of its creditors, shareholders, and stakeholders.  As such, Reply hereby demands that Sensoria immediately take all actions necessary to seek a sale of its assets and proceed with an orderly liquidation of its assets and businesses.  To the extent that it fails to take such actions, Reply will seek the appointment of a receiver under Delaware law.

**Demand for Payment on First Loan**

This letter constitutes a demand on the loan (the "First Loan"), in the original principal amount of Two Hundred Thirty Thousand Euro (€230.000), which was made pursuant to that certain Infragroup Financing Contract, date March 2, 2016, made by Sensoria in favor of Reply (as it may have been modified, amended, supplemented or restated from time to time, the "First Financing Contract").  On August 31, 2016, the First Loan matured, and the failure of Sensoria to pay, in full, the First Loan on this End Date constitutes an immediate default and breach of the First Financing Contract.

Reply hereby demands payment of all amounts due by Sensoria.  The amount due is principal of Two Hundred Thirty Thousand Euro (€230.000), plus interest, late charges, expenses (including legal fees), and other amounts which may be payable under the First Financing Contract.  You may contact Reply for a statement of the amounts due as of any particular payment date.  Reply reserves the right to accept payments made after the date of this demand even though such payments are not offered as, or are insufficient to, repay the First Loan in full.  Reply may apply such payments in the order provided in the First Financing Contract.  Reply notifies Sensoria that at no time shall any prior or subsequent course of conduct by Sensoria or Reply directly or indirectly limit, impair or

10354700.1B

Sensoria, Inc.                                                    **Bryan Cave LLP**
August 14, 2017
Page 2

otherwise adversely affect any of Reply's rights, interests or remedies in connection with the First Loan and the First Financing Contract or obligate Reply to agree to, or to negotiate or consider an agreement to, waiver of any obligation, default by Sensoria under the First Financing Contract or any amendment to any term or condition of the First Financing Contract.

Nothing herein, in Reply's application of any payments received, in any prior communications, in Reply's election of remedies or timing of election of remedies is or shall be deemed a waiver, release, forbearance or forgiveness of any such rights, remedies, defenses and objections, all of which are expressly preserved. Reply reserves all other rights and remedies under the First Financing Contract and under applicable laws and in equity.

<u>Demand For Payment on Second Loan</u>

Additionally, Reply also made a second loan (the "Second Loan"), in the original principal amount of One Milion Euro (€ 1.000.000,00), to Sensoria pursuant to that certain Intragroup Financing Contract, date October 18, 2016, made by Sensoria in favor of Reply (as it may have been modified, amended, supplemented or restated from time to time, the "Second Financing Contract"). On May 25, 2017, the parties amended the Second Financing Contract, and Reply agreed to increase the maximum principal balance of the Second Loan to One Million Seventy-Five Thousand US Dollars ($1,075,000.00).

Pursuant to the Second Financing Contract, Reply as lender has the option of either waiting to the End Date thereunder or on demand upon Sensoria's receipt of thirty (30) day's prior written notice:

> The Loan shall be repaid in its entirety (including the interest accrued and unpaid until such date) and the availability of the Loan shall be annulled on the request of the Lender, with prior written notification sent to the Borrower with at least 30 days' notice or, at the latest on the End Date.

(Second Financing Contract, § 5.1.) Reply as lender hereby gives notice of and makes demand for payment of the Second Loan in its entirety on or before September 13, 2017.

<u>Sensoria's Inability To Pay Its Debts As They Come Due</u>

Prior to the date hereof, Sensoria has provided with certain information and has communicated its inability to pay, in full, the First Loan and the Second Loan. In addition, Sensoria has requested that Reply make additional loans to allow Sensoria to pay its debts in the ordinary course of business. As such, Reply has significant concerns that Sensoria will be unable to repay its debts as they come due. Moreover, such information and communications from Reply and its management strongly suggest that Reply is insolvent under both balance sheet (i.e., the value of Reply's assets is less than the amount of its liabilities, taking into account its contingent and prospective liabilities) and cash flow tests (i.e., Reply is unable to pay its debts as they fall due).

Sensoria, Inc.                                                                **Bryan Cave LLP**
August 14, 2017
Page 3

## Demand for Sale Process to Maximize Value of Business For Benefit of Sensoria's Stakeholders

In addition to its status as a creditor of Sensoria, Reply is also the largest holder of Sensoria's Series A Preferred Stock. As we understand it, despite the requirements that Sensoria's Board of Directors includes five members, as of the date hereof, said Board has less than five (5) total member. (See Voting Agreement, Section 1.2.)

The current board members of Sensoria have failed to abide by their fiduciary duties in light of Sensoria's current financial issues. Under Delaware law, Sensoria's directors owe fiduciary duties to the corporation itself, for the benefit of all of its residual claimants. As Sensoria is likely insolvent, the category of residual claimants includes the corporation's creditors. To that end, Sensoria (and its Board) should be seeking to maximize the value of its assets and business for the benefit of all of its stakeholders. Given its financial difficulties, Sensoria (and its Board) must be proactive and seek to either (a) sell itself as a going concern or (b) sell Sensoria's assets for the highest and best price. To assist it with either scenario, Sensoria (and its Board) should immediately engage an investment banker to create a market for its business or assets. Sensoria (and its Board) should also empower Sensoria's management to begin to wind-down operations and not incur additional liabilities that it will not be able to pay.

## Receivership

Finally, to the extent Sensoria fails to take the actions described above for the benefit of its stakeholders, Reply intends to seek the appointment of a receiver under Delaware law. Section 291 of the Delaware General Corporation Law provides the statutory basis to seek the appointment of a receiver. Under Section 291, whenever a corporation is insolvent, any creditor or stockholder of a corporation may petition the Court of Chancery to appoint a receiver for the corporation.[1] As both a creditor and stockholder, Reply clearly has standing to seek such relief. Moreover, given the insolvency of Sensoria, and the failure of its Board to take appropriate actions for the benefit of Sensoria's stakeholders, the appointment of a receiver is warranted under Delaware law.

---

[1]      The term "creditor" is broadly interpreted to include not only judgment creditors, but also contract creditors. *See Noble v. European Mtg. & Inv. Corp.*, 165 A. 157, 159 (Del. Ch. 1933), *Velut Co. v. U.S. Wrench Mfg. Co.*, 140 A. 801, 802 (Del. Ch. 1928); *Mackenzie Oil Co. v. Omar Oil & Gas Co.*, 120 A. 852, 854 (Del. Ch. 1923);.

Sensoria, Inc.                                                        Bryan Cave LLP
August 14, 2017
Page 4


## Conclusion

We trust Sensoria and its Board will act in a timely fashion to seek the engagement of an investment banker and begin an orderly sale process. Please be advised that there will be no further notices prior to the exercise of remedies by Reply to the extent Sensoria fails to take all necessary actions on or before August 18, 2017 (other than with respect to the payment in full of the Second Loan, which must be made on or before September 13, 2017). Given Sensoria's clear financial issues, time is of the essence, and Sensoria and its Board should act swiftly and efficiently to preserve the value of Sensoria's assets.


Very truly yours,

Jason J. DeJonker

139

# EXHIBIT

# F

BRYAN
CAVE
LEIGHTON
PAISNER BLP

BRYAN CAVE LEIGHTON PAISNER LLP
161 North Clark Street  Suite 4300
Chicago  IL 60601 3315
T: +1 312 602 5000
F: +1 312 602 5050
www.bclplaw.com

August 10, 2018

Maria Z Vathis
Direct: 312/602-5127
Fax: 312/698-7527
Maria.Vathis@bclplaw.com

Dr. David Vigano
Mr. Maurizio Macagno
Sensoria, Inc.
16225 NE 87th Street
Suite A-10
Redmond, Washington 98052

**VIA FEDEX**

Re:      Second Notice of Default and Demand for Payment

Dear Messrs. Vigano and Macagno:

We are counsel to Reply S.P.A. ("Reply").  This letter follows up on our first demand letter dated August 14, 2017, in which Reply demanded payment in full of the debts owed by Sensoria, Inc. ("Sensoria").  As you know, on or about dated March 2, 2016, Sensoria entered into that certain Infragroup Promissory Note as borrower with Reply as lender (the "First Promissory Note").  Pursuant to Paragraph 2.1 of the First Promissory Note, Reply agreed to make a short-term loan to Sensoria in the amount of 230.000,00€, with a payment due date of August 31, 2016.  Pursuant to Paragraph 4.1 of the First Promissory Note, Sensoria agreed to pay interest to Reply "on a daily basis at a rate of annual return equivalent to the three-months EURIBOR rate in force on the date of calculation of the interest raised by a 3% *spread* (the interest shall be calculated, in relation to the initial withdrawal, on the Start Date and subsequently on the date of the first day of each following quarter)."

Sensoria subsequently entered into another Infragroup Promissory Note with Reply dated October 18, 2016, as amended on May 26, 2017 (the "Second Promissory Note", and, collectively with the First Promissory Note, the "Notes"), pursuant to which Reply agreed to make a short-term loan to Sensoria in the amount of 1.075.000,00€, with a due date of October 17, 2017.  Pursuant to Paragraph 4.1 of the Second Promissory Note, Sensoria agreed to pay interest to Reply S.p.A. "on a daily basis at a rate of annual return equivalent to the three-months EURIBOR rate in force on the date of calculation of the interest raised by a 3% *spread* (the interest shall be calculated, in relation to the initial withdrawal, on the Start Date and subsequently on the date of the first day of each following quarter)."

Sensoria has failed and refused to pay the funds owed to Reply pursuant to the Notes at maturity as when due, which failure constitutes a breach and default under the Notes (the "Defaults").   There may be additional defaults under the terms of the Notes, and Reply does not waive any right to call such defaults in the future and hereby reserves all rights and remedies as a result thereof.

As a result of the foregoing Defaults, all indebtedness due Reply under the Notes is immediately due and payable and Reply hereby demands immediate payment of the entire aggregate principal balance of the Notes plus accrued and accruing interest, costs, fees (including attorneys' fees and costs) and expenses provided for in the Notes.  **By this letter, Reply S.p.A. hereby demands payment by wire transfer or cashier's check of the full amount owed, or 1.305.000,00€ plus interest, on or before Friday, August 17, 2018.**

12026896.2

141

August 10, 2018
Page 2



As a further consequence of the Defaults, any options of Sensoria under the Notes, if any, to extend the maturity date of the Notes have ceased and terminated and are of no further effect. Additionally, any and all obligations of Reply to advance funds under the Notes has ceased and terminated and Reply has no obligation to provide any further funding under the Notes.

Reply advises Sensoria that, to the fullest extent provided in the Notes, Reply shall be entitled to reimbursement for all costs incurred by Reply in connection with the Reply's exercise of any rights and remedies thereunder, including attorneys' fees and court costs.

Reply notifies Sensoria that it reserves the right to exercise any and all remedies available at law or equity, including under the Notes. This notice constitutes neither an exclusive election of remedies nor a waiver by Reply of any rights and remedies under applicable laws and governing agreements, including, without limitation, Reply's right to exercise any other rights granted to Reply pursuant to the Notes or otherwise.

Reply hereby notifies Sensoria that at no time shall any prior or subsequent course of conduct by Sensoria or Reply directly or indirectly limit, impair or otherwise adversely affect any of Reply's rights, interests or remedies in connection with the Notes, or obligate Reply to agree to, or to negotiate or consider an agreement to, any waiver of any obligation or default by Sensoria under any Note or any amendment to any term or condition of any Note.

Nothing herein, in any prior communications, in Reply's election of remedies or timing of election of remedies is or shall be deemed a waiver, release, forbearance or forgiveness of any such rights, remedies, defenses and objections with respect to the Default or any other present or future default, whether or not known to Reply, all of which are expressly preserved.

Reply reserves all other rights and remedies under the Loan Documents and under applicable laws and in equity, and further reserves all rights and remedies with respect to other defaults now or hereafter in existence, whether known or unknown.

**Reply hopes to resolve this matter quickly, amicably, and without the need for both parties to incur unnecessary litigation fees and costs. Accordingly, please feel free to contact me to discuss this matter further**. Although Reply is currently willing to work with Sensoria to resolve any issues between the parties, please be advised that Reply the right to exercise all rights and remedies as deemed necessary and appropriate under the circumstances, including initiating litigation seeking attorney fees and costs, and may do so without further notice.

We look forward to hearing from you.

Regards,

*Maria Z. Vathis*

Maria Z Vathis

MZV:llh
cc:     Andrea Pocci

12026896.2

# EXHIBIT

# G

# Sensoria IP Licensing Agreement

This Intellectual Property Agreement (this "Agreement") is made effective as of July 31, 2017 between **Sensoria Inc.** ("Licensor"), a Delaware Corporation with its principal place of business at 16225 NE 87th Street #A10, Redmond, Washington 98052 and **Sensoria Holdings Ltd.** ("Licensee"), a Nevada Limited Liability Company, 1468 James Road, Gardnerville, Nevada 89460 and mailing address at PO BOX 3324, Redmond, Washington 98073. In this Agreement, the party who is granting the right to use the licensed property will be referred to as "Sensoria Inc.," and the party who is receiving the right to use or acquire the licensed property will be referred to as "Sensoria Holdings Ltd.".

The parties agree as follows:

**1. LICENSE GRANT.** Sensoria Inc. owns all of Sensoria Inc. owned and licensed intellectual property, including source code, patents, patent applications, trademarks and trade secrets (the "Authored Work"). In accordance with this Agreement, Sensoria Inc. grants Sensoria Holdings Ltd.

   a) The exclusive, irrevocable, worldwide, perpetual, transferable, license to all of Sensoria Inc.'s Authored Work and intellectual property.
   b) The exclusive right to assert or enforce the Licensed Patent Rights at Licensee's sole discretion. The exclusive license granted herein includes any and all rights to recover past, present and future damages and settlement amounts based on any enforcement action brought by Licensee.
   c) The right to extend the acquired licensing rights to any Affiliates or third parties.
   d) The right to sub-license the acquired licensing rights at its discretion.

**2. COMPENSATION.** Sensoria Holdings Ltd. agrees to pay to Sensoria Inc. the agreed upon amount of $247,000 (two hundred and forty seven thousand dollars) for the licensing rights to all Sensoria Inc.'s Authored Work at completion of this agreement.

**3. LICENSOR'S OBLIGATIONS.** Licensor shall pay any and all maintenance fees required to maintain the Licensed Patent Rights in force during the term of this Agreement. Licensor shall maintain patents in good standing at all times during the term of this Agreement.

**4. TERMS.** The term of this Agreement is from the Effective Date until the expiration of Licensed Patent Rights.

**5. ARBITRATION.** The parties will attempt to resolve any dispute arising out of or relating to this Agreement through friendly negotiations amongst the parties. If the matter is not resolved by negotiation within 30 days, the parties will resolve the dispute using the below Alternative (ADR) procedure. Any controversies or disputes arising out of or relating to this Agreement will be resolved by binding arbitration under the rules of the American Arbitration Association. The arbitrator's award will be final, and judgment may be entered upon it by any court having proper jurisdiction.

**6. ENTIRE AGREEMENT.** This Agreement contains the entire agreement of the parties and there are no other promises or conditions in any other agreement whether oral or written. This Agreement supersedes any prior written or oral agreements between the parties.

**7. SEVERABILITY.** If any provision of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid or enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

**8. WAIVER OF CONTRACTUAL RIGHT.** The failure of either party to enforce any provision of this Agreement shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Agreement.

**9. APPLICABLE LAW.** This Agreement shall be governed by the laws of the State of Washington, County of King.

**10. SIGNATORIES.** This Agreement shall be signed on behalf of Sensoria Inc. by Maurizio Macagno, Director and on behalf of Sensoria Holdings Ltd. by Davide Vigano, Director and effective as of the date first above written.

Sensoria Inc.

By: _____
Maurizio Macagno
Director & CTO

Sensoria Holdings Ltd.

By: _____
Davide Vigano
Managing Partner

# EXHIBIT

# H

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 01:27 PM 07/18/2014*
*FILED 01:18 PM 07/18/2014*
*SRV 140971539 - 5553337 FILE*

Execution Copy

## AMENDED AND RESTATED CERTIFICATE OF INCORPORATION
## OF
## SENSORIA INC.

(Pursuant to Sections 242 and 245 of the
General Corporation Law of the State of Delaware)

Sensoria, Inc., a corporation organized and existing under and by virtue of the provisions of the General Corporation Law of the State of Delaware (the "*DGCL*"),

**DOES HEREBY CERTIFY:**

     **1.**     That the name of this corporation is Sensoria Inc., and that this corporation was originally incorporated pursuant to the DGCL on June 17, 2014.

     **2.**     That the Board of Directors duly adopted resolutions proposing to amend and restate the Certificate of Incorporation of this corporation in accordance with Sections 242 and 245 of the DGCL, which resolutions setting forth the proposed amendment and restatement are set forth below:

     **3.**     That this Amended and Restated Certificate of Incorporation, which restates and integrates and further amends the provisions of this corporation's Certificate of Incorporation, has been duly adopted in accordance with Sections 242 and 245 of the DGCL.

     **RESOLVED**, that the Certificate of Incorporation of this corporation be amended and restated in its entirety to read as follows:

### I.

The name of this company is Sensoria Inc. (the "*Company*").

### II.

The address of the registered office of this Company in the State of Delaware is 2711 Centerville Road, Wilmington, New Castle County, Delaware 19808, and the name of the registered agent of this Company in the State of Delaware at such address is Corporation Service Company.

### III.

The purpose of the Company is to engage in any lawful act or activity for which a corporation may be organized under the Delaware General Corporation Law ("*DGCL*").

## IV.

**A.**    The Company is authorized to issue two classes of stock to be designated, respectively, "*Common Stock*" and "*Preferred Stock*." The total number of shares which the Company is authorized to issue is Seventy Million (70,000,000) shares, Fifty Million (50,000,000) shares of which shall be Common Stock (the "*Common Stock*") and Twenty Million (20,000,000) shares of which shall be Preferred Stock (the "*Preferred Stock*"). The Common Stock and the Preferred Stock shall each have a par value of $0.001 per share.

**B.**    The number of authorized shares of Common Stock may be increased or decreased (but not below the number of shares of Common Stock then outstanding) by (in addition to any vote of the holders of one or more series of Preferred Stock that may be required by the terms of this Amended and Restated Certificate of Incorporation) the affirmative vote of the holders of shares of capital stock of the Company representing a majority of the votes represented by all outstanding shares of capital stock of the Company entitled to vote, irrespective of the provisions of Section 242(b)(2) of the DGCL.

**C.**    Nine Million Six Hundred Twenty Nine Thousand Five Hundred Thirteen (9,629,513) shares of the authorized shares of Preferred Stock are hereby designated "*Series A Preferred Stock*" (also referred to as the "*Series Preferred*"). Unless otherwise indicated, references to "Section" or "Sections" in this Part C of this Article IV refer to a Section and Sections of Part C of this Article IV. The rights, preferences, privileges, restrictions and other matters relating to the Series Preferred are as follows:

1.    CERTAIN DEFINITIONS.

(a)    The "*Original Issue Price*" shall be $0.730663 per share for the Series A Preferred Stock (as adjusted for stock splits, dividends, recapitalizations and the like after the filing date hereof).

(b)    The "*Board*" means the Board of Directors of the Company, as in office from time to time.

2.    VOTING RIGHTS.

(a)    **General Rights.** Each holder of shares of the Series Preferred shall be entitled to the number of votes equal to the number of shares of Common Stock into which such shares of Series Preferred could be converted (pursuant to Section 5 hereof) immediately after the close of business on the record date fixed for such meeting or the effective date of such written consent and shall have voting rights and powers equal to the voting rights and powers of the Common Stock and shall be entitled to notice of any stockholders' meeting in accordance with the bylaws of the Company. Except as otherwise provided herein or as required by law, the Series Preferred shall vote together with the Common Stock at any annual or special meeting of the stockholders and not as a separate class, and may act by written consent in the same manner as the Common Stock.

2.

**(b) Separate Vote of Series Preferred.** For so long as at least Four Million Five Hundred Fifty Five Thousand Four Hundred Seventy (4,557,470) shares of Series Preferred remain outstanding (as adjusted for any stock dividends, combinations, splits, recapitalizations and the like with respect to such shares after the filing date hereof), in addition to any other vote or consent required herein or by law, the vote or written consent of the holders of at least a majority of the outstanding shares of Series Preferred, voting together as a single class on an as-if converted to Common Stock basis, shall be necessary for the Company to effect or validate any of the following actions (whether by merger, reclassification, consolidation or otherwise) or to permit any subsidiary of the Company to effect or validate any of the following actions (whether by merger, reclassification, consolidation or otherwise):

(i)    any authorization, issuance or any designation, whether by reclassification or otherwise, of any new or existing class or series of stock or any other securities convertible into, or exercisable for, equity securities of the Company having rights, preferences or privileges senior to or on parity with the Series Preferred;

(ii)    any increase or decrease in the authorized number of shares of Preferred Stock or Common Stock;

(iii)    any adverse change in the voting or other powers, preferences, or other special rights or privileges, or restrictions of any of the Series Preferred;

(iv)    any Liquidation Event;

(v)    any establishment of or investment in any subsidiary that will not be wholly-owned, directly or indirectly, by the Company, or dispose of any stock in any subsidiary stock or all or substantially all of any subsidiary assets;

(vi)    any amendment, alteration, waiver or repeal of any provision of the Certificate of Incorporation or the Bylaws of the Company (including any filing of a Certificate of Designation);

(vii)    any issuance of stock options (or stock or similar rights) to employees, consultants or directors in excess of those currently issued or reserved for issuance under existing plans, unless approved by the Board of Directors, including the Series Designee;

(viii)    any increase or decrease in the authorized number of members of the Board or election procedure for members to serve on the Board, whether set forth in the Bylaws of the Company or elsewhere;

(ix)    any redemption or repurchase of the Company's Common Stock or Preferred Stock (except for acquisitions of Common Stock by the Company in connection with repurchase or redemption of stock from former employees or consultants in connection with cessation of employment or services);

(x)    any action that results in the payment or declaration of a dividend on any shares of Common Stock or Preferred Stock; or

3.

(xi)    any action that creates, or authorizes the creation of, or issues, or authorizes the issuance of any debt security, or permits any subsidiary to take any such action with respect to any debt security, if the aggregate indebtedness of the Company and its subsidiaries for borrowed money following such action would exceed $500,000, other than bank or market counter-party lines of credit and similar debt securities, the purpose of which will be to provide trade credit for financing of trading collateral, trade credit for working capital for commodities purchases, bonding for trading counter parties or licensing and accounts receivable financing.

(c) **Election of Board of Directors**. The holders of Common Stock and Series Preferred shall be entitled to vote on the election of the members of the Board and to remove from office such directors and to fill any vacancy caused by the resignation, death or removal of such directors, voting together as a single class on an as-if converted to Common Stock basis. If anyone (1) director serving on the board is designated as the "Preferred Director" pursuant to that certain Voting Agreement, dated on or about the date of filing hereof, between certain stockholders of the Company, then such director shall be deemed to be the "*Series Designee*" for purposes hereof.

3.    LIQUIDATION RIGHTS.

(a) **Series Preferred**. Upon any liquidation, dissolution, or winding up of the Company, whether voluntary or involuntary, or any Deemed Liquidation (collectively, a "*Liquidation Event*"), before any distribution or payment shall be made to the holders of any Common Stock or any other security ranking junior to the Series Preferred (including options), the holders of Series Preferred shall be entitled to be paid out of the assets of the Company legally available for distribution (or the consideration received by the Company or its stockholders in such Acquisition or Asset Transfer), for each share of Series Preferred held by them, an amount per share of Series Preferred equal to the greater of (A) the sum of (i) the applicable Original Issue Price plus (ii) all accrued dividends and all declared and unpaid dividends on the Series Preferred (as adjusted for any stock dividends, combinations, splits, recapitalizations and the like with respect to such shares after the filing date hereof), or (B) such amount per share as would have been payable if all shares of the Series Preferred had been converted into Common Stock immediately prior to the Liquidation Event.

(b) **Insufficient Assets.** If, upon any such Liquidation Event, the assets of the Company (or the consideration received in such transaction) shall be insufficient to make payment in full to all holders of Series Preferred of the liquidation preference set forth in this Section 3(a), then such assets (or consideration) shall be distributed among the holders of Series Preferred at the time outstanding, ratably in proportion to the full amounts to which they would otherwise be respectively entitled if such amounts had been paid in full.

4.    ASSET TRANSFER OR ACQUISITION RIGHTS.

(a) An Acquisition or Asset Transfer (each as hereinafter defined) shall be deemed to be a liquidation of the Company, unless the holders of at least a majority of the outstanding Series Preferred, voting together as a single class on an as-converted to Common

Stock basis, elect otherwise by written notice given to the Company at least five (5) days prior to the effective date of any such Acquisition or Asset Transfer (a "*Deemed Liquidation*"). The Company shall not have the power to effect any transaction constituting a Deemed Liquidation unless the agreement or plan of merger or consolidation provides that the consideration payable to the stockholders of the Company shall be allocated among the holders of capital stock of the Company in accordance with Sections 3(a) and (b) above. The amount deemed paid or distributed to holders of capital stock of the Company upon any Deemed Liquidation shall be determined in accordance with Section 4(c) below.

(b) For the purposes of this Article IV: (i) "*Acquisition*" shall mean (A) any consolidation, stock exchange, merger of the Company with or into any other corporation or other entity or person, or any other corporate reorganization, in which the stockholders of the Company immediately prior to such consolidation, stock exchange, merger or reorganization, own less than fifty percent (50%) of the voting power of the surviving entity (or if the surviving entity is a wholly-owned subsidiary, its parent) immediately after such consolidation, stock exchange, merger or reorganization; or (B) any transaction or series of related transactions to which the Company is a party in which in excess of fifty percent (50%) of the Company's voting power is transferred; *provided* that an Acquisition shall not include any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by the Company or any successor or indebtedness of the Company is cancelled or converted or a combination thereof; and (ii) "*Asset Transfer*" shall mean a sale, lease transfer or other disposition of all or substantially all of the assets of the Company or the sale, exclusive license, conveyance, exchange or other transfer of all or substantially all of the intellectual property of the Company.

(c) In any Acquisition or Asset Transfer, if the consideration to be received is securities of a corporation or other property other than cash its fair market value as determined in good faith by the Board (including the affirmative approval of the Series Designee), on the date such determination is made shall be used in calculating the total consideration being paid for the business and the holders of Series Preferred shall receive the amount due to them pursuant to Section 3(a) and 3(b) based on the same determination; *provided, however,* that any publicly-traded securities to be distributed to stockholders will be valued as follows:

(i)     Securities not subject to investment letter or other similar restrictions on free marketability:

(A) If traded on a securities exchange, the value shall be deemed to be the average of the closing prices of the securities on such exchange over the thirty (30)-day period ending three (3) calendar days prior to the closing; and

(B) If actively traded over-the-counter, the value shall be deemed to be the average of the closing bid or sale prices (whichever are applicable) over the thirty (30)-day period ending three (3) calendar days prior to the closing.

5.

(ii)     The method of valuation of securities subject to investment letter or other restrictions on free marketability (other than restrictions arising solely by virtue of a stockholder's status as an affiliate or former affiliate) shall be to make an appropriate discount from the market value determined as above in Sections 4(c)(i)(A) and (B) to reflect the approximate fair market value thereof, as determined in good faith by the Board.

(d) Notwithstanding anything to the contrary in this Section 4, if the definitive transaction documents for an Acquisition or Asset Transfer provide for a different method of valuation, the method of valuation set forth in such documents shall control.

(e) **Allocation of Escrow.** In the event of a Deemed Liquidation, unless otherwise determined by holders of a majority of the Series Preferred, if any portion of the consideration payable to the stockholders of the Company is placed into escrow or is payable to the stockholders of the Company subject to contingencies, the definitive acquisition agreement relating thereto shall provide that (a) the portion of such consideration that is not placed in escrow and not subject to any contingencies (the *"Initial Consideration"*) shall be allocated among the holders of capital stock of the Company in accordance with Sections 3(a) and 3(b) as if the Initial Consideration were the only consideration payable in connection with such Deemed Liquidation and (b) any additional consideration which becomes payable to the stockholders of the Company upon release from escrow or satisfaction of contingencies shall be allocated among the holders of capital stock of the Company in accordance with Sections 3(a) and 3(b) after taking into account the previous payment of the Initial Consideration as part of the same transaction.

5.     CONVERSION RIGHTS.

The holders of the Series Preferred shall have the following rights with respect to the conversion of the Series Preferred into shares of Common Stock (the *"Conversion Rights"*):

(a) **Optional Conversion.**     Subject to and in compliance with the provisions of this Section 5, any shares of Series Preferred may, at the option of the holder, be converted at any time into fully-paid and nonassessable shares of Common Stock. The number of shares of Common Stock to which a holder of Series Preferred shall be entitled upon conversion shall be the product obtained by multiplying the applicable *"Series Preferred Conversion Rate"* then in effect for the Series Preferred (determined as provided in Section 5(b)) by the number of shares of Series Preferred being converted.

(b) **Series Preferred Conversion Rate.** The conversion rate in effect at any time for conversion of the Series Preferred (the *"Series Preferred Conversion Rate"*) shall be the quotient obtained by dividing the applicable Original Issue Price for such series of Series Preferred by the applicable *"Conversion Price"* for such series of Series Preferred, calculated as provided in Section 5(c).

(c) **Conversion Price.** The conversion price with respect to the Series A Preferred Stock shall initially be the Original Issue Price applicable to such series (as applicable,

the "*Conversion Price*"). Such initial Conversion Price shall be adjusted from time to time in accordance with this Section 5. All references to the Conversion Price herein shall mean the applicable Conversion Price as so adjusted.

(d) **Mechanics of Conversion.** Each holder of Series Preferred who desires to convert the same into shares of Common Stock pursuant to this Section 5 shall surrender the certificate or certificates therefor, duly endorsed, at the office of the Company or any transfer agent for the Series Preferred, and shall give written notice to the Company at such office that such holder elects to convert the same. Such notice shall state the number of shares of Series Preferred being converted. Thereupon, the Company shall promptly issue and deliver at such office to such holder a certificate or certificates for the number of shares of Common Stock to which such holder is entitled and shall promptly pay (i) at the election of each holder of Series Preferred in his, her or its sole discretion, in cash or in Common Stock (at the Common Stock's fair market value determined by the Board as of the date of such conversion), all accrued dividends and all declared and unpaid dividends on the shares of Series Preferred being converted and (ii) in cash (at the Common Stock's fair market value determined by the Board as of the date of conversion) the value of any fractional share of Common Stock otherwise issuable to any holder of Series Preferred. Such conversion shall be deemed to have been made at the close of business on the date of such surrender of the certificates representing the shares of Series Preferred to be converted, and the person or entity entitled to receive the shares of Common Stock issuable upon such conversion shall be treated for all purposes as the record holder of such shares of Common Stock on such date.

(e) **Adjustment for Stock Splits and Combinations.** If at any time or from time to time after the date that the first share of Series Preferred is issued (the "*Original Issue Date*") the Company effects a subdivision of the outstanding Common Stock without a corresponding subdivision of the Series Preferred, the Conversion Price in effect immediately before that subdivision shall be proportionately decreased. Conversely, if at any time or from time to time after the Original Issue Date the Company combines the outstanding shares of Common Stock into a smaller number of shares without a corresponding combination of the Series Preferred, the Conversion Price in effect immediately before the combination shall be proportionately increased. Any adjustment under this Section 5(e) shall become effective at the close of business on the date the subdivision or combination becomes effective.

(f) **Adjustment for Common Stock Dividends and Distributions.** If at any time or from time to time on or after the Original Issue Date the Company pays to holders of Common Stock a dividend or other distribution on the Common Stock in additional shares of Common Stock without a corresponding dividend or other distribution to holders of Series Preferred, the Conversion Price that is then in effect shall be decreased as of the time of such issuance, as provided below:

(i) Each Conversion Price for each series of Series Preferred shall be adjusted by multiplying each applicable Conversion Price then in effect by a fraction:

(A) the numerator of which is the total number of shares of Common Stock issued and outstanding immediately prior to the time of such issuance, and

7.

(B) the denominator of which is the total number of shares of Common Stock issued and outstanding immediately prior to the time of such issuance plus the number of shares of Common Stock issuable in payment of such dividend or distribution;

(ii)    If the Company fixes a record date to determine which holders of Common Stock are entitled to receive such dividend or other distribution, each Conversion Price shall be fixed as of the close of business on such record date and the number of shares of Common Stock shall be calculated immediately prior to the close of business on such record date; and

(iii)    If such record date is fixed and such dividend is not fully paid or if such distribution is not fully made on the date fixed therefor, each Conversion Price shall be recomputed accordingly as of the close of business on such record date and thereafter each Conversion Price shall be adjusted pursuant to this Section 5(f) to reflect the actual payment of such dividend or distribution.

(g) **Adjustment for Reclassification, Exchange, Substitution, Reorganization, Merger or Consolidation.** If at any time or from time to time on or after the Original Issue Date, the Common Stock issuable upon the conversion of the Series Preferred is changed into the same or a different number of shares of any class or classes of stock, whether by recapitalization, reclassification, merger, consolidation or otherwise (other than an Acquisition or Asset Transfer as defined in Section 4 or a subdivision or combination of shares or stock dividend or a reorganization, merger, consolidation or sale of assets provided for elsewhere in this Section 5), in any such event each holder of Series Preferred shall then have the right to convert such stock into the kind and amount of stock and other securities and property receivable upon such recapitalization, reclassification, merger, consolidation or other change by holders of the maximum number of shares of Common Stock into which such shares of Series Preferred could have been converted immediately prior to such recapitalization, reclassification, merger, consolidation or change, all subject to further adjustment as provided herein or with respect to such other securities or property by the terms thereof. In any such case, appropriate adjustment shall be made in the application of the provisions of this Section 5 with respect to the rights of the holders of Series Preferred after the capital reorganization to the end that the provisions of this Section 5 (including adjustment of any applicable Conversion Price then in effect and the number of shares issuable upon conversion of the Series Preferred) shall be applicable after that event and be as nearly equivalent as practicable.

(h) **Sale of Shares Below Conversion Price.**

(i)    If at any time or from time to time after the Original Issue Date, the Company issues or sells, or is deemed by the express provisions of this Section 5(h) to have issued or sold, Additional Shares of Common Stock (as defined below), other than as provided in Section 5(e), 5(f) or 5(g) above, for an Effective Price (as defined below) less than any applicable then effective Conversion Price (a "*Qualifying Dilutive Issuance*"), then and in each such case, the applicable then existing Conversion Price shall be reduced, as of the opening of business on the date of such issue or sale, to a price determined by multiplying the applicable Conversion Price in effect immediately prior to such issuance or sale by a fraction:

8.

(A) the numerator of which shall be (i) the number of shares of Common Stock deemed outstanding (as determined below) immediately prior to such issue or sale, plus (ii) the number of shares of Common Stock which the Aggregate Consideration (as defined below) received or deemed received by the Company for the total number of Additional Shares of Common Stock so issued would purchase at such then-effective Conversion Price for such series of Series Preferred, and

(B) the denominator of which shall be the number of shares of Common Stock deemed outstanding (as determined below) immediately prior to such issue or sale plus the total number of Additional Shares of Common Stock so issued.

(ii) For the purposes of the preceding sentence, the number of shares of Common Stock deemed to be outstanding as of a given date shall be the sum of (A) the number of actually issued and outstanding shares of Common Stock on the day immediately preceding the given date, plus (B) the number of shares of Common Stock into which the then outstanding shares of Series Preferred could be converted if fully converted on the day immediately preceding the given date, plus (C) the number of shares of Common Stock which could be obtained through the exercise or conversion of all other rights, options and convertible securities outstanding on the day immediately preceding the given date.

(iii) No adjustment shall be made to any Conversion Price in an amount less than one cent per share. Any adjustment otherwise required by this Section 5(h) that is not required to be made due to the preceding sentence shall be included in any subsequent adjustment to the applicable Conversion Price. Before taking any action which would cause an adjustment reducing the Conversion Price below the then par value of the shares of Common Stock issuable upon conversion of the Series Preferred, the Company will take any corporate action which may, in the opinion of its counsel, be necessary in order that the Company may validly and legally issue fully paid and nonassessable shares of Common Stock at such adjusted Conversion Price.

(iv) For the purpose of making any adjustment required under this Section 5(h), the aggregate consideration received by the Company for any issue or sale of securities (the "*Aggregate Consideration*") shall be computed as follows: (A) to the extent it consists of cash, Aggregate Consideration shall be computed at the gross amount of cash received by the Company without deduction of any commissions or other expenses payable by the Company, (B) to the extent it consists of property other than cash, Aggregate Consideration shall be computed at the fair value of that property as determined in good faith by the Board, and (C) if Additional Shares of Common Stock, Convertible Securities (as defined below) or rights or options to purchase either Additional Shares of Common Stock or Convertible Securities are issued or sold together with other stock or securities or other assets of the Company for a consideration which covers both, Aggregate Consideration shall be computed as the portion of the consideration so received that may be reasonably determined in good faith by the Board to be allocable to such Additional Shares of Common Stock, Convertible Securities or rights or options.

9.

556280/1/SANFRANCISCO

(v)    For the purpose of the adjustment required under this Section 5(h), if the Company issues or sells (x) Preferred Stock or other stock, options, warrants, purchase rights or other securities convertible into, Additional Shares of Common Stock (such convertible stock or securities being referred to as "*Convertible Securities*") or (y) rights or options for the purchase of Additional Shares of Common Stock or Convertible Securities and if the Effective Price of such Additional Shares of Common Stock is less than any Conversion Price, in each case the Company shall be deemed to have issued at the time of the issuance of such rights or options or Convertible Securities the maximum number of Additional Shares of Common Stock issuable upon exercise or conversion thereof and to have received as consideration for the issuance of such shares an amount equal to the total amount of the consideration, if any, received by the Company for the issuance of such rights or options or Convertible Securities plus:

(A) in the case of such rights or options, the minimum amounts of consideration, if any, payable to the Company upon the exercise of such rights or options; and

(B) in the case of Convertible Securities, the minimum amounts of consideration, if any, payable to the Company upon the conversion thereof (other than by cancellation of liabilities or obligations evidenced by such Convertible Securities); *provided* that if the minimum amounts of such consideration cannot be ascertained, but are a function of antidilution or similar protective clauses, the Company shall be deemed to have received the minimum amounts of consideration without reference to such clauses, or based on the applicable conversion cap, if any.

(C) If the minimum amount of consideration payable to the Company upon the exercise or conversion of rights, options or Convertible Securities is reduced over time or on the occurrence or non-occurrence of specified events other than by reason of antidilution adjustments, the Effective Price shall be recalculated using the figure to which such minimum amount of consideration is reduced; *provided further*, that if the minimum amount of consideration payable to the Company upon the exercise or conversion of such rights, options or Convertible Securities is subsequently increased, the Effective Price shall be again recalculated using the increased minimum amount of consideration payable to the Company upon the exercise or conversion of such rights, options or Convertible Securities.

(D) No further adjustment of any Conversion Price, as adjusted upon the issuance of such rights, options or Convertible Securities, shall be made as a result of the actual issuance of Additional Shares of Common Stock or the exercise of any such rights or options or the conversion of any such Convertible Securities. If any such rights or options or the conversion privilege represented by any such Convertible Securities shall expire without having been exercised, the applicable Conversion Price as adjusted upon the issuance of such rights, options or Convertible Securities shall be readjusted to the Conversion Price which would have been in effect had an adjustment been made on the basis that the only Additional Shares of Common Stock so issued were the Additional Shares of Common Stock, if any, actually issued or sold on the exercise of such rights or options or rights of conversion of such Convertible Securities, and such Additional Shares of Common Stock, if any, were issued or sold

10.

for the consideration actually received by the Company upon such exercise, plus the consideration, if any, actually received by the Company for the granting of all such rights or options, whether or not exercised, plus the consideration received for issuing or selling the Convertible Securities actually converted, plus the consideration, if any, actually received by the Company (other than by cancellation of liabilities or obligations evidenced by such Convertible Securities) on the conversion of such Convertible Securities, *provided* that such readjustment shall not apply to prior conversions of Series Preferred.

(vi)    For the purpose of making any adjustment to the Conversion Price for any series of Series Preferred required under this Section 5(h), "*Additional Shares of Common Stock*" shall mean all shares of Common Stock issued by the Company or deemed to be issued pursuant to this Section 5(h) (including shares of Common Stock subsequently reacquired or retired by the Company), other than:

(A)    shares of Common Stock issued upon conversion of the Series Preferred or as a dividend or distribution on the Series Preferred;

(B)    shares of Common Stock issued or issuable pursuant to the conversion of any debenture, warrant, option or other convertible security outstanding as of the Original Issue Date, or issued or issuable pursuant to the Sensoria, Inc. 2014 Equity Incentive Plan or any plan approved by the Board of Directors with the approval of the Series A Director;

(C)    shares of Common Stock issued in connection with any stock split, stock dividend or recapitalization by the Company;

(D)    shares of Common Stock issued pursuant to any equipment loan or leasing arrangement, real property leasing arrangement, or debt financing from a bank or similar financial or lending institution approved by the Board (including the affirmative approval of the Series Designee);

(E)    shares of Common Stock issued in connection with strategic transactions involving the Company and other entities, including (i) joint ventures, manufacturing, marketing or distribution arrangements or (ii) sponsored research, collaboration, technology license, technology transfer or development arrangements; *provided* that the issuance of shares therein has been approved by the Board (including the affirmative approval of the Series Designee);

(F) securities issued in an underwritten initial public offering of the Company; or

(G) any other securities issued by the Company so long as such transaction was approved by the Board (including the affirmative approval of the Series Designee) and by a majority of the Series Preferred.

References to Common Stock in the subsections of this clause (vi) above shall mean all shares of Common Stock issued by the Company or deemed to be issued pursuant to this

11.



Section 5(h).  The "*Effective Price*" of Additional Shares of Common Stock shall mean the quotient determined by dividing the total number of Additional Shares of Common Stock issued or sold, or deemed to have been issued or sold by the Company under this Section 5(h), into the Aggregate Consideration received, or deemed to have been received by the Company for such issue under this Section 5(h), for such Additional Shares of Common Stock.  In the event that the number of shares of Additional Shares of Common Stock or the Effective Price cannot be ascertained at the time of issuance, such Additional Shares of Common Stock shall be deemed issued immediately upon the occurrence of the first event that makes such number of shares or the Effective Price, as applicable, ascertainable.

(vii)   In the event that the Company issues or sells, or is deemed to have issued or sold, Additional Shares of Common Stock in a Qualifying Dilutive Issuance (the "*First Dilutive Issuance*"), then in the event that the Company issues or sells, or is deemed to have issued or sold, Additional Shares of Common Stock in a Qualifying Dilutive Issuance other than the First Dilutive Issuance as part of the same transaction or series of related transactions as the First Dilutive Issuance (a "*Subsequent Dilutive Issuance*"), then and in each such case upon a Subsequent Dilutive Issuance each applicable Conversion Price shall be reduced to the Conversion Price that would have been in effect had the First Dilutive Issuance and each Subsequent Dilutive Issuance all occurred on the closing date of the First Dilutive Issuance.

(i)  **Waiver of Antidilution Protection.**  Notwithstanding anything to the contrary, any provision of Section 5(h) and any adjustments made or required to be made to the Conversion Price pursuant hereto may be waived on behalf of all shares of Series Preferred by the vote or written consent of the holders of at least a majority of the outstanding shares of Series Preferred (voting on an as-converted to Common Stock basis).

(j)  **Certificate of Adjustment.**   In each case of an adjustment or readjustment of any Conversion Price for the number of shares of Common Stock or other securities issuable upon conversion of any series of Series Preferred, if such series of Series Preferred is then convertible pursuant to this Section 5, the Company, at its expense, shall compute such adjustment or readjustment in accordance with the provisions hereof and prepare a certificate showing such adjustment or readjustment, and shall mail such certificate, by first class mail, postage prepaid, to each registered holder of such series of Series Preferred at the holder's address as shown in the Company's books.  The certificate shall set forth such adjustment or readjustment, showing in detail the facts upon which such adjustment or readjustment is based, including a statement of (i) the consideration received or deemed to be received by the Company for any Additional Shares of Common Stock issued or sold or deemed to have been issued or sold, (ii) the applicable Conversion Price at the time in effect, (iii) the number of Additional Shares of Common Stock and (iv) the type and amount, if any, of other property which at the time would be received upon conversion of such series of Series Preferred.

(k)  **Notices of Record Date.**  Upon (i) any taking by the Company of a record of the holders of any class of securities for the purpose of determining the holders thereof who are entitled to receive any dividend or other distribution, or (ii) any Acquisition or other capital reorganization of the Company, any reclassification or recapitalization of the capital stock

12.

of the Company, any merger or consolidation of the Company with or into any other corporation, or any Asset Transfer, or any voluntary or involuntary dissolution, liquidation or winding up of the Company, the Company shall mail to each holder of Series Preferred at least ten (10) days prior to (x) the record date, if any, specified therein; or (y) if no record date is specified, the date upon which such action is to take effect (or, in either case, such shorter period approved by the holders of at least a majority of the outstanding Series Preferred, voting together as a single class on an as-if converted to Common Stock basis) a notice specifying (A) the date on which any such record is to be taken for the purpose of such dividend or distribution and a description of such dividend or distribution, (B) the date on which any such Acquisition, reorganization, reclassification, transfer, consolidation, merger, Asset Transfer, dissolution, liquidation or winding up is expected to become effective, and (C) the date, if any, that is to be fixed as to when the holders of record of Common Stock (or other securities) shall be entitled to exchange their shares of Common Stock (or other securities) for securities or other property deliverable upon such Acquisition, reorganization, reclassification, transfer, consolidation, merger, Asset Transfer, dissolution, liquidation or winding up.

(l) **Automatic Conversion to Common Stock.**

(i)     Each share of Series Preferred shall automatically be converted into shares of Common Stock, based on the then-effective applicable Conversion Price, (A) at any time upon the affirmative election of the holders of at least a majority of the outstanding shares of the Series Preferred, voting together as a single class on an as-if converted to Common Stock basis, or (B) immediately upon the closing of a firmly underwritten public offering pursuant to an effective registration statement under the Securities Act of 1933, as amended, covering the offer and sale of Common Stock for the account of the Company in which the gross cash proceeds to the Company (before deduction of underwriting discounts, commissions and expenses) are at least $100,000,000 (a "*Qualified Public Offering*"). Upon any such automatic conversion, all accrued dividends and all declared but unpaid dividends shall be paid in accordance with the provisions of Section 5(d).

(ii)     Upon the occurrence of either of the events specified in Sections 5(l)(i) (A) or (B) above, the outstanding shares of Series Preferred shall be converted automatically without any further action by the holders of such shares and whether or not the certificates representing such shares are surrendered to the Company or its transfer agent; *provided, however,* that the Company shall not be obligated to issue certificates evidencing the shares of Common Stock issuable upon such conversion unless the certificates evidencing shares of Series Preferred are either delivered to the Company or its transfer agent as provided below, or the holder notifies the Company or its transfer agent that such certificates have been lost, stolen or destroyed and executes an agreement satisfactory to the Company to indemnify the Company from any loss incurred by it in connection with such certificates. Upon the occurrence of such automatic conversion of the Series Preferred, the holders of Series Preferred shall surrender the certificates representing such shares at the office of the Company or any transfer agent for the Series Preferred. Thereupon, there shall be issued and delivered to such holder promptly at such office and in its name as shown on such surrendered certificate or certificates, a certificate or certificates for the number of shares of Common Stock into which such shares of Series Preferred surrendered were convertible on the date on which such automatic conversion occurred, and all

13.

accrued dividends and all declared but unpaid dividends shall be paid in accordance with the provisions of Section 5(d).

(m) **Fractional Shares.** No fractional shares of Common Stock shall be issued upon conversion of Series Preferred. All shares of Common Stock (including fractions thereof) issuable upon conversion of more than one share of Series Preferred by a holder thereof shall be aggregated for purposes of determining whether the conversion would result in the issuance of any fractional share. If, after the aforementioned aggregation, the conversion would result in the issuance of any fractional share, the Company shall, in lieu of issuing any fractional share, pay cash equal to the product of such fraction multiplied by the fair market value of one share of Common Stock (as determined by the Board) on the date of conversion.

(n) **Reservation of Stock Issuable Upon Conversion.** The Company shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock, solely for the purpose of effecting the conversion of the shares of the Series Preferred, such number of its shares of Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding shares of the Series Preferred. If at any time the number of authorized but unissued shares of Common Stock shall not be sufficient to effect the conversion of all then outstanding shares of the Series Preferred, the Company will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Common Stock to such number of shares as shall be sufficient for such purpose.

(o) **Notices.** Any notice required by the provisions of this Section 5 shall be in writing and shall be deemed effectively given: (i) upon personal delivery to the party to be notified, (ii) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient; if not, then on the next business day, (iii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (iv) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with verification of receipt. All notices shall be addressed to each holder of record at the address of such holder appearing on the books of the Company.

(p) **Payment of Taxes.** The Company will pay all taxes (other than taxes based upon income) and other governmental charges that may be imposed with respect to the issue or delivery of shares of Common Stock upon conversion of shares of Series Preferred, excluding any tax or other charge imposed in connection with any transfer involved in the issue and delivery of shares of Common Stock in a name other than that in which the shares of Series Preferred so converted were registered.

    6.    No Reissuance of Series Preferred.

No shares of Series Preferred acquired by the Company by reason of redemption, purchase, conversion or otherwise shall be reissued.

559280/1/SANFRANCISCO

## V.

A.     The liability of the directors of the Company for monetary damages shall be eliminated to the fullest extent under applicable law.

B.     To the fullest extent permitted by applicable law, the Company is authorized to provide indemnification of, and advancement of expenses to, directors, officers, employees, other agents of the Company and any other persons to which the DGCL permits the Company to provide indemnification.

C.     Any repeal or modification of this Article V shall only be prospective and shall not affect the rights under this Article V in effect at the time of the alleged occurrence of any action or omission to act giving rise to liability.

## VI.

For the management of the business and for the conduct of the affairs of the Company, and in further definition, limitation and regulation of the powers of the Company, of its directors and of its stockholders or any class thereof, as the case may be, it is further provided that:

A.     The management of the business and the conduct of the affairs of the Company shall be vested in its Board.  The number of directors which shall constitute the whole Board shall be fixed by the Board in the manner provided in the Bylaws, subject to any restrictions which may be set forth in this Amended and Restated Certificate of Incorporation.

B.     The Board is expressly empowered to adopt, amend or repeal the Bylaws of the Company.  The stockholders shall also have the power to adopt, amend or repeal the Bylaws of the Company; provided, however, that, in addition to any vote of the holders of any class or series of stock of the Company required by law or by this Amended and Restated Certificate of Incorporation, the affirmative vote of the holders of at least a majority of the voting power of all of the then-outstanding shares of the capital stock of the Company entitled to vote generally in the election of directors, voting together as a single class, shall be required to adopt, amend or repeal any provision of the Bylaws of the Company.

C.     The directors of the Company need not be elected by written ballot unless the Bylaws so provide.

## VII.

The Company renounces, to the fullest extent permitted by law, any interest or expectancy of the Company in, or in being offered an opportunity to participate in, any Excluded Opportunity.  An "**Excluded Opportunity**" is any matter, transaction or interest that is presented to, or acquired, created or developed by, or which otherwise comes into the possession of (i) any director of the Corporation who is not an employee of the Company or any of its subsidiaries, or (ii) any holder of Series Preferred or any partner, member, director, stockholder, employee or agent of any such holder, other than someone who is an employee of the Company or any of its subsidiaries (collectively, "**Covered Persons**"), unless such matter,

15.

transaction or interest is presented to, or acquired, created or developed by, or otherwise comes into the possession of, a Covered Person expressly and solely in such Covered Person's capacity as a director of the Company.

* * * *

[Remainder of page intentionally left blank.]

556280/1/SANFRANCISCO

162

IN WITNESS WHEREOF, Sensoria Inc. has caused this Amended and Restated Certificate of Incorporation to be signed by its Chief Executive Officer this 16th day of July, 2014.

SENSORIA INC.

By: _____

Name: Davide Viganò

Title: Chief Executive Officer